IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MID-CONTINENT CASUALTY COMPANY, | § § § | |
| | § | Civil Action No. 3:06-CV-1576-D |
| Plaintiff-counterdefendant, | § § | consolidated with Civil Action No. 3:06-CV-1578-D |
| | § | |
| VS. | § | |
| | § | **[SEALED OPINION]** |
| ELAND ENERGY, INC., et al., | § | |
| | § | |
| Defendants-counterplaintiffs. | § § | |

MEMORANDUM OPINION
AND ORDER

These consolidated lawsuits present an insurance coverage dispute involving commercial general liability and umbrella policies and relate to the escape of crude oil following Hurricanes Katrina and Rita, triggering the insureds' actual or potential liability to third parties.  From the insureds' perspective, the insurer has attempted to tender policy limits prematurely to avoid paying litigation defense costs and to secure a right of subrogation that would enable it to recover from a government fund, without correspondingly replenishing the policy limits.  The insurer's view regarding the Hurricane Katrina claim is that it paid policy limits in accordance with the terms of the policies and the requirements of law, and that it is the insureds who are miscreants, attempting without authority to place their claim in an unrecognized state of abeyance.  The insurer maintains that there is no coverage for the Hurricane Rita claim.  The parties have

filed cross-motions for summary judgment regarding the declaratory judgment, contractual, and extracontractual claims that the parties assert and that are somewhat typical of insurance litigation of this type. They have also filed motions related to expert witness testimony. Additionally, the insureds move for leave to amend their counterclaim.[1] For the reasons that follow, the court grants in part and denies in part both sides' summary judgment motions, grants the insureds leave to file a fourth amended counterclaim, grants the insurer leave to file a supplemental summary judgment motion, and declines to reach the merits of the expert witness motions.

I

A

Plaintiff-counterdefendant Mid-Continent Casualty Co. ("Mid-Continent") filed suit against defendants-counterplaintiffs Eland Energy, Inc. and Sundown Energy LP (collectively, "Sundown") seeking a declaratory judgment that it owed no further duty to defend or indemnify Sundown under either a commercial general liability policy ("Primary Policy")[2] or an umbrella policy

---

[1]The court also addresses related motions for an oral hearing and for leave to file a supplemental appendix.

[2]Policy No. 04-GL-000575872, for the period December 31, 2004 to December 31, 2005.

("Umbrella Policy")[3] and seeking affirmative reimbursement of attorney's fees and expenses incurred after it tendered the limits of the Primary Policy.   In a separate lawsuit filed on the same day, Sundown sued Mid-Continent asserting various contractual and extracontractual claims.   The cases were later consolidated.

The parties' dispute arises in connection with the escape of crude oil from storage tanks at Sundown's oil and gas facility near Port Sulphur, Louisiana, caused by Hurricane Katrina, and from the escape of this oil from a containment boom that Sundown was using during Hurricane Katrina cleanup operations, caused by Hurricane Rita.[4]   Hurricane Katrina struck the Louisiana coast on August 29, 2005, causing the release of crude oil from storage tanks at Sundown's facility and impacting the surrounding land, canals, and marsh.   The U.S. Coast Guard ("Coast Guard") mandated that Sundown clean up the affected sites.   While the cleanup operation was still underway, Hurricane Rita made landfall on September 24, 2005,

---

[3]Policy No. XS 136152, for the period December 31, 2004 to December 31, 2005.

[4]Where the background facts are undisputed, the court recounts them according to the summary judgment record developed through the parties' cross-motions.   Where the facts are materially disputed, the court recounts the evidence in a light favorable to the nonmovant on that issue and draws all reasonable inferences in favor of the nonmovant.   *See, e.g.*, *Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 617 n.2 (N.D. Tex. 2007) (Fitzwater, J.) (in context of cross-motions, construing evidence favorably to party against whom summary judgment was being entered) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

- 3 -

causing oil to escape from a containment boom that Sundown had installed to control the migration of crude oil that had originally escaped during Hurricane Katrina.

At the times pertinent to this lawsuit, Mid-Continent insured Sundown under the Primary Policy and the Umbrella Policy. The Primary Policy had limits of $1 million per occurrence and $2 million aggregate and included a duty to defend. Although the Primary Policy excluded pollution coverage, an Oil & Gas Endorsement provided coverage for a "Pollution Incident." The Umbrella Policy had an aggregate limit of $5 million and included a right, but not a duty, to associate with an underlying insurer and the insured to defend.

In addition to the Coast Guard's mandate that Sundown clean up the spill, five lawsuits (the "Underlying Lawsuits") were filed against Sundown by neighboring property owners and commercial fishermen affected by the Hurricane Katrina spillage. Three class actions—the *Blanchard*, *Barasich*, and *Danos* lawsuits (the "Underlying Class Action Lawsuits")—were filed in September 2005. Two individual lawsuits—the *Farac* and *Isla Corp.* cases (the "Underlying Individual Lawsuits")—were filed in August 2006. All of the Underlying Lawsuits were either filed in or removed to the United States District Court for the Eastern District of Louisiana ("Eastern District of Louisiana").

Sundown tendered the Underlying Lawsuits to Mid-Continent for

- 4 -

defense and indemnification. In October 2005 Mid-Continent informed Sundown that it would provide a defense in the Underlying Class Action Lawsuits, subject to a reservation of rights. Mid-Continent sent Sundown six reservation of rights letters, one that referenced the Primary Policy and one that referenced the Umbrella Policy for each of the Underlying Class Action Lawsuits. Mid-Continent appointed counsel to represent Sundown, but Sundown asserted that the reservation of rights created a conflict and that it was entitled to independent counsel. Mid-Continent agreed that Sundown could be represented by counsel of its choice——the firm of Jones, Walker, Waechter, Poitevent, Carrère & Denègre, L.L.P. ("Jones Walker")——provided that Jones Walker would be paid at Mid-Continent's typical rates for appointed counsel. Jones Walker began defending Sundown in the Underlying Class Action Lawsuits.

As required by the Coast Guard, Sundown undertook efforts to clean up the spilled oil. In October 2005 Sundown submitted invoices to Mid-Continent for cleanup costs so far incurred. Mid-Continent also monitored Sundown's cleanup costs through periodic reports from Sundown's insurance agent. Mid-Continent remitted a $853,943.15 payment to Sundown in November 2005, but Sundown returned the payment in December 2005, informing Mid-Continent that it wanted to hold its cleanup costs claim "in abeyance" and to use its insurance for the Underlying Class Action Lawsuits.

Mid-Continent rejected Sundown's request and asserted that it

had both the right and duty to pay the claim.   After monitoring cleanup costs that Mid-Continent maintains were well in excess of $1 million, it tendered to Sundown on March 22, 2006 a check for the $1 million limits of the Primary Policy, stating that it had received documentation indicating that Sundown's cleanup costs had exceeded that amount.   On August 18, 2006 Mid-Continent asserted in a letter signed by W. Steve Haltom ("Haltom"), its Assistant Vice-President, that Sundown's cleanup costs had now exceeded the Umbrella Policy limits, and it tendered to Sundown a $5 million check.   In connection with this tender, Mid-Continent also informed Sundown that it was withdrawing its defense of Sundown in the Underlying Class Action Lawsuits and would no longer reimburse Sundown for attorney's fees or other defense expenses.   Mid-Continent later refused to provide Sundown a defense in the Underlying Individual Lawsuits on the ground that the policy limits had been exhausted.   Sundown has declined to negotiate either the $1 million dollar check or the $5 million dollar check, both of which have been deposited into the court registry.

While the dispute concerning Sundown's Hurricane Katrina claim was in progress, Sundown submitted in July 2006 a claim for cleanup costs incurred from damage caused by Hurricane Rita.   Mid-Continent denied the Hurricane Rita claim in July 2007 on the ground that it was not a "Pollution Incident" under the Primary Policy and Oil & Gas Endorsement because there had been no new release of crude oil

caused by Hurricane Rita, and it has made no payments on that claim.

In simplified terms, Sundown maintains concerning its Hurricane Katrina claim that Mid-Continent improperly attempted to pay the combined $6 million limits of the Primary Policy and the Umbrella Policy, even though Sundown had reached only approximately $5.7 million in cleanup costs, so that Mid-Continent could invoke its contractual right to stop paying Sundown's third-party litigation defense costs in the Underlying Class Action Lawsuits and could also seek subrogation from a fund established under the Oil Pollution Act of 1990 ("OPA Fund"), all without replenishing Sundown's coverage limits under the policies.  Mid-Continent maintains that its timely payments of the combined policy limits for covered Hurricane Katrina claims, which it was legally obligated to pay and which it made when Sundown's liability for government-mandated cleanup costs had become reasonably clear, were authorized by contract and by law.   It seeks a favorable declaratory judgment concerning its duty to defend and indemnify Sundown.   Regarding Hurricane Rita, Sundown posits that Mid-Continent has failed to pay a covered claim, and Mid-Continent contends that the damages caused by Hurricane Rita did not result from a covered "Pollution Incident." Sundown asserts counterclaims for breach of contract and for extracontractual liability under Texas law based on Mid-Continent's handling of its Hurricane

Katrina and Hurricane Rita claims.

                                    B

     The following motions are pending for decision: (1) Sundown's
May  15,  2008  motion  for  partial  summary  judgment;  (2)
Mid-Continent's May 15, 2008 motion for summary judgment on the
affirmative claims in its first amended complaint for declaratory
judgment  and  as  to  all  counterclaims  of  defendants;  (3)
Mid-Continent's May 15, 2008 motion to exclude expert testimony;
(4) Sundown's May 15, 2008 motion to strike or alternatively to
limit Mid-Continent's expert witnesses; (5) Sundown's June 4, 2008
motion for hearing on its motion for partial summary judgment and
Mid-Continent's motion for summary judgment;[5] (6) Sundown's July 1,
2008 motion for leave to file unsealed supplemental appendix in
connection with its motion for partial summary judgment; and (7)
Sundown's July 1, 2008 motion for leave to file fourth amended
counterclaim.

     In the parties' cross-motions for summary judgment, Mid-
Continent seeks a declaratory judgment establishing that it has no
further duty to defend or indemnify Sundown under either the
Primary Policy or the Umbrella Policy because it has already paid

_____

[5]Sundown's motion for a hearing on its summary judgment motion
is denied.  *See* N.D. Tex. Civ. R. 7.1(g) ("Unless otherwise
directed by the presiding judge, oral  argument on a motion will
not be held.").  Despite the length of this memorandum opinion and
order and the number of issues and motions addressed, the court has
determined that oral argument would not materially assist the
court's decisional process.

policy limits under both policies.  It also moves for summary judgment dismissing all of Sundown's counterclaims.  Sundown moves for partial summary judgment on certain "points," i.e., issues that govern the parties' claims and counterclaims, and it seeks to establish that certain material facts are not genuinely at issue.[6]

C

Before the court addresses the specific grounds of the parties' motions, it will decide three preliminary issues that underlie this dispute and impact other claims at issue: first, whether Mid-Continent properly paid and exhausted the Primary Policy limits, thus terminating its duty to defend Sundown under the Primary Policy; second, whether Mid-Continent is obligated to defend Sundown, and has satisfied its duty to indemnify Sundown, under the Umbrella Policy; and third, whether Hurricane Rita caused a second "Pollution Incident" covered under the Primary Policy.

---

[6]This is authorized under Fed. R. Civ. P. 56(a) ("A party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of the claim."), 56(b) ("A party against whom relief is sought may move at any time, with or without supporting affidavits, for summary judgment on all or part of the claim."), and 56(d)(1) ("If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue.").

II

It is undisputed that Texas law applies in this diversity case.[7] Texas courts interpret insurance policies according to the rules of contract interpretation. *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 291 (5th Cir. 2005) (citing *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998)); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). ("Interpretation of insurance contracts in Texas is governed by the same rules as the interpretation of other contracts."). "In applying these rules, a court's primary concern is to ascertain the parties' intent as expressed in the language of the policy." *Int'l Ins. Co.*, 426 F.3d at 291; *see also Forbau*, 876 S.W.2d at 133 ("[T]he court's primary concern is to give effect to the written expression of the parties' intent."). The court must give effect to all of a policy's provisions so that none is rendered meaningless. *Int'l Ins. Co.*, 426 F.3d at 291. "If an insurance contract uses unambiguous language, [the court] must enforce it as written. If, however, a contract is susceptible to more than one reasonable interpretation, [the court] will resolve any ambiguity in favor of coverage." *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008) (footnotes omitted); *see also Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555

---

[7]Sundown asserts alternative claims under Louisiana law. Were the court not dismissing these claims, *see infra* § XVIII, it would apply Louisiana law in deciding them.

- 10 -

(Tex. 1991).   "[E]xceptions or limitations on liability are strictly construed against the insurer and in favor of the insured." *Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365, 371 (5th Cir. 2008) (quoting *Nat'l Union Fire Ins. Co., 811 S.W.2d at 555*).   Additionally, "[p]olicy terms are given their ordinary and commonly understood meaning unless the policy itself shows the parties intended a different, technical meaning," and the court must not "insert[ ] additional provisions into the contract." *Don's Bldg. Supply*, 267 S.W.3d at 23.   "Whether an insurance contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Int'l Ins. Co.*, 426 F.3d at 291 (citing *Kelley-Coppedge*, 980 S.W.2d at 464).

The parties' summary judgment burdens depend on whether they are addressing a claim or defense for which they will have the burden of proof at trial.   To be entitled to summary judgment on a matter for which it will have the burden of proof, a party "must establish 'beyond peradventure all of the essential elements of the claim or defense.'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).   The court has noted that the "beyond peradventure" standard is "heavy." *See, e.g.*, *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23,

- 11 -

2007) (Fitzwater, J.).

When the summary judgment movant will not have the burden of proof at trial, it need only point the court to the absence of evidence of any essential element of the opposing party's claim or defense. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once it does so, the nonmovant must go beyond its pleadings and designate specific facts demonstrating that there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant's failure to produce proof as to any essential element renders all other facts immaterial. *Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory where the nonmoving party fails to meet this burden. *Little*, 37 F.3d at 1076.

III

The court will address first whether Mid-Continent properly paid and exhausted the Primary Policy limits, i.e., whether Mid-Continent breached the Primary Policy when it exhausted the policy limits in paying for cleanup costs and withdrew on that basis from funding Sundown's defense of the Underlying Class Action Lawsuits.

A

The parties dispute whether the Primary Policy limits were exhausted, thus terminating Mid-Continent's duty to defend Sundown under the Primary Policy. The Primary Policy provides that Mid-Continent's "right and duty to defend ends when [Mid-Continent] ha[s] used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C." P. May 19, 2008 App. 20.[8] The Primary Policy has a limit of insurance of $1 million for each occurrence and an aggregate limit of $2 million.

Mid-Continent asserts that its duty to defend ended on March 22, 2006, when it tendered to Sundown a payment of $1 million in reimbursement for the government-mandated cleanup costs that Sundown had incurred. Sundown argues for two reasons that this attempted payment did not exhaust the Primary Policy limits and did not relieve Mid-Continent of its duty to defend: first, cleanup costs do not deplete the Primary Policy limits; and, second, even if they do, Mid-Continent could not exhaust the policy limits by paying for government-mandated cleanup costs because Sundown put its Hurricane Katrina cleanup costs claim "in abeyance."

---

[8]Because the parties have filed cross-motions, including separate appendixes in support of their respective motions, the court for clarity will refer to each appendix by the date filed.

B

Sundown contends that, under the terms of the Primary Policy, cleanup costs are not subject to the policy limits, that is, that Mid-Continent must pay for *all* the covered cleanup costs that Sundown incurs, regardless of the amount.  Sundown reasons that, under the standard commercial general liability policy form, the pollution exclusion would preclude coverage of cleanup costs altogether.  But the Primary Policy contains an Oil & Gas Endorsement that replaces the standard pollution exclusion.  Under the endorsement, "Property Damage" resulting from a "Pollution Incident" is not excluded from coverage, and "'Property Damage' . . . includes mandated 'clean-up costs' caused by a 'Pollution Incident.'"  P. May 19, 2008 App. 18.  Sundown argues that, because this provision of the Oil & Gas Endorsement does not explicitly say that property damage resulting from a "Pollution Incident" is included within the limits of insurance, it is not included and does not deplete the Primary Policy limits.  To support this argument, Sundown points to other main provisions of the Oil & Gas Endorsement that explicitly provide that other types of property damage are either included in the Primary Policy's limit of insurance or are subject to different limits.  Specifically, the other relevant provisions of the endorsement provide that (1) property damage caused by an "Underground Resources Hazard" is limited to $1 million in the aggregate, (2) property damage caused

by an "Underground Equipment Hazard" is limited to $100,000 in the aggregate, and (3) property damage caused by the blow-out or cratering of a well is included within the contractual "Limit of Insurance."   According to Sundown, it follows that because the endorsement does not explicitly address the limits that apply to property damage resulting from a "Pollution Incident," there are no limits.

Applying Texas rules of interpretation to the Primary Policy and the Oil & Gas Endorsement, the court rejects Sundown's reasoning.  First, the comparison to the other provisions of the Oil & Gas Endorsement is inapposite.  The provision that replaces the standard policy form's pollution exclusion and provides coverage for cleanup costs is the only provision in the endorsement that replaces an exclusion and extends coverage to property damage that would be excluded under the standard policy form.  The function of the other cited provisions of the endorsement is to reduce the limits of insurance (i.e., the aggregate limits) that apply to specific types of property damage already covered by the Primary Policy.  Because these provisions serve a fundamentally different purpose than the provision concerning "'Property Damage' resulting from a 'Pollution Incident,'" Sundown's interpretation of the Oil & Gas Endorsement lacks force.

Second, the Primary Policy, including the endorsements, must be read as a whole.  *See Kelley-Coppedge*, 980 S.W.2d at 464.  When

- 15 -

read in its entirety, the Primary Policy unambiguously includes "'Property Damage' resulting from a 'Pollution Incident'" within its limits of insurance.   Coverage A of the Primary Policy[9] obligates Mid-Continent to pay sums that Sundown becomes obligated to pay because of covered "property damage," and it provides that the amount Mid-Continent "will pay for damages is limited as described in Section III — Limits Of Insurance." P. May 19, 2008 App. 20.  "Section III — Limits Of Insurance" provides that the "Each Occurrence Limit is the most [Mid-Continent] will pay for the sum of . . . Damages under Coverage A . . . because of all 'bodily injury' and 'property damage' arising out of any one 'occurrence[.]'" *Id.* at 28.  The "Each Occurrence Limit" shown on the declaration page of the Primary Policy is $1 million.  *Id.* at 15.  The Oil & Gas Endorsement replaces the standard policy form's pollution exclusion and explicitly provides that Coverage A includes "'Property Damage' resulting from a 'Pollution Incident'" *Id.* at 18.  The endorsement does not provide that such property damage is subject to a different limit of insurance than would otherwise apply.  Instead, it provides that "[a]ll other terms, conditions and exclusions remain unchanged."  *Id.* at 19. Therefore, properly interpreted, the Oil & Gas Endorsement extends the coverage of the Primary Policy to "'Property Damage' resulting

---

[9]The coverage at issue in the present case is Coverage A: "Bodily Injury and Property Damage Liability."

from a 'Pollution Incident,'" but it leaves in place the limits of insurance contained in the policy.

Sundown briefly argues that, because coverage of cleanup costs is triggered by a "Pollution Incident" and not an "occurrence," the "Each Occurrence Limit" does not apply to cleanup costs. This argument is also unavailing, and it does not accurately interpret the Primary Policy. For *any* property damage to be covered, it must be caused by an "occurrence." *Id.* at 20 ("This insurance applies to . . . 'property damage' only if . . . caused by an 'occurrence[.]'"). An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 32. Policy exclusions, however, preclude coverage of certain types of property damage. Under the Oil & Gas Endorsement, property damage arising from pollution is excluded from coverage except with respect to "'Property Damage' resulting from a 'Pollution Incident,'" *id.* at 18, which is defined as "the sudden and accidental emission, discharge, release or escape of pollutants into or upon the land, atmosphere or any water course or body of water, provided that such emission, discharge, release or escape emanates from operations conducted on land and results in 'Bodily Injury' or 'Property Damage[,]'" *id.* at 19. Property damage resulting from a "Pollution Incident" is an exception to the general pollution exclusion, but it does not trigger coverage by itself. As the terms are defined

- 17 -

in the Primary Policy, a "Pollution Incident" also clearly constitutes an "occurrence." Therefore, property damage is not exempt from the "Each Occurrence Limit" simply because it results from a "Pollution Incident" rather than from other types of "occurrences." Under the unambiguous terms of the Primary Policy, property damage arising from a "Pollution Incident" is subject to the policy's applicable limits of insurance, which are a per occurrence limit of $1 million and an aggregate limit of $2 million. Accordingly, Mid-Continent's payment of cleanup costs depleted the Primary Policy's limits.

C

Sundown also maintains that, even if cleanup costs deplete the Primary Policy limits, Mid-Continent could not exhaust the limits by paying for government-mandated cleanup costs on March 22, 2006 because Sundown had previously placed its Hurricane Katrina cleanup costs claim "in abeyance."[10]

---

[10]As the court discusses *infra* at § III(C)(3), Sundown offers no basis for placing a claim "in abeyance" in the insurance context, and it does not elaborate on the concept of "abeyance." Generally, the term "abeyance" means a state of suspension. *See Black's Law Dictionary* 4 (8th ed. 2004) (defining the term, in relevant part, as "[t]emporary inactivity; suspension"); Bryan A. Garner, *A Dictionary of Modern Legal Usage* 5 (2d ed. 1995) (defining the term, in relevant part, as "a state of suspension, temporary nonexistence, or inactivity" (quoting *The Oxford English Dictionary* (2d ed. 1989))); *The American Heritage Dictionary* 67 (2d college ed. 1991) ("The condition of being temporarily set aside; suspension.").

1

On September 12, 2005 Sundown submitted a "General Liability Notice of Occurrence/Claim" form concerning the Hurricane Katrina cleanup.  In a December 2, 2005 letter, after Mid-Continent had sent Sundown an $853,943.15 partial payment for the Hurricane Katrina cleanup costs that Sundown had incurred, Sundown returned the payment and informed Mid-Continent that it was placing its cleanup costs claim in abeyance:

> Please be advised that [Sundown] has decided to hold its claim for clean-up expenses in abeyance at this time and to persevere in its claim under the three existing class action lawsuits and any other storm-related lawsuits that may be filed in the future.  While we reserve our right to reactivate the clean-up claim in the future, should the lawsuits not exhaust Mid-Continent's primary and excess limits, we believe it is in the best interests of [Sundown] to put our clean-up claim on hold for the time being.

*Id.* at 87.  Sundown asserts that Mid-Continent could not make any more cleanup costs payments after Sundown placed its claim in abeyance, and that Mid-Continent was obligated to continue defending it in the Underlying Class Action Lawsuits.

Mid-Continent responds that neither Texas law nor the terms of the Primary Policy allowed an insured like Sundown to place a claim in abeyance.  Furthermore, Mid-Continent contends that it had the right under the Primary Policy to investigate any occurrence and settle any resulting claim, including the government-mandated cleanup costs.  Mid-Continent's current position is the same one it

took in its response to Sundown's request to place its claim in abeyance.  In its March 22, 2006 letter, Mid-Continent asserted:

> Neither the terms of [Mid-Continent's] policy, nor Texas law, recognize[s] the holding of a claim "in abeyance" in these circumstances. The only language of the policy that addresses this issue would appear to be the insuring agreement.  Under the insuring agreement, the investigation and settlement of claims is at the discretion of [Mid-Continent].

*Id.* at 90.  In this letter, Mid-Continent also enclosed a check for $1 million, stating that, based on information that Mid-Continent had received from Sundown or developed on its own, it was Mid-Continent's "belief that the covered [government] mandated cleanup costs associated with this claim now clearly exceed the $1,000,000.00 policy limit." *Id.*  Mid-Continent asserts that this payment exhausted the Primary Policy limits and terminated its duties under the Primary Policy.

2

Before addressing the abeyance issue, the court will discuss the preliminary question of how the government-mandated cleanup costs fit into the Primary Policy's coverage.  Coverage A of the Primary Policy provides that Mid-Continent "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." *Id.* at 20.  The Oil & Gas Endorsement explicitly provides that "'Property Damage' . . . includes mandated 'clean-up costs.'" *Id.* at 18.  The parties do not dispute that the

Hurricane Katrina cleanup costs, which Sundown was mandated to incur by the Coast Guard, constitute damages covered under the Primary Policy.  It follows, and it is also undisputed, that the mandated cleanup costs represent a third-party claim rather than a first-party claim.  *See Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 17 (Tex. 2007) ("[A] first-party claim is stated when 'an insured seeks recovery for the insured's own loss,' whereas a third-party claim is stated when 'an insured seeks coverage for injuries to a third party.'" (quoting *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 54 n.2 (Tex. 1997))).  The covered cleanup costs constitute property damage suffered by a third party, and a government agency has mandated that Sundown pay to clean up this damage.

The cleanup costs were also sums that Sundown was "legally obligated" to pay, and sums that Sundown did in fact pay.  Although Sundown appears to agree with this in parts of its briefing,[11] at other times it implies that it was not yet legally obligated to pay for the cleanup costs.  Sundown does not argue that it could have chosen to ignore the government mandate, opted not to clean up the spilled oil, or decided not to incur the cleanup costs.  But it

---

[11]For example, Sundown states in its response to Mid-Continent's motion for summary judgment: "While Mid-Continent's Primary Policy required it to pay damages that Sundown became legally obligated to pay, Sundown's placement of its Hurricane Katrina clean-up claim in abeyance suspended Mid-Continent's duty." Ds. June 4, 2008 Br. 21.

contends that it was not yet legally obligated to pay for these costs because there was a possibility that it could recover the expenses from the OPA Fund if it could prove that the spill was caused solely by an "act of God."  The possibility that Sundown could recover cleanup costs neither changes the fact that Sundown was legally obligated to incur the government-mandated cleanup costs nor alters how the Primary Policy and the Oil & Gas Endorsement worked in tandem to provide coverage.  Under the Primary Policy, Mid-Continent obligated itself to "pay those sums that [Sundown] becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies."  P. May 19, 2008 App. 20.  Under the Oil & Gas Endorsement, "'Property Damage' resulting from a 'Pollution Incident' includes mandated 'clean-up costs' caused by a 'Pollution Incident[.]'" *Id.* at 18.  Therefore, when Sundown faced——as it did here——mandated cleanup costs resulting from a pollution incident, Mid-Continent became obligated to pay to Sundown the cleanup costs that it incurred.  Moreover, Sundown's reasoning unjustifiably compromises Mid-Continent's subrogation rights[12] and, if taken to its logical conclusion, means that an insurer need not pay a claim so long as

---

[12]Under the "Transfer Of Rights Of Recovery Against Others To Us" provision of the Primary Policy, "[i]f the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us.  The insured must do nothing after loss to impair them.  At our request, the insured will bring 'suit' or transfer those rights to us and help us enforce them."  P. May 19, 2008 App. 30.

there are recovery options that remain available to the insured. That is not how the Primary Policy works. The Coast Guard mandated that Sundown clean up the oil spill, and Sundown was "legally obligated" to do so. Additionally, the Fifth Circuit has held, under Texas law and in the context of similar policies, that environmental cleanup costs, even when the insured voluntarily undertakes the cleanup, constitute damages that an insured is obligated to pay. *Int'l Ins. Co.*, 426 F.3d at 287-88; *SnyderGeneral Corp. v. Century Indem. Co.*, 113 F.3d 536, 539 (5th Cir. 1997); *see also Anderson Dev. Co. v. Travelers Indem. Co.*, 49 F.3d 1128, 1133 (6th Cir. 1995) (applying Michigan law and holding that environmental cleanup costs mandated by the EPA constituted damages the insured was legally obligated to pay and that "[t]he fact that the insured cooperates and assumes the obligation to conduct the clean-up, rather than forcing the EPA to incur the expenses of a clean-up and then bring a coercive suit, does not change the bottom line that a legal obligation exists").

In support of its argument, Sundown also cites Mid-Continent's original response to its claim, in which Mid-Continent stated that "[a]t this time we [are] not sure if [Sundown] would have a *legal obligation* to undertake the clean up effort. It is our belief, based on the limited information we have at this time, the act of God exception to liability under CERCLA may inure to the benefit of [Sundown]." P. May 19, 2008 App. 70. As the response indicates,

- 23 -

Mid-Continent possessed limited information at the time, and it did not know whether the cleanup had been mandated by a government agency. After receiving more information, Mid-Continent determined that Sundown was legally obligated to incur the cleanup costs, and that Mid-Continent was contractually required to pay for the costs under the Primary Policy.

Accordingly, the court holds that Sundown's Hurricane Katrina cleanup costs were sums that it had become legally obligated to pay as damages because of covered property damage, and that Mid-Continent was required to pay them under Coverage A of the Primary Policy.

3

Sundown contends that, after it placed its claim in abeyance, Mid-Continent was no longer obligated to, and could not, pay the claim. It argues that it was entitled as a matter of law to place its claim in abeyance. What Sundown does not explain, however, is what gave it the right to place its claim in abeyance. It offers no Texas statutory or common law basis for this assertion, and the court has found none. Because there is no statutory or common law predicate for a right of abeyance, the court looks to the Primary Policy. Again, Sundown has offered no contractual basis for placing its claim in abeyance, and it concedes that the "Primary Policy says nothing about abeyance one way or the other." Ds. June

4, 2008 Br. 20.[13]   The court has also been unable to locate any provision in the Primary Policy that could be interpreted as even suggesting a right to place a claim in abeyance.

Additionally, the concept of abeyance directly conflicts with Mid-Continent's rights under the Primary Policy.   The court's main concern when construing an insurance contract is to ascertain the intent of the parties as expressed in the language of the policy, viewing the contract as a whole.   *See Kelley-Coppedge*, 980 S.W.2d at 464.   It is clear from the Primary Policy that Mid-Continent has the right to settle third-party claims, which government-mandated cleanup costs undisputedly are.   The Primary Policy provides that Mid-Continent "may, at [its] discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result."   P. May 19, 2008 App. 20.   It is also clear from the Primary Policy that Sundown, as the insured, may not interfere with Mid-Continent's right.   Sundown has the duty to "[c]ooperate with [Mid-Continent] in the investigation or settlement of the claim or defense against the 'suit.'"   *Id*. at 29.   The Primary Policy also provides that "[n]o insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without [Mid-Continent's] consent."   *Id.*   The Primary Policy does not contain a "consent to

---

[13]As with the parties' appendixes, the court cites their briefs by the date filed.

- 25 -

settle" provision, which would require Mid-Continent to obtain Sundown's consent before settling a claim, and the court cannot add such a provision to the policy. *See, e.g.*, *Wayne Duddlesten, Inc. v. Highland Ins. Co.*, 110 S.W.3d 85, 90 (Tex. App. 2003, pet. denied). Sundown does not have the right to dictate when third-party claims are settled, which would be the effect of placing a cleanup costs claim in abeyance.

Embedded in Sundown's abeyance argument is the premise that Mid-Continent lacked the right to exhaust the Primary Policy limits and terminate its duty to defend by tendering Sundown a payment for policy limits. Under the Primary Policy, Mid-Continent's "right and duty to defend ends when [Mid-Continent has] used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B." P. May 19, 2008 App. 20. Sundown contends that Mid-Continent's attempted payment to Sundown is not a "payment of judgment or settlement" because Sundown did not accept it. As discussed above, it is Mid-Continent who has the right under the Primary Policy to settle third-party claims, not Sundown. The circumstances of this case take it outside the scope of the more typical commercial liability claim because, although the government-mandated cleanup costs are third-party claims, they operate in practice like (and the parties have treated them as) first-party claims in the sense that the insured pays them and then seeks reimbursement from the insurer. But this arrangement——which

- 26 -

is probably typical of mandated cleanup costs——does not change the fact that Mid-Continent, as the insurer, has the obligation and the right to pay covered third-party claims.   The only way that an insurer can perform in these circumstances is to pay the insured the mandated cleanup costs that it has incurred.   Sundown cannot effectively prevent Mid-Continent from paying property damage (mandated cleanup costs) by refusing to accept Mid-Continent's check.   Cleanup costs mandated by the government are property damages that Sundown is legally obligated to pay, and they are the functional equivalent of "judgments or settlements" under Coverage A that, when paid, exhaust the limits of insurance.   *See County of Santa Clara v. U.S. Fid. & Guar. Co.*, 868 F. Supp. 274, 279 (N.D. Cal. 1994) (holding that remedial action order requiring insured to remediate mercury contamination was "functional equivalent of a final adjudication of liability sufficient to exhaust primary indemnity limits").   The court has already concluded that cleanup costs constitute property damage that depletes the policy limits. Thus by paying $1 million of the cleanup costs, Mid-Continent has "used up the applicable limit of insurance in the payment of judgments or settlements." P. May 19, 2008 App. 20.   After Mid-Continent exhausted the Primary Policy limits, it had neither the duty nor the right to defend Sundown.

Underlying Sundown's abeyance argument is its desire to pursue reimbursement of the government-mandated cleanup costs from the OPA

Fund. Sundown wants to see if it can successfully pursue reimbursement before Mid-Continent pays the cleanup costs and exhausts the Primary Policy limits. It apparently recognizes that once Mid-Continent pays for the cleanup costs, Mid-Continent will have no further duty to pay for the defense of Sundown in the Underlying Lawsuits, and that Mid-Continent, through its subrogation rights, will be entitled to any reimbursement from the OPA Fund. Although Sundown essentially argues that this outcome would be unfair, it is the outcome clearly provided for by the Primary Policy. The policy confers on Mid-Continent the obligation and the right to pay covered claims, which the government-mandated cleanup costs undisputedly are, and it gives subrogation rights to Mid-Continent as well. Despite Sundown's preference that Mid-Continent fund Sundown's defense of the Underlying Lawsuits before exhausting the Primary Policy limits, Mid-Continent has no contractual or legal obligation to do so. Under the Primary Policy, Mid-Continent is only required to indemnify Sundown for $1 million in property damage arising out of an occurrence, and Mid-Continent's payment of the cleanup costs has satisfied this duty concerning the Hurricane Katrina oil spill.

4

Sundown also argues that Mid-Continent waived its right to object to abeyance. "Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with that right."

- 28 -

*Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 189 (Tex. App. 2003, pet. denied) (citing *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) (per curiam)). Waiver is an issue on which Sundown will have the burden of proof at trial. *See, e.g., Days Inn Worldwide, Inc. v. Sonia Invs.*, 2006 WL 3103912, at *13 (N.D. Tex. Nov. 2, 2006) (Fitzwater, J.). A reasonable jury could not find from the evidence that Mid-Continent intended to waive its right to object to abeyance.

First, Mid-Continent could not have intended to waive the right to object to abeyance because, until Sundown attempted to place its claim in abeyance, Mid-Continent was unaware of this concept. For an insurer to waive a right, it must know about the right and intend to release it. *See Comsys Info. Tech. Servs.*, 130 S.W.3d at 189. Sundown has not offered evidence that Mid-Continent was familiar with the concept of abeyance, and, as the court has discussed, there is no basis for an insured's placing a claim in abeyance under Texas law or the Primary Policy.

Second, Haltom's conduct during early meetings with Sundown would not enable a reasonable jury to find that Mid-Continent waived its right to object to Sundown's holding the claim in abeyance. Sundown's entire argument in this respect is as follows:

> Haltom's conduct and statements in the early meetings with Sundown demonstrated that Mid-Continent believed (albeit erroneously) that it had the right to immediately pay its policy limits for clean-up costs and get out of defending any lawsuits. Despite this

> belief, Haltom stated that Mid-Continent would
> not do this, but instead would give priority
> to the defense and indemnity of the lawsuits.
> Accordingly, Haltom's statements waived Mid-
> Continent's right to later change its position
> and refuse to allow Sundown to place its
> Hurricane Katrina claim in abeyance.
>
> Should Haltom attempt to dispute these
> facts, then at most this would raise an issue
> of material fact for trial, barring summary
> judgment.

Ds. June 4, 2008 Br. 25-26 (citations omitted).

The only evidence Sundown cites in support of waiver is the affidavit of its insurance agent, Gary Ray ("Ray"). *Id.* at 26 (citing Ds. June 5, 2008 App. 354-370). Although Sundown cites generally to the entire affidavit—a violation of N.D. Tex. Civ. R. 56.5(c) ("A party whose motion or response is accompanied by an appendix must include in its brief citations to each page of the appendix that supports each assertion that the party makes concerning the summary judgment evidence.")—it presumably intends to rely on Ray's recollection of Haltom's statements during a September 21, 2005 meeting. According to Ray, Haltom stated that "he thought the clean-up costs would exceed the policy limits, and that Mid-Continent would be entitled to put up its policy limits for clean-up, but that instead, Mid-Continent would give priority to defense and settlement of the lawsuits and attempt to conserve on spending for the clean-up as much as possible." Ds. June 5, 2008 App. 357. During this meeting, the parties also allegedly discussed whether a government mandate existed for the cleanup, the

potential recovery of cleanup costs from the OPA Fund, and how Sundown could minimize cleanup costs.

A reasonable jury could not find from this evidence that Mid-Continent intended to waive its right to tender the limits of the Primary Policy when it became legally obligated to do so.  Even when viewed favorably to Sundown as the summary judgment nonmovant, Haltom's statements say nothing about the subject of holding a claim in abeyance.  And as the court concludes above, Mid-Continent could not have intended to waive the right to object to abeyance when it was unaware of this concept.  The September 21, 2005 meeting preceded by several months the letter of December 2, 2005, in which Sundown first requested that its claim be put in abeyance.

Moreover, because Haltom did not address the subject of abeyance directly, Sundown is necessarily arguing that this was *the effect* of what he was saying, that is, that by stating that Mid-Continent believed it had the right to pay policy limits immediately, but would not do so and would give priority to defending and settling the lawsuits and to conserving spending for the cleanup, Mid-Continent intended to waive its right to object when Sundown later asked that a claim be held in abeyance.  But a reasonable jury could not find that Haltom intended his statements to express anything more than a present intended course of conduct, not an intentional relinquishment, once and for all, of Mid-Continent's contractual right to tender the policy limits when the

terms of the policy permitted.   This is particularly true since Sundown's stated intent to place its claim in abeyance did not enter the picture until months later.

Accordingly, Sundown cannot rely on waiver to establish a right to place its claim in abeyance.

5

Accordingly, the court concludes that there was no basis for Sundown to place its claim in abeyance, and it could not suspend Mid-Continent's right and obligation to pay for the government-mandated cleanup costs under the Primary Policy.   Mid-Continent exhausted the applicable limits of the Primary Policy by tendering a $1 million check to Sundown on March 22, 2006 for the government-mandated cleanup costs that Sundown had incurred.   Thus Mid-Continent's duty to defend Sundown under the Primary Policy against suits seeking damages arising out of Hurricane Katrina ceased on March 22, 2006.   Mid-Continent also has no further duty to indemnify Sundown under the Primary Policy for property damage arising out of Hurricane Katrina.

D

In addition to Sundown's general abeyance arguments and its abeyance arguments concerning the Primary Policy, Sundown argues that the *Umbrella Policy* required that its Hurricane Katrina

- 32 -

cleanup costs claim be placed in abeyance.[14]   As the court has already concluded, there is no basis for placing a claim in abeyance under Texas law or the Primary Policy.   Likewise, the Umbrella Policy provides no predicate for Sundown to place its claim in abeyance.   Sundown's real argument, however, essentially has nothing to do with abeyance.   Sundown contends that Mid-Continent cannot pay for cleanup costs under the terms of the Umbrella Policy until Sundown's claim for reimbursement from the OPA Fund is determined.   The court addresses this issue below.   *See infra* § IV(D).

IV

The court turns next to the question whether Mid-Continent is obligated to defend, and has satisfied its duty to indemnify, Sundown under the Umbrella Policy.

A

The parties dispute whether Mid-Continent breached a duty to Sundown when it withdrew its defense of Sundown in the Underlying Class Action Lawsuits.   Mid-Continent ceased paying for Sundown's defense on August 18, 2006, when it tendered the $5 million limits of the Umbrella Policy.   Mid-Continent moves for summary judgment

---

[14]As a preliminary matter, Sundown has offered no evidence that it even attempted to place the cleanup costs claim in abeyance under the Umbrella Policy.   The letter in which Sundown notified Mid-Continent that it was placing the cleanup costs claim in abeyance only referred to the Primary Policy.   Because the court concludes that there is no basis for abeyance under the Umbrella Policy, however, it need not address this issue.

declaring that it owes no further duty to defend Sundown under the Umbrella Policy.  Sundown seeks summary judgment holding that Mid-Continent is not entitled to withdraw its defense of Sundown until the Umbrella Policy limits are exhausted.  Sundown maintains, first, that Mid-Continent exercised its right to defend Sundown under the Umbrella Policy, and, second, that the exercise of this right obligates Mid-Continent to continue the defense until the Umbrella Policy limits are exhausted.  Mid-Continent disputes both parts of Sundown's theory.  It contends that it never exercised its right to defend Sundown under the Umbrella Policy.  And it further asserts that even if it did exercise this right, it did not thereby assume a duty to defend Sundown until exhaustion of the Umbrella Policy limits.  Rather, Mid-Continent posits that it retained the right to unilaterally withdraw from the defense at any time.

B

The court considers first whether there is any basis in the language of the Umbrella Policy to impose on Mid-Continent a duty to defend.

1

"[T]he duty to defend is contractual, and if there is no contract to defend, there is no duty to defend." *Daca, Inc. v. Commonwealth Land Title Ins. Co.*, 822 S.W.2d 360, 364 (Tex. App. 1992, writ denied).  The question whether Mid-Continent breached a duty to Sundown by withdrawing its defense therefore depends on an

- 34 -

interpretation of the Umbrella Policy's relevant language. As explained above, *see supra* § II, in Texas, interpretation of insurance contracts is governed by the same rules as is the interpretation of other contracts. The court's primary concern is to give effect to the written expression of the parties' intent. If an insurance contract uses unambiguous language, the court must enforce it as written. But if a contract is susceptible to more than one reasonable interpretation, the court will resolve any ambiguity in favor of coverage. Policy terms are given their ordinary and commonly understood meaning unless the policy itself shows the parties intended a different, technical meaning, and the court must not insert additional provisions into the contract.

2

With these principles in mind, the court turns to the relevant language of the Umbrella Policy:

> 1.   Insuring Agreement
>
> a.   We will indemnify the insured for ultimate net loss in excess of the retained limit because of bodily injury or property damage to which this insurance applies. We will have *the right* to associate with the underlying insurer and the insured to defend any claim or suit seeking damages for bodily injury or property damage to which this insurance applies. But:
>
> . . .
>
> (2) We have *a right to defend* any claims or suits to which this insurance applies but which are not covered by any underlying insurance shown in the Declarations; we also

- 35 -

> have the *right to defend* such claims or suits
> if the applicable limit of underlying
> insurance is exhausted;
>
> (3) At our discretion, we may investigate any
> occurrence and settle any claim or suit that
> we have a right to defend; and
>
> (4) *Our right to defend* any existing or future
> suits end [sic] when we have exhausted the
> applicable Limit of Insurance in
> indemnification of judgments or settlements
> under Coverage A and B.

P. May 19, 2008 App. 40 (bold font omitted) (italics added). The terms of the Umbrella Policy plainly grant Mid-Continent the right——but do not impose a duty——to defend Sundown against suits seeking damages for bodily injury or property damage to which the Umbrella Policy applies. Notably absent is the word "duty" or a synonymous term. By contrast, under the Primary Policy, Mid-Continent has the "right *and duty*" to defend Sundown against suits seeking damages for, *inter alia*, property damage to which the Primary Policy applies. *Id.* at 20 (emphasis added). Viewed together, the policies make clear that the parties intended that Mid-Continent assume a duty to defend Sundown under the Primary Policy but not under the Umbrella Policy.

Further, this distinction is consistent with the differing purposes of primary and umbrella policies and the premiums charged for each.

> Excess insurers are able to provide relatively
> inexpensive insurance with high policy limits
> because they require the insured to contract
> for underlying primary insurance with another

> carrier.   The   primary   carrier   generally
> provides a much lower amount of coverage, but
> must insure against what is likely to be a
> greater number of claims and must provide a
> defense.   The   premiums   charged   are   thus   a
> reflection of the risks undertaken.

*Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
20 S.W.3d 692, 700-01 (Tex. 2000) (citations omitted).

This interpretation is in accord with that of other courts, including those in Texas that have considered comparable policy language.  In *Laster v. American National Fire Insurance Company*, 775 F. Supp. 985 (N.D. Tex. 1991) (McBryde, J.), a case decided by this court and cited by both parties, the insurance policy provided that the insurer "shall" defend certain suits against the insured. *Id*. at 994.  An endorsement to the policy, however, substituted the word "may" for the word "shall." *Id*.  Judge McBryde concluded that this "drastic change" clearly indicated that the insurer had the "option" but not the "obligation" to defend its insured. *Id; see also Comsys Info. Tech. Servs.*, 130 S.W.3d at 190 (holding insurer not obligated to defend insured where policy provided that insurer had the "right but not the duty to assume control of the defense"); *B&D Appraisals v. Gaudette Mach. Movers, Inc.*, 752 F. Supp. 554, 556-58 (D.R.I. 1990) (holding same where policy provided that insurer "reserves the right at its sole option to defend" certain actions against the insured).

C

Sundown maintains that Mid-Continent exercised its right to defend Sundown under the Umbrella Policy, and that, once it did so, it was obligated to continue defending Sundown until the limits of the Umbrella Policy were exhausted.  The court will assume that Mid-Continent exercised its right to defend Sundown under the Umbrella Policy, and will consider whether doing so obligated Mid-Continent to continue defending Sundown until the Umbrella Policy limits were exhausted.

1

Sundown appears to advance two principal arguments in support of its position that Mid-Continent would assume a continuing duty to defend Sundown by exercising its right to defend.  First, Sundown maintains that *Laster* compels this conclusion. Interpreting a particular provision of the *Laster* policy, Judge McBryde noted that the insurer would become "obligated in reference to the matter of defense only if it [chose] to exercise" its contractual right to defend the insured.  *Laster*, 775 F. Supp. at 994-95.  But the Umbrella Policy here contains no provision comparable to that of the *Laster* policy that gave rise to the conclusion that the insurer assumed a duty to defend once it exercised the right to do so.[15]  And *Laster* does not hold that an

_____

[15]The provision stated:

The [insurer] shall have the right and shall

- 38 -

insurer inexorably becomes obligated to defend an insured through the exhaustion of policy limits once it exercises a right to do so. Further, Sundown points to no other authority, and the court has found none, for the general proposition that an insurer who does not have a contractual duty to defend its insured assumes such a duty when the insurer exercises a contractual right to defend.

Second, Sundown cites the Umbrella Policy provision that relates to termination of the duty to defend.  This provision states that Mid-Continent's "*right* to defend . . . end[s] when we have exhausted the applicable Limit of Insurance in indemnification of judgments or settlements under Coverage A and B."  P. May 19, 2008 App. 40 (emphasis added).  The plain meaning of this provision is that Mid-Continent no longer has the right or prerogative to participate in Sundown's defense once Mid-Continent exhausts the Umbrella Policy limits in indemnification of judgments or settlements.  It does not mean, as Sundown suggests, that if Mid-Continent decides to defend Sundown, it must continue to do so until the Umbrella Policy limits are exhausted.  In short, this

---

be given the opportunity to associate with the insured or its underlying insurers, or both, in the defense and control of any claim, suit or proceeding which involves or appears reasonably likely to involve the [insurer] and *in which event* the insured, such insurers and *the [insurer] shall cooperate in all things in defense of such claim, suit or proceeding*.

*Laster*, 775 F. Supp. at 995 (emphasis added).

provision *terminates the right* to defend; it does not *create a duty* to defend.

2

Absent a contractual basis for Sundown's position that Mid-Continent was obligated not to withdraw its defense before exhausting the Umbrella Policy limits, Sundown must resort to principles of equity, such as estoppel and waiver.

"Estoppel requires a showing that the insured was prejudiced by the conduct of the insurer." *Am. Eagle Ins. Co. v. Nettleton*, 932 S.W.2d 169, 174-75 (Tex. App. 1996, writ denied) (citing *Employers Cas. Co. v. Tilley*, 496 S.W.2d 552, 560 (Tex. 1973)). A reasonable jury could not find from the summary judgment evidence that Mid-Continent's August 18, 2006 withdrawal of its defense has prejudiced Sundown in the defense of the Underlying Lawsuits. Mid-Continent ceased paying the attorney's fees and other costs that Sundown had incurred or might incur in the future in defending the Underlying Class Action Lawsuits, and it denied Sundown's request that it pay defense costs for the Underlying Individual Lawsuits. But Sundown was represented by counsel of its own choice at the time  Mid-Continent withdrew its defense, and there is no evidence that Mid-Continent's withdrawal has required Sundown to obtain new counsel or in any way impacted its defense of the Underlying Class Action Lawsuits. For example, there is no evidence that Sundown or its counsel conducted the defense in a materially different way due

to reliance on Mid-Continent's payment of defense costs or that
Sundown's position in the Underlying Class Action Lawsuits has been
weakened by Mid-Continent's withdrawal.  *Cf. Broadhead v. Hartford
Cas. Ins. Co.*, 773 F. Supp. 882, 917 (S.D. Miss. 1991) (holding
that insurer was obligated to continue defending insured absent
duty to do so "because of the prejudice that would inure to [the
insured] otherwise").

   As noted above, waiver is an intentional relinquishment of a
known right or intentional conduct inconsistent with that right.
A reasonable jury could not find from the evidence an intent on the
part of Mid-Continent to waive its right to withdraw its defense of
Sundown before exhaustion of the Umbrella Policy limits.  Although
Sundown points to evidence that may suggest that Mid-Continent
intended to exercise its right to defend Sundown under the Umbrella
Policy rather than to cease its defense upon exhaustion of the
Primary Policy limits, this proof does not create a genuine issue
of material fact as to whether Mid-Continent intended to waive its
right to withdraw from defending Sundown and thereby to assume a
continuing duty to defend Sundown until the exhaustion of the
Umbrella Policy limits.  As one example, Sundown cites the three
reservation of rights letters that Mid-Continent sent to Sundown
with respect to the Umbrella Policy.  Each letter contains the
following statement: "Although [Mid-Continent] may not have a duty
to indemnify Sundown for all of the claims that have been made in

this lawsuit we will defend you for all of the allegations being made." Ds. May 15, 2008 App. 66, 72, 79.  Although this statement could be interpreted as Mid-Continent's exercising its *right* to defend Sundown under the Umbrella Policy or promising to do so in the future, it does not indicate that Mid-Continent intended to assume a continuing *duty* to defend Sundown until the exhaustion of the Umbrella Policy limits.[16]  This statement does not touch on the duration of the defense to be provided.  Moreover, each letter also expressly reserves Mid-Continent's rights as to the "terms and conditions of the policies issued by [Mid-Continent]."  *Id*. at 62, 68, 75.  This cuts against a finding of waiver.

Therefore, even assuming that Mid-Continent exercised its right to defend Sundown under the Umbrella Policy, it did not thereby undertake a duty to defend Sundown until the exhaustion of Umbrella Policy limits.  Nor does the doctrine of estoppel or waiver preclude Mid-Continent from withdrawing its defense under the Umbrella Policy.  Accordingly, Sundown is not entitled to summary judgment holding that Mid-Continent cannot withdraw its defense under the Umbrella Policy until exhaustion of Umbrella

---

[16]Similarly, other evidence that Sundown cites may suggest that Mid-Continent intended to exercise its *right* to defend Sundown under the Umbrella Policy but does not indicate an intent to assume a continuing *duty* to defend Sundown until the exhaustion of the Umbrella Policy limits.  *See*, *e.g.*, Ds. June 5, 2008 App. 168 (email from Haltom to Fred Thompson); *id*. at 170 (letter from Haltom to Brad Burlew).

Policy limits.[17]  And Mid-Continent is entitled to summary judgment
that it owes no further duty to defend Sundown under the Umbrella
Policy.

D

The issue remains, however, whether Mid-Continent has
satisfied its duty to indemnify Sundown under the Umbrella Policy.
Mid-Continent contends that it has no further duty to indemnify
Sundown because it tendered to Sundown a $5 million check for
Hurricane Katrina cleanup costs, which exhausted the Umbrella
Policy limits.  Sundown argues that Mid-Continent cannot pay for
cleanup costs under the Umbrella Policy until Sundown's claim for
reimbursement from the OPA Fund is determined.

Three Umbrella Policy provisions are relevant to this issue.
First, the Umbrella Policy provides that Mid-Continent "will
indemnify the insured for ultimate net loss in excess of the
retained limit because of . . . property damage to which this
insurance applies."  P. May 19, 2008 App. 40 (bold font omitted).
Second, the Umbrella Policy defines "Ultimate net loss" as follows:

---

[17]It follows that Sundown is also not entitled to summary
judgment on its contention that Mid-Continent's tender of the
Umbrella Policy limits did not discharge Mid-Continent's duty to
defend Sundown because the combined policy limits had not been
exhausted.  Although it is true that Mid-Continent has not offered
evidence that cleanup costs exceeded the combined policy limits ($6
million), Mid-Continent only had a duty to defend under the Primary
Policy.  And it is undisputed that cleanup costs exceeded the
applicable Primary Policy limit of $1 million.

> Ultimate net loss means the total amount of
> damages for which the insured is legally
> liable in payment of . . . property damage . .
> . .   Ultimate net loss must be fully
> determined as shown in SECTION V — CONDITIONS
> Item 18.  When Loss Payable.  Ultimate net
> loss shall be reduced by any recoveries or
> salvages which have been paid or will be
> collected, but the amount of ultimate net loss
> shall not include any expenses incurred by any
> insured, by us or by any underlying insurance.

*Id.* at 53 (bold font omitted).   Third, the "When Loss Payable"

condition provides:

> [Mid-Continent's] liability for any portion of
> ultimate net loss shall not apply until the
> insured or any underlying insurance shall be
> obligated to actually pay the full and
> complete amount of the retained limit.  When
> ultimate net loss has been finally determined,
> the insured may make claim for indemnity under
> this policy as soon as practicable thereafter.
> Such insured's obligation to pay any amount of
> ultimate net loss must have been finally
> determined either by judgment against the
> insured after actual trial or by written
> agreement of the insured, the claimant and
> [Mid-Continent].

*Id.* at 50 (bold font omitted).

Although the parties discuss at length whether Mid-Continent

assumed a duty to defend under the Umbrella Policy, they devote

little discussion to whether Mid-Continent performed its duty to

indemnify Sundown under the Umbrella Policy.  Because Mid-Continent

moves for summary judgment on the indemnification issue, and it

will have the burden of proof at trial on its declaratory judgment

claim, it must prove beyond peradventure that it has satisfied its

duty to indemnify.  *See Bank One, Tex., N.A.*, 878 F. Supp. at 962.

Mid-Continent has not carried this burden.

Although Mid-Continent tendered payment of the Umbrella Policy limits, it has not proved that this payment complied with the terms of the Umbrella Policy.  For example, Mid-Continent has not shown that Sundown's ultimate net loss has been "finally determined." The "When Loss Payable" condition of the Umbrella Policy provides that Sundown's "obligation to pay any amount of ultimate net loss must have been finally determined either by judgment against [Sundown] after actual trial or by written agreement of [Sundown], the claimant and [Mid-Continent]."  P. May 19, 2008 App. 50.  Mid-Continent has not shown that this condition has been met.[18]  There is no summary judgment evidence that Sundown's obligation for the cleanup costs has been determined by judgment after actual trial or by a written agreement among Sundown, the claimant, and Mid-Continent.  Moreover, there is summary judgment evidence that Sundown never incurred covered cleanup costs that met or exceeded the Umbrella Policy limits.[19]

The court recognizes that the "When Loss Payable" condition, along with the other provisions concerning ultimate net loss, are

---

[18]The Primary Policy does not contain a provision similar to the "When Loss Payable" condition of the Umbrella Policy, and indemnification under the Primary Policy is not tied to "[u]ltimate net loss."  Thus the inquiry under the two policies is different.

[19]The summary judgment record indicates that the total amount of cleanup costs Sundown incurred was $5,729,394.86, i.e., $4,729,394.86. in excess of the Primary Policy limits.

generally intended to benefit the *insurer*, not the *insured*.  It
would seem to be a relatively infrequent occurrence that an
umbrella carrier would want to tender policy limits before the
insured wanted a claim to be paid.  But this is such a case, with
Sundown contending that Mid-Continent cannot tender policy limits
under the Umbrella Policy because Sundown's ultimate net loss has
yet to be "finally determined."

Sundown's stated reasons for this position are twofold.
First, Sundown wants Mid-Continent to continue defending it in the
Underlying Lawsuits under the Umbrella Policy.  The court has
already concluded, however, that Mid-Continent has no such duty.
And whether Mid-Continent has satisfied its obligation to indemnify
Sundown under the Umbrella Policy does not affect this conclusion.

Sundown's second motivation, however, is still in play.
Sundown does not want Mid-Continent to exhaust the Umbrella Policy
limits by paying for the cleanup costs, because Mid-Continent would
be subrogated to Sundown's right to seek recovery from the OPA
Fund, and it would not use the proceeds of any such recovery to
replenish the Umbrella Policy limits.  Sundown wants to keep any
recoveries it is able to get from the OPA Fund and retain the
balance of the Umbrella Policy limits to pay for cleanup costs that
the OPA Fund does not cover or for losses incurred in the
Underlying Lawsuits.  Thus resolving the question whether Mid-
Continent has already fulfilled its indemnity obligation under the

- 46 -

Umbrella Policy has significant consequences to both sides.

Regardless how this question is resolved through a trial, the court cannot dispose of it on summary judgment.  Mid-Continent has not established beyond peradventure that it satisfied its duty to indemnify under the terms of the Umbrella Policy.  Hence, Mid-Continent is not entitled to summary judgment on this issue.

V

The final preliminary question that the court will address is whether Hurricane Rita caused a second "Pollution Incident" covered by the Primary Policy.

A

The parties dispute whether Sundown's Hurricane Rita claim qualifies as a second "Pollution Incident" under the Primary Policy, thereby adding another $1 million to the Primary Policy's limits.  The Oil & Gas Endorsement to the Primary Policy defines a "Pollution Incident" as:

> the sudden and accidental emission, discharge, release or escape of pollutants into or upon the land, atmosphere or any water course or body of water, provided that such emission, discharge, release or escape emanates from operations conducted on land and results in "Bodily Injury" or "Property Damage."  The entirety of any such emission, discharge, release or escape shall be deemed to be one "Pollution Incident."

P. May 19, 2008 App. 19.

It is undisputed that while Hurricane Rita caused an escape of crude oil previously contained within a boom erected by Sundown's

- 47 -

cleanup contractor, Environmental Safety and Health Consulting Services, Inc. d/b/a ES&H Consulting and Training Group ("ES&H"), Hurricane Rita did not cause any new crude oil to escape from Sundown's facility. The court must therefore decide whether, under the Oil & Gas Endorsement to the Primary Policy, Hurricane Rita's damage constitutes a second "Pollution Incident" or whether it is merely a continuation of the entirety of the Hurricane Katrina "Pollution Incident."

Focusing on the definition of "Pollution Incident," Sundown argues that Hurricane Rita is a second "Pollution Incident" because (1) Hurricane Rita caused an "escape" of crude oil that had previously been contained within a boom; (2) the escape was "sudden and accidental"; and (3) the escape emanated from the cleanup operation, an "operation conducted on land," related to Sundown's oil production operations and paid for by Sundown.

Mid-Continent contends that the sudden and accidental escape of crude oil from Sundown's storage tanks was caused by Hurricane Katrina, and Hurricane Rita merely caused the escape of oil from a containment boom being used to remediate the original release. Mid-Continent maintains that, because "[t]he entirety of any . . . escape shall be deemed to be one 'Pollution Incident,'" P. May 19, 2008 App. 19, the escape of oil from a containment boom due to Hurricane Rita falls within "the entirety" of the storage tank escape caused by Hurricane Katrina, and therefore the escape caused

by Hurricane Rita is subsumed within a single "Pollution Incident" caused by Hurricane Katrina.[20] Mid-Continent therefore reasons that Sundown is not entitled to the additional sum of $1 million in coverage arising from Hurricane Rita.

B

As discussed above, *see supra* § II, if an insurance contract is susceptible of more than one reasonable interpretation, the court must resolve the uncertainty by adopting the construction that favors the insured.   And exceptions or limitations on liability are strictly construed against the insurer and in the insured's favor.

1

For reasons the court will explain, it is reasonable to construe "Pollution Incident" to include a sudden and accidental release of previously spilled oil, provided the escape occurs at a different time and emanates from an operation conducted on land. According to the endorsement's terms, the escape of pollutants occurring during a "Pollution Incident" may emanate from

---

[20]Mid-Continent also contends that Sundown made no claims with the OPA Fund for Hurricane Rita cleanup expenses, received no claims or lawsuits from Hurricane Rita, and has never established any amount of cleanup costs attributable to Hurricane Rita, and that these facts further establish the lack of a second and independent covered loss.  Because the court agrees with Sundown that the only real issue here is whether the escape of crude oil caused by Hurricane Rita is a "Pollution Incident" under the Oil & Gas Endorsement, the court will only address Mid-Continent's additional arguments to the extent they are relevant to construing the terms of the policy.

"operations conducted on land." P. May 19, 2008 App. 19. Consequently, if, as Sundown alleges, the cleanup operations and the establishment of the containment boom constitute "operations conducted on land," then a sudden and accidental escape of oil emanating from such operations would appear to be a separate "Pollution Incident" based on the first sentence of the definition. The question becomes whether the second sentence of the definition changes this analysis. That sentence states: "The entirety of any such emission, discharge, release or escape shall be deemed to be one 'Pollution Incident.'" *Id.* In sum, whether Sundown's Hurricane Rita claim constitutes a separate "Pollution Incident" turns on two issues: (1) whether the cleanup operations and establishment of the containment boom constitute "operations conducted on land," and (2) whether the clause that provides that the entirety of an escape shall be deemed one "Pollution Incident" means that the escape of previously spilled oil cannot constitute a separate "Pollution Incident."

                                2

On the second issue, *Konell Construction & Demolition Corp. v. Valiant Insurance Co.*, 2006 WL 1360956 (D. Ore. May 15, 2006), provides some guidance. In *Konell* the court sought to determine whether each delivery of contaminated soil by a dump truck—138 individual dumps in all—constituted its own separate "Pollution Incident" under the insurance policy or whether the 138 individual

dumps combined to constitute a single "Pollution Incident." *Id.* at *3-*5. The insurance policy defined "Pollution Incident" as

> the emission, discharge, release, or escape of "pollutants" which happens at or emanates from a "work site" provided that such emission, discharge, release, or escape results in "environmental contamination." The entirety of any such emission, discharge, release, or escape will be deemed to be one "pollution incident."

*Id.* at *3 (citing the policy). The insured contended that each individual load constituted a separate "Pollution Incident." The insured made this argument because, under the coverage limitations of the insurance policy, the "Pollution Incident" had to commence and end within 72 consecutive hours. *See id.* If the combined 138 individual dumps constituted the "Pollution Incident," then because the 138 individual dumps did not commence and end within a 72-hour period, they would not have been covered by the policy.

Under the plain meaning of the "Pollution Incident" definition, the court held that the policy was "reasonably susceptible" to the insured's interpretation. *Id.* at *4 (holding that each truckload was a "discharge" of "pollutants" at a "work site" resulting in "environmental contamination"). The court further noted that while the policy's "attempt to make something singular; i.e. to make the entirety of any discharge a single pollution incident," accomplishes its apparent purpose in some

settings,[21] in the case before the court, it merely "begs the critical question"——what is a discharge? *Id.* "If a discharge is a single dump truck load, then the whole dump truck load is one pollution incident. If, on the other hand, a discharge is all the dump truck loads in the course of as a single job at one work site, then all of them are one pollution incident." *Id.* Applying the rule that when an insurance policy is reasonably susceptible to more than one construction, the policy should be construed against the drafter, the court granted summary judgment for the insured on the issue of coverage, despite recognizing that "at some intuitive level, [the insurer's] interpretation of the policy definition seems better than [the insured's]." *Id.* at *4-*5 ("[T]his court's task, under governing law, is not to choose the better of two interpretations. When the policy is reasonably susceptible to more than one interpretation . . . then it should be construed against the drafter.").

Here, as in *Konell*, the court is faced with two reasonable interpretations of the Oil & Gas Endorsement's requirement that the entirety of the escape be deemed one "Pollution incident." Mid-Continent maintains that the entirety of an escape is defined by

---

[21]*Konell*, 2006 WL 1360956, at *4 ("For example, it neatly disposes of [the insurer's] 1,000 gallon hypothetical" where contamination caused by a pipe that leaked 1,000 gallons of fuel intermittently could be rephrased as a series of 1,000, one-gallon releases, instead of a single pollution incident as the policy intended.).

the first emanation of pollutants, such that the pollutants can emanate only once from an operation conducted on land; after that, regardless of what may happen to them, the cost of cleanup belongs to the "Pollution Incident" that caused that single emanation. Under this interpretation, no two "Pollution Incidents" can share the same pollutants.  Sundown, on the other hand, argues that the entirety of an escape is defined by what causes the escape, such that a single "Pollution Incident" encompasses only those damages proximately caused by the sudden and accidental force that released the pollutants.  Hence, under Sundown's interpretation, although the Hurricane Katrina escape and the Hurricane Rita escape shared the same pollutants (crude oil), the escapes are nonetheless distinct, occurring at different times and as a result of different sudden and accidental causes.  Therefore, Sundown reasons that the entirety of one escape is distinct from the entirety of the other. The property damage caused by the Hurricane Katrina escape is the damage that would have occurred as a result of the oil spilled from Sundown's storage tanks in the absence of Hurricane Rita, while the property damage caused by the Hurricane Rita escape is only that damage over and above the damage caused solely by Hurricane Katrina.

Based on the plain meaning of the policy's terms, Sundown's interpretation is reasonable.  Nothing in the definition "Pollution Incident" makes the language reasonably susceptible only to Mid-

Continent's interpretation, which would mean that pollutants can emanate only once from operations conducted on land.  Because the relevant portions of the Oil & Gas Endorsement are susceptible to more than one reasonable meaning, the court adopts Sundown's construction.  *See Gore Design Completions*, 538 F.3d at 371.  A sudden and accidental escape of a previously-escaped pollutant is covered as a separate "Pollution Incident," provided that such escape occurs at a different time, has a sudden and accidental cause, and emanates from an operation conducted on land.

3

The court now considers whether the establishment of the containment boom constitutes an "operation conducted on land." Because the term "operations conducted on land" is not defined in the policy, the court gives the term its "generally accepted or commonly understood meaning."  *See Lamar Homes*, 242 S.W.3d at 8. One definition of a "boom" is "a floating barrier used to confine or restrict something, for example, a barrier to protect a harbor from attack or to confine an oil spill."  *Microsoft Encarta World English Dictionary* (computer version) (1999).  Sundown alleges, without explanation, that its cleanup operations and the establishment of the boom constitute "operations conducted on land."  Ds. June 4, 2008 Br. 37 ("The clean-up was an 'operation conducted on land' related to Sundown's oil production operations and was paid for by Sundown.").  Mid-Continent does not dispute

this assertion.  And the fact that its July 19, 2007 letter denying the Hurricane Rita claim did not contest that this was a land-based operation may suggest that it was.  But while Sundown may be able to demonstrate this at trial, it has failed to establish beyond peradventure——a heavy burden——that it is reasonable to construe the boom as an "operation conducted on land."  The parties have not provided sufficient facts regarding Sundown's cleanup operations and the operation of the boom for the court to decide on summary judgment whether the boom can fairly be characterized as an "operation conducted on land."[22]  Consequently, the court denies summary judgment for both Sundown and Mid-Continent on the question whether Sundown qualifies for additional coverage of $1 million under the Primary Policy due to Hurricane Rita and its impact on the crude oil contained by the boom.

VI

Having decided the three principal issues underlying the parties' dispute, the court now turns to Mid-Continent's declaratory judgment claim.

Mid-Continent seeks summary judgment declaring that it owes no further duty to defend or indemnify Sundown under either the

---

[22]Although the court cannot resolve disputed facts at the summary judgment stage, it notes that it is unaware of any containment boom installation that appears to qualify as an "operation conducted on land."  Such booms all appear to float on water.  Sundown may, however, have evidence that would enable a reasonable jury to find in its favor.

- 55 -

Primary Policy or the Umbrella Policy.  The court holds that Mid-Continent is entitled to a declaratory judgment establishing that it has no further duty to defend and no further duty to indemnify Sundown under the *Primary Policy* for damages arising out of the Hurricane Katrina "Pollution Incident," and that it has no duty to defend Sundown under the *Umbrella Policy*.  The court otherwise denies summary judgment for Mid-Continent on its declaratory judgment claim.  There are genuine issues of material fact regarding whether Mid-Continent has satisfied its duty to indemnify Sundown under the *Umbrella Policy*, and whether Mid-Continent has fulfilled its duty to indemnify Sundown under the *Primary Policy* for damages arising out of Hurricane Rita.[23]

In addition to its declaratory judgment claim, Mid-Continent asserts a claim for affirmative reimbursement of attorney's fees and expenses paid in defense of Sundown in the Underlying Class Action Lawsuits after March 22, 2006.  Sundown seeks summary judgment dismissing this claim.  Mid-Continent concedes that a recent Texas Supreme Court decision precludes it from recovering. *See Excess Underwriters at Lloyd's, London v. Frank's Casing Crew*

---

[23]The duty to *defend* Sundown under the Primary Policy concerning Hurricane Rita claims is not now in issue, presumably because no litigation has been filed and no separate government-mandated cleanup directives have been issued, regarding the Hurricane Rita-caused escape from the containment boom.

& *Rental Tools, Inc.*, 246 S.W.3d 42 (Tex. 2008).[24]  Accordingly, the court grants summary judgment for Sundown on this claim.[25]

VII

The court now turns to Sundown's counterclaims, which encompass specific contractual, statutory, and common law claims. Mid-Continent moves for summary judgment dismissing all of these counterclaims.

A

Sundown alleges that Mid-Continent is liable for breach of contract for ceasing to defend Sundown against the Underlying Class Action Lawsuits and failing to provide a defense against the Underlying Individual Lawsuits.  Because the court has concluded that Mid-Continent's duty to defend under the Primary Policy terminated with the tendering of policy limits on March 22, 2006, Mid-Continent is entitled to summary judgment dismissing Sundown's contract claims to this extent.  Sundown has also asserted claims, however, alleging that Mid-Continent violated its contractual duty to defend by providing Sundown with a sham defense, by slashing

---

[24]To be fair to Mid-Continent, when it filed suit, the Supreme Court of Texas had reached a different result in *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 2005 WL 1252321, 48 Tex. Sup. Ct. J. 735 (Tex. May 27, 2005), *superseded on reh'g by* 246 S.W.3d 42 (Tex. 2008).  The law changed after Mid-Continent made the claim.

[25]To the extent Mid-Continent moves for summary judgment on this claim, the court denies the motion in this respect.  *But see* Ds. June 4, 2008 Br. 3 (questioning whether Mid-Continent seeks summary judgment on this claim).

payments of legal bills submitted by Jones Walker, and by undermining Sundown's defense through prejudicial actions taken behind the scenes, without notice to Sundown. *See* 3d Am. Countercl. ¶¶ 188-191, 193. Because Mid-Continent has failed to point the court to the absence of evidence of any essential element of these breach of contract claims, or even to discuss them, the court denies Mid-Continent's motion for summary judgment as to these components of Sundown's breach of contract claims.

B

Mid-Continent moves for summary judgment on Sundown's claim that Mid-Continent breached the Primary Policy by failing to notify Sundown within ten days of making a settlement offer to Chris Leopold ("Leopold"), a neighbor whose property potentially may have been impacted by Sundown's oil spills. Sundown moves for partial summary judgment establishing that Mid-Continent violated the Primary Policy by failing to provide timely notice, but it seeks to reserve the damages issue for trial.

1

Testing conducted at Mid-Continent's direction detected the presence of two "hot spots" on Leopold's property. Further analysis indicated that these "hot spots" were diesel oil and therefore could not have spilled from Sundown's tanks, which contained only crude oil. Nonetheless, without notifying Sundown, Mid-Continent made a $54,536.00 settlement offer to Leopold on June

- 58 -

2, 2006.  Mid-Continent first informed Sundown of the offer by letter dated July 10, 2006, which Sundown apparently did not receive until July 21, 2006.  Sundown immediately demanded that Mid-Continent withdraw the offer, and Mid-Continent did so that day.  Subsequently, Leopold joined the *Blanchard* case as a class representative.

An endorsement to the Primary Policy requires that Mid-Continent

> notify the first Named Insured in writing of:
>
> 1.   An initial offer to compromise or settle a claim made or "suit" brought against any insured under this coverage.  The notice will be given not later than the 10th day after the date on which the offer is made.

P. May 19, 2008 App. 35.  Mid-Continent concedes that it made a settlement offer to Leopold on June 2, 2006 and did not notify Sundown within ten days.  Mid-Continent contends, however, that Sundown is not entitled to summary judgment on its breach of contract claim because Sundown cannot show that it suffered any damages due to this failure.

Sundown maintains that a genuine issue of material fact regarding whether Mid-Continent's untimely notice damaged Sundown precludes summary judgment.  Specifically, Sundown posits that Mid-Continent's surreptitious offer to Leopold and the subsequent withdrawal of that offer angered Leopold and caused him to join *Blanchard*.  Sundown maintains that Leopold then conveyed

- 59 -

information to *Blanchard* class counsel that prejudiced Sundown's litigation position.  Sundown also contends that it was forced to incur the expenses of answering the amended complaint and deposing Leopold.  According to Sundown, had Mid-Continent provided timely notice of the settlement offer, Sundown could have contacted Leopold and explained that Sundown's spills may not have impacted his property.  This, Sundown argues, may have changed Leopold's mind about joining the *Blanchard* action and thereby avoided these damages.  In support, Sundown points to Leopold's deposition testimony that had he known that Sundown's spills may not have contaminated his property, he "potentially [could] have changed [his] view" of Sundown.  Ds. June 5, 2008 App. 38.  Additionally, Sundown posits that it will offer further damages evidence at trial.

Mid-Continent counters that Sundown's damages argument is wholly speculative because it rests on the unfounded theory that Leopold would not have joined the *Blanchard* suit but for Mid-Continent's delay in informing Sundown of the settlement offer. Mid-Continent maintains that Sundown's damages, if any, resulted from the offer itself rather than from the untimely notice, and that any such damages are not recoverable because the Primary Policy gave Mid-Continent the right to make settlement offers to third parties.  Mid-Continent further contends that Sundown cannot preclude summary judgment by asserting that it will adduce further

damages evidence at trial.

2

Under Texas law, the party seeking to establish a breach of contract claim must prove that it suffered damages as a result of the breach. *E.g.*, *Lewis v. Bank of Am. N.A.*, 343 F.3d 540, 544-45 (5th Cir. 2003) (Texas law); *Aguiar v. Segal*, 167 S.W.3d 443, 451 (Tex. App. 2005, pet. denied). Sundown has not adduced evidence that would enable a reasonable jury to find that it suffered damages from Mid-Continent's untimely notice of the Leopold settlement offer.

The premise of Sundown's argument is that, had it received timely notice of Mid-Continent's settlement offer, it could have dissuaded Leopold from joining *Blanchard* by informing him that Sundown was not responsible for his property's contamination. But Sundown has failed to adduce evidence from which a reasonable jury could find that, had Sundown been notified within the required ten-day period, it could have persuaded Leopold not to join the *Blanchard* class. A reasonable jury could only find that Sundown was injured by the making of the settlement offer itself, coupled with Mid-Continent's failure to inform Leopold that Sundown's spills may not have impacted his property. And Sundown cannot survive summary judgment by averring that it will produce at trial additional, unspecified evidence of damages.

Accordingly, the court grants Mid-Continent's motion for

summary judgment on Sundown's breach of contract claim for failure to timely inform Sundown of a settlement offer, and it denies Sundown's motion for summary judgment on this claim.

VIII

Mid-Continent also moves for summary judgment on Sundown's claims that Mid-Continent breached Tex. Ins. Code Ann. § 541.060(a)(2)(A) (Vernon Supp. 2008) and § 541.060(a)(3) by making an unreasonable and excessive settlement offer to Leopold and failing to promptly provide Sundown with a reasonable explanation of the basis for the offer.

Mid-Continent advances two reasons why it is entitled to summary judgment on these claims. First, it maintains that § 541.060 does not provide a cause of action based on an insurer's conduct in investigating or settling a third party's claim against the insured. Second, Mid-Continent contends that an insurer does not owe an insured a duty of good faith and fair dealing in investigating or settling third-party claims. Rather, Mid-Continent contends that the only duty owed is the *Stowers* duty of ordinary care to accept reasonable settlement demands that are within policy limits. Mid-Continent cites for this proposition *Maryland Insurance Co. v. Head Industrial Coatings & Services, Inc.*, 938 S.W.2d 27 (Tex. 1996) (per curiam).

The court disagrees with Mid-Continent's bipartite contention. Although the court in *Maryland Insurance* did limit the insured's

right to challenge the insurer for unfair settlement practices to the *Stowers* duty, this holding has since been modified by legislative action. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 391 F.Supp.2d 541, 554 n.19 (S.D. Tex. 2005); *Chickasha Cotton Oil Co. v. Houston Gen. Ins. Co.*, 2002 WL 1792467, at *7 (Tex. App. Aug. 6, 2002, no pet. h.) (not designated for publication). The Texas Legislature enacted a statute, now codified at § 541.060, that provides the insured a cause of action against the insurer for unfair practices in settling third-party claims. *In re Enron*, 391 F.Supp.2d at 554 n.19. Accordingly, the court denies Mid-Continent's motion for summary judgment on Sundown's § 541.060(a)(2)(A) and § 541.060(a)(3) claims based on Mid-Continent's settlement offer to Leopold.

IX

Mid-Continent moves for summary judgment on Sundown's claim that Mid-Continent violated Tex. Ins. Code Ann. § 542.153 (Vernon Supp. 2008). Although Mid-Continent concedes that it failed to comply with the notice requirements of the statute,[26] § 542.153 does not provide for a private cause of action. *Compare* Tex. Ins. Code

_____

[26]Specifically, Mid-Continent concedes that it gave notice of the Leopold settlement offer 38 days after the offer was made——28 days after the statutory deadline. *See* Tex. Ins. Code Ann. § 542.153(a) (Vernon Supp. 2008) ("Not later than the 10th day after the date an initial offer to settle a claim against a named insured under a casualty insurance policy issued to the insured is made, the insurer shall notify the insured in writing of the offer.").

- 63 -

Ann. § 541.151 (Vernon Supp. 2008) (providing private cause of action for persons damaged by unfair methods of competition and unfair deceptive acts or practices as defined by Chapter 541, subsection B) *with* Tex. Ins. Code Ann. § 542 (containing no provision permitting private actions for violations of Chapter 542).  The court agrees, and it therefore dismisses Sundown's § 542.153 claim.

Citing *Brown v. De La Cruz*, 156 S.W.3d 560, 568 (Tex. 2004), Sundown argues that even though a statute does not create a cause of action, it may establish a standard of conduct that is enforceable under other pre-existing actions.  If, however, the statute requires nothing more than what the parties' contract already required, then there is no new standard of conduct created. *See id.* ("But as section 5.102 required Brown to do nothing more than what the parties' contract already required, neither party asserts it created a new standard of conduct.").  Here, because language identical to § 542.153 has been incorporated by Mid-Continent in its Primary Policy, § 542.153 establishes no standard of conduct that is not already enforceable in Sundown's contractual and bad faith claims.

Sundown also argues that Mid-Continent's violation of § 542.153 is "admissible evidence because it demonstrates Mid-Continent's failure to comply with legal requirements established for the protection of its insured and is evidence of Mid-

Continent's state of mind"——specifically, Mid-Continent's
"malicious, intentional and/or grossly negligent conduct that
ultimately is required for punitive damages." Ds. June 19, 2008
Reply Br. 18. The admissibility of evidence demonstrating Mid-
Continent's noncompliance with § 542.153, however, is a separate
issue from whether Sundown may sue Mid-Continent for violating
§ 542.153. The court need not now decide whether the evidence will
be admissible at trial.

X

Sundown alleges that Mid-Continent violated Tex. Ins. Code
Ann. § 542.060 (Vernon Supp. 2008) when it failed to pay promptly
Sundown's claim for defense costs and its claim for Hurricane Rita
cleanup costs. Mid-Continent moves for summary judgment on both
claims, and Sundown moves for summary judgment only on Mid-
Continent's alleged failure to promptly pay Sundown's defense
costs.

Section 542.060 provides, in relevant part:

> If an insurer that is liable for a claim under
> an insurance policy is not in compliance with
> this subchapter, the insurer is liable to pay
> the holder of the policy or the beneficiary
> making the claim under the policy, in addition
> to the amount of the claim, interest on the
> amount of the claim at the rate of 18 percent
> a year as damages, together with reasonable
> attorney's fees.

"To successfully maintain a claim under [§ 542.060], a party must
establish three elements: (1) a claim under an insurance policy;

- 65 -

(2) that the insurer is liable for the claim; and (3) that the insurer has failed to follow one or more sections of [Prompt Payment Claims statute, Tex. Ins. Code Ann. §§ 542.051-.061] with respect to the claim." *Allstate Ins. Co. v. Bonner*, 51 S.W.3d 289, 291 (Tex. 2001) (bracketed text reflects current codification of statute).

Because a "claim" under the Prompt Payment Statute is defined as "a first-party claim," Tex. Ins. Code Ann. § 542.051, § 542.060 is inapplicable to Sundown's claim for Hurricane Rita cleanup costs, which both parties agree is a third-party claim. Accordingly, the court grants summary judgment for Mid-Continent on Sundown's § 542.060 claim regarding its Hurricane Rita cleanup costs. *See Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 674-75 (Tex. 2008) (reversing court of appeals' judgment awarding damages and attorney's fees under Tex. Ins. Code Ann. art. 21.55 (predecessor to § 542.060) for insurer's failure to promptly pay third-party claims).

Regarding Sundown's claim for Hurricane Katrina-based defense costs, as previously discussed, Mid-Continent is not liable for these costs under either the Primary Policy or the Umbrella Policy.[27]  Consequently, Sundown cannot successfully maintain a claim under § 542.060 based on Mid-Continent's failure to promptly

---

[27]Sundown is not complaining of the timeliness of Mid-Continent's payment of attorney's fees and defense costs that *were* covered and that Mid-Continent paid.

pay Sundown's defense costs incurred after the Primary Policy limits were exhausted. Mid-Continent's motion for summary judgment on this claim is accordingly granted, and Sundown's motion is denied.

XI

Although Sundown alleges numerous bad faith claims under statutory and common law, it moves for summary judgment on only three issues: (1) that Mid-Continent violated Tex. Ins. Code Ann. § 541.060(a)(4) (Vernon Supp. 2008) in its handling of Sundown's Hurricane Rita claim; (2) that Mid-Continent made a misrepresentation of the Primary Policy in its July 19, 2007 letter denying the Hurricane Rita claim, in violation of § 541.061; and (3) that Mid-Continent violated § 541.060(2)(a) by failing to participate in the *Blanchard* settlement. Mid-Continent, on the other hand, moves for summary judgment on all of Sundown's bad faith claims.

A

The court considers first Sundown's common law claims for breach of the duty of good faith and fair dealing. If Mid-Continent is entitled to summary judgment dismissing these claims, then Sundown's statutory claims, if based on the same predicate acts,[28] fail as well. Under Texas law, an insured cannot prevail

_____

[28]A defense to an insured's common law bad faith claim also serves to defeat each of its other extracontractual causes of action (e.g., its deceptive trade practice claim and Insurance Code

- 67 -

on a cause of action under the Texas Insurance Code or the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code Ann. §§ 17.41-17.826 (Vernon 2002), if its claim for breach of the common law duty of good faith and fair dealing lacks merit as a matter of law.  *See Higginbotham v. State Farm Mut. Auto. Ins. Co.,* 103 F.3d 456, 460 (5th Cir. 1997) ("Although these claims are individual causes of action which do not depend on each other for support, Texas courts have clearly ruled that these extra-contractual tort claims require the same predicate for recovery as bad faith causes of action in Texas.  Plainly put, an insurer will not be faced with a tort suit for challenging a claim of coverage if there was any reasonable basis for denial of that

---

claim) *only if* "each cause was nothing more than a recharacterization of the bad faith claim." *Escajeda v. Cigna Ins. Co. of Tex.*, 934 S.W.2d 402, 408 (Tex. App. 1996, no writ).

> But, when the tortious acts underlying the deceptive trade practices/Insurance Code and bad faith claims differ, [a defense to the bad faith claim] does not bar recovery for the [statutory claim] simply because the insurer proved that it had a reasonable basis to deny coverage (and thereby defeat the claim of bad faith [denial]).  For instance, if one sued an insurer contending that it 1) committed a deceptive act by stating that the cost of the policy was only $100 when in truth it was $300, and 2) denied a claim in bad faith, the insurer's proving that it had a reasonable basis to deny the claim does not prevent the insured from pursuing recovery for the deceptive act of misrepresenting the policy's cost.

*Id.*

- 68 -

coverage."   (citations omitted)).

Under Texas law, there is a duty on the part of the insurer to deal fairly and in good faith with an insured in the processing and payment of claims.  *Arnold v. Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987).[29]  A cause of action for breach of the duty of good faith and fair dealing exists when the insurer has *no reasonable basis* for denying or delaying payment of a claim or when the insurer fails to determine or delays in determining whether there is any reasonable basis for denial.  *Id.*  In order to sustain such a claim, the insured must establish the absence of a reasonable basis for denying or delaying payment of the claim and that the insurer knew, or should have known, that there was no reasonable basis for denying or delaying payment of the claim. *Aranda v. Ins. Co. of N. Am.*, 748 S.W.2d 210, 213 (Tex. 1988).  The

---

[29]This duty arises from the inherent power imbalance between the insurer and the insured:

> In the insurance context a special relationship arises out of the parties' unequal bargaining power and the nature of insurance contracts which would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims . . . . [W]ithout such a cause of action insurers can arbitrarily deny coverage and delay payment of a claim with no more penalty than interest on the amount owed. An insurance company has exclusive control over the evaluation, processing and denial of claims.

*Arnold*, 725 S.W.2d at 167.

insured must prove that there were no facts before the insurer that, if believed, would justify denial of the claim. *State Farm Lloyds Inc. v. Polasek*, 847 S.W.2d 279, 284-85 (Tex. App. 1992, writ denied). Insurance carriers have the right to deny questionable claims without being subject to liability for an erroneous denial. *St. Paul Lloyd's Ins. Co. v. Fong Chun Huang*, 808 S.W.2d 524, 526 (Tex. App. 1991, writ denied) (citing *Aranda*, 748 S.W.2d at 213). A bona fide controversy is sufficient reason for an insurer's failure to make a prompt payment of a loss claim. *Id.* As long as the insurer has a reasonable basis to deny or delay payment of a claim, even if that basis is eventually determined by the fact-finder to be erroneous, the insurer is not liable for the tort of bad faith. *Lyons v. Millers Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 600 (Tex. 1993).

Whether an insurer acted in bad faith because it denied or delayed payment of a claim after its liability became reasonably clear is a question for the fact-finder. *Universe Life Ins. Co.*, 950 S.W.2d at 56. Even so, there still may be circumstances where judgment may be rendered as a matter of law because no genuine issues of material fact exist. *See id.; U.S. Fire Ins. Co. v. Williams*, 955 S.W.2d 267, 268 (Tex. 1997) (per curiam) (holding that where summary judgment evidence "conclusively established" that there was no more than a good-faith dispute between the parties concerning insurer's liability on the contract, bad faith

was not shown, and case could be decided as a matter of law).

B

1

In the context of Sundown's claim for Hurricane Rita cleanup costs, Sundown essentially alleges that Mid-Continent committed statutory and common-law bad faith in two ways: (1) failing to reasonably and promptly process the Hurricane Rita claim, and (2) failing to pay the claim.  Sundown therefore challenges both Mid-Continent's ultimate decision about coverage and the process by which Mid-Continent reached its decision.  The distinction between these two challenges, as the court will discuss in more detail below, is important because the law recognizes a duty to deal fairly and in good faith with the insured both in the processing of a claim[30] and in the ultimate coverage decision.  *See Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 340 (Tex. 1995) ("An insurer has a duty to deal fairly and in good faith with its insured in the processing and payment of claims.").  It is possible to breach the

---

[30]It is well established that an insurer has a duty to conduct a timely and fair investigation of an insured's claims.  *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995) (noting that general rule that there can be "no claim for bad faith when an insurer has *promptly* denied a claim that is in fact not covered" does not retreat from "the established principles regarding the duty of an insurer to timely investigate its insureds' claims" (emphasis added)); *id.* at 340 ("An insurer has a duty to deal fairly and in good faith with its insured in the processing . . . of claims."); *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex. 1998) ("[A]n insurer cannot insulate itself from bad faith liability by investigating a claim in a manner calculated to construct a pretextual basis for denial.").

- 71 -

good faith duty in the processing of a claim but not in the coverage decision. *See id.* at 341 ("We do not exclude, however, the possibility that in denying the claim, the insurer may commit some act, so extreme, that would cause injury independent of the policy claim."). Moreover, whether certain defenses (i.e., the bona fide dispute rule) are available to Mid-Continent will depend on the predicate acts (i.e., denying the claim, processing the claim) underlying Sundown's bad faith claims. *See Escajeda v. Cigna Ins. Co. of Tex.*, 934 S.W.2d 402, 408 (Tex. App. 1996, no writ) (holding that reasonable basis to deny coverage does not preclude recovery upon extracontractual claims that have predicate or "gist" different from bad faith denial claim; where the operative facts underlying the claims are distinct, both claims would not necessarily be defeated if the insured had reasonable grounds for denial).

2

"As a general rule there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered." *Republic Ins. Co.*, 903 S.W.2d at 341. This general rule, however, cannot be applied to Mid-Continent's denial of Sundown's Hurricane Rita claim because there are coverage issues that remain to be resolved and that may impact the disposition of the claim. As previously discussed, Sundown's summary judgment evidence does not establish beyond peradventure that its cleanup operations and the

establishment of the containment boom can reasonably be characterized as an "operation conducted on land." Consequently, the court cannot determine on summary judgment that Sundown's Hurricane Rita claim is covered as a separate "Pollution Incident" under the Primary Policy.

Nevertheless, the court holds that the bona fide dispute rule precludes bad faith liability on the denial of the Hurricane Rita claim. "Whether there is a reasonable basis for denial of a claim must be judged by the facts before the insurer at the time the claim was denied." *Id.* at 340 (internal quotation marks and brackets omitted) (citing *Viles v. Sec. Nat'l Ins. Co.*, 788 S.W.2d 566, 567 (Tex. 1990)). It is an "objective determination" involving whether "a reasonable insurer under similar circumstances would have delayed or denied the claimant's benefits." *Id.* (internal quotations omitted). So long as a reasonable basis for denial of the claim exists——even if it is not the actual reason the insurer relied on in denying the claim——the insurer will not be subject to liability for an erroneous denial of a claim. *Id.* at 340-41 (holding insurer was not liable for denying claim for an incorrect reason when there was a correct reason for denial). As discussed above in § V(B)(2), a reasonable insurer could have interpreted the Primary Policy as Mid-Continent did to mean that an escape of previously spilled oil could not constitute a separate "Pollution Incident." Therefore, even if it is established at

- 73 -

trial that Mid-Continent erroneously denied Sundown's Hurricane Rita claim (because the containment boom can reasonably be characterized as an "operation conducted on land"), no reasonable jury could find that Mid-Continent denied the claim in bad faith, because Mid-Continent had an objectively reasonable basis for denying the claim. Mid-Continent is accordingly entitled to summary judgment dismissing Sundown's common law claim for the bad faith denial of its Hurricane Rita claim.

3

Mid-Continent characterizes Sundown's bad faith claims regarding Hurricane Rita as based only on Mid-Continent's failure to pay the Hurricane Rita claim. *See, e.g.*, P. May 15, 2008 Br. 37 ("Sundown asserts Mid-Continent committed statutory and common-law bad faith in three ways: (1) failing to pay the Hurricane Rita claim; (2) failing to pay all of Jones Walker's attorney's fees and expenses; and (3) making an unreasonable settlement offer to a third-party claimant."). Consequently, Mid-Continent does not adequately address Sundown's bad faith claims based on Mid-Continent's failure to conduct a reasonable investigation of the Hurricane Rita claim. *See* 3d Am. Countercl. ¶ 227 ("Mid-Continent has violated its common law duty of good faith and fair dealing in the following respects: . . . refusing to pay Sundown's Hurricane Rita clean-up claim without conducting a reasonable investigation."). The court therefore denies Mid-Continent's

motion for summary judgment on Sundown's common law claim for bad faith investigation and processing of the Hurricane Rita claim.

Moreover, to the extent Mid-Continent contends that the determination of coverage of the Hurricane Rita claim is dispositive of the issue of Mid-Continent's alleged bad faith processing, the court disagrees.  The general rule articulated in *Republic Insurance Co.* was that "there can be no claim for bad faith when an insurer has *promptly* denied a claim that is in fact not covered," and the court specifically noted that it should not be understood as "retreating from the established principles regarding the duty of an insurer to *timely* investigate its insureds' claims." *Republic Ins. Co.*, 903 S.W.2d at 341 (emphasis added).  *Republic Insurance Co.* also recognized that the general rule does not exclude "the possibility that in denying the claim, the insurer may commit some act, so extreme, that would cause injury independent of the policy claim." *Id.*  Therefore, an insurer has a duty to conduct a timely and fair investigation of the insured's claim, *see also supra* note 30, and under some circumstances the insurer can be held liable for bad faith handling of a claim even in the absence of coverage.  *See Northwinds Abatement, Inc. v. Employers Ins. of Wausau*, 258 F.3d 345, 353 (5th Cir. 2001) (finding bad faith liability where there was no coverage of claim); *Broadhead*, 773 F. Supp. at 905 (holding that insured's bad faith claim was not limited solely to insurer's decision to

deny coverage but included allegations that related to insurer's conduct in the adjustment process, which precluded summary judgment for insurer on bad faith claim); *Liberty Nat'l Fire Ins. Co. v. Akin*, 927 S.W.2d 627, 631 (Tex. 1996) ("While [*Republic Ins. Co.*] held that a judgment for the insurer on the coverage claim prohibits recovery premised only on *bad faith denial of a claim*, it does not necessarily bar all claims for bad faith.") (emphasis added)).

4

In the context of Sundown's claim for defense costs, Sundown's bad faith claim is predicated on Mid-Continent's denial of coverage. *See* 3d Am. Countercl. ¶ 227 ("Mid-Continent has violated its common law duty of good faith and fair dealing [by] . . . failing to attempt in good faith to effectuate a prompt, fair and equitable settlement of Sundown's attorney's claim fees when its liability therefore is reasonably clear[.]"). The court holds that the bona fide dispute rule precludes Sundown's claim.

Sundown submitted its claim for Hurricane Katrina costs on September 12, 2005. By October 6, 2005 Mid-Continent had received information indicating that Sundown had incurred over $2 million in cleanup costs due to Hurricane Katrina, and on March 22, 2006 Mid-Continent sent Sundown a check for the $1 million Primary Policy limits for reimbursement of government-mandated cleanup costs. Although Sundown indicated on December 2, 2005 that it wanted to

hold its claim for Katrina cleanup costs "in abeyance," Mid-Continent determined after investigating the abeyance request that there was no basis for this request under the Primary Policy, the Umbrella Policy, or Texas law.  There are no provisions in either the Primary Policy or the Umbrella Policy for the placing of a claim "in abeyance," and neither Mid-Continent nor the court has found any case law that supports the premise that an insured can initiate a claim and then abate it.  Because there were neither contractual provisions nor case law to guide Mid-Continent's decision concerning Sundown's request for abeyance, and because Mid-Continent reasonably interpreted the Primary Policy and Umbrella Policy not to permit Sundown to place the claim in abeyance, Mid-Continent had a reasonable basis to believe that the Primary Policy limits had been exhausted and that its duty to defend had ended on March 22, 2006.  *See U.S. Fire Ins. Co.*, 955 S.W.2d at 268-69 (holding that insurer had not acted in bad faith because there was no case law to guide insurer's decision, and its interpretation of policy was not unreasonable).  Because Mid-Continent had a reasonable basis to deny coverage for any defense costs incurred by Sundown after March 22, 2006, Mid-Continent is not liable in tort for denying these claims. See *Lyons*, 866 S.W.2d at 600.  Mid-Continent's motion for summary judgment is accordingly granted, and Sundown's claim for bad-faith denial of its attorney's fees is dismissed.

XII

Having addressed Sundown's common law bad faith claims, the court now turns to Sundown's statutory bad faith claims.

A

Sundown seeks summary judgment on its claim that Mid-Continent committed an unfair settlement practice under Tex. Ins. Code Ann. § 541.060(a)(4) (Vernon Supp. 2008). Section 541.060(a)(4) provides that it is an unfair settlement practice for an insurer to fail within a reasonable time to either (A) affirm or deny coverage of a claim to a policyholder; or (B) submit a reservation of rights to a policyholder. Based on the organization of § 541.060(a)(4), Sundown divides its ultimate argument into two components, seeking summary judgment establishing that Mid-Continent failed to affirm or deny Sundown's Hurricane Rita claim, or to submit a reservation of rights, within a reasonable period of time.

By July 12, 2006 letter Sundown submitted to Mid-Continent a claim for Hurricane Rita's cleanup costs. It included with the letter a summary of "Hurricane Katrina and Hurricane Rita Clean-Up Invoices" and the invoices themselves. On July 14, 2006 Mid-Continent acknowledged receipt of the Hurricane Rita claim and stated that it was starting an investigation. By September 20, 2006 letter Mid-Continent referenced the continuing investigation and stated, *inter alia*:

> As information is developed be advised there
> may be reasons that become known to us that
> will provide the basis for asserting
> exclusions, definitions or conditions that
> could affect our obligations under the above
> policy of insurance. [Mid-Continent] reserves
> the right to issue a declination of coverage
> should it be determined that coverage does not
> apply.

Ds. May 15, 2008 App. 113. Sundown received no other communication from Mid-Continent regarding coverage for its Hurricane Rita claim until Mid-Continent's letter of July 19, 2007, in which Mid-Continent denied coverage.

Sundown contends that Mid-Continent failed to submit a reservation of rights within a reasonable time because (1) the September 20, 2006 letter was inadequate as a matter of law to reserve rights on Sundown's Hurricane Rita claim, and (2) even if the letter was adequate, it was not submitted within a reasonable time. Citing case law regarding the adequacy of a reservation of rights letter in the context of the duty to defend, Sundown submits that the standard should be the same for purposes of deciding compliance with subsection (B) of § 541.060(a)(4). Specifically, to satisfy subsection (B), Sundown argues that the "notice of intent to reserve rights must be sufficient to inform the insured of the insurer's position and must be timely." *Rhodes v. Chi. Ins. Co.*, 719 F.2d 116, 120 (5th Cir. 1983) (duty to defend case). It contends that "the reservation must be unambiguous; if it is ambiguous, the 'the purported reservation of rights must be

construed strictly against the insurer and liberally in favor of the insured.'" *Canal Ins. Co. v. Flores*, 524 F.Supp.2d 828, 834 (W.D. Tex. 2007) (duty to defend case) (citing *Farmers Tex. County Mut. Ins. Co. v. Wilkinson*, 601 S.W.2d 520, 523 (Tex. Civ. App. 1980, writ denied)).

B

It is questionable whether the adequacy standards on which Sundown relies apply in contexts outside the duty to defend. Sundown cites only duty-to-defend cases, and the court has found no case where the standards were applied outside this context. Indeed, as Sundown concedes, the primary significance of a reservation of rights letter under Texas law is in the context of the duty to defend.

> The Texas Supreme Court described an insurer's reservation of rights as the notification to the insured that the insurer will defend the insured, but that the insurer is not waiving any defenses it may have under the policy, and it protects an insurer from a subsequent attack on its coverage position on waiver or estoppel grounds.  Once a defense is taken under a valid reservation of rights, the insurer may withdraw the defense when it becomes clear that there is no coverage under the applicable policy.  The purpose of the reservation of rights letter is to permit the insurer to provide a defense for its insured while it investigates questionable coverage issues.

*Canal Ins. Co.*, 524 F.Supp.2d at 833-34 (internal quotation marks and citations omitted).  Although generally the doctrines of waiver and estoppel cannot be used to create insurance coverage where none

exists under the terms of the policy, *id.* at 834, under a well-established exception,

> if an insurer assumes the insured's defense
> without obtaining a reservation of rights or a
> non-waiver agreement and with knowledge of the
> facts indicating non-coverage, all policy
> defenses, including those of non-coverage, are
> waived, or the insurer may be estopped from
> raising them.

*Id.* (quoting *Farmers Tex. County Mut. Ins.*, 601 S.W.2d at 521-22). This exception is based on the apparent conflict of interest that might arise when the insurer represents the insured in a lawsuit against the insured and simultaneously formulates its defense against the insured for noncoverage. *Id.* In summary, the purposes of a reservation of rights——protecting the insurer from subsequent attack on its coverage position on waiver or estoppel grounds, permitting the insurer to provide a defense for its insured while it investigates questionable coverage issues, and notifying the insured of a potential conflict between the insurer's right to control the defense of the case and the insurer's duty to indemnify——inform the adequacy standards highlighted by Sundown and are highly dependent on the duty-to-defend context. Consequently, it is not clear that the same standards should be applied here in a context outside of the duty to defend, i.e., where the insurer denied coverage of a third-party claim altogether.

Furthermore, for these same reasons, it is not clear that Texas law requires a reservation of rights letter in any context

other than the provision of a qualified defense.   Consequently,
because Mid-Continent need not have sent a reservation of rights
letter at all in the context of Sundown's Hurricane Rita claim, it
seems that Mid-Continent cannot be held liable for failing to send
a reservation of rights letter within a reasonable time.   Indeed,
Sundown admits that the issue whether the September 20, 2006 letter
adequately reserved Mid-Continent's rights within a reasonable time
is really beside Sundown's main point, which is that Mid-Continent
violated § 541.060(a)(4) by failing to deny the Hurricane Rita
claim within a reasonable amount of time.   "The importance of a
reservation of rights" here, Sundown contends, is "that an adequate
reservation of rights letter might have supported some pretense for
the delay of over one year in Mid-Continent's issuing a decision on
coverage for Hurricane Rita."   Ds. June 19, 2008 Reply Br. 21-22.
By attacking the adequacy of the September 20, 2006 letter, Sundown
apparently seeks to preclude Mid-Continent from arguing that the
letter excused Mid-Continent's delay in denying the Hurricane Rita
claim.   Therefore, because the court finds that the inquiry
regarding the adequacy of the September 20, 2006 letter is more
properly folded into the one regarding whether Mid-Continent denied
the Hurricane Rita claim within a reasonable amount of time, the
court will construe Sundown's motion for summary judgment that Mid-
Continent failed to submit a reservation of rights to Sundown
within a reasonable period of time in violation of

§ 541.060(a)(4)(B), and that the letter was inadequate as a matter of law to reserve rights on Sundown's Hurricane Rita claim, as a motion for a summary judgment ruling that the September 20, 2006 letter does not excuse Mid-Continent's delay in denying the Hurricane Rita claim.

C

1

Sundown argues that, by denying Sundown's Hurricane Rita claim over one year after the claim was submitted in writing, Mid-Continent failed to deny coverage within a reasonable time under § 541.060(a)(4), either because a delay of more than one year is *per se* unreasonable or because the reasons cited for the denial were either actually known or available to Mid-Continent at the time the claim was submitted in writing.[31]  Mid-Continent responds that the

---

[31]Specifically, in its July 19, 2007 letter, Mid-Continent asserted three grounds for denying the Hurricane Rita claim under the Primary Policy and one ground for denying the claim under the Umbrella Policy: (1) Sundown waited too long (ten months) to assert its claim; (2) the crude oil that escaped from the containment boom as a result of Hurricane Rita does not constitute a second "Pollution Incident"; (3) Mid-Continent could find no evidence of a government mandate to clean up any spill solely from Hurricane Rita; and (4) because there is no coverage of the Hurricane Rita claim under the Primary Policy and because no payments have been made to exhaust the Primary Policy limits, coverage under the Umbrella Policy has not been triggered.
Sundown submitted its Hurricane Rita claim on July 12, 2006. At this time, Mid-Continent knew that (1) Hurricane Rita had hit ten months before; (2) a September 27, 2005 report from ES&H revealed that the only oil displaced by Hurricane Rita emanated from a containment boom; (3) on October 4, 2005 Sundown had no written mandate concerning Hurricane Katrina; and (4) it had made no payments on Hurricane Rita.

time it took to deny the Hurricane Rita claim was reasonable because its investigation occurred during litigation between the parties over Hurricane Katrina claims; it was forced to subpoena documents from Sundown's cleanup contractor, ES&H; it was necessary to review and analyze voluminous documents received from ES&H on June 29, 2006; and the Hurricane Rita claim was complicated and interrelated to Sundown's Hurricane Katrina claim. Because fact issues abound as to whether the delay was reasonable, the court denies both Sundown's and Mid-Continent's motions for summary judgment on Sundown's § 541.060(a)(4) claim. *See Comsys Info. Tech. Servs.,* 130 S.W.3d at 200 (finding an "arguably unreasonable" delay in providing a coverage opinion to raise an issue of fact regarding whether insurer had breached its duty under Article 21.21 of the Texas Insurance Code (the predecessor to § 541.060(a)(4))).[32]

---

[32]Mid-Continent contends that Sundown's § 541.060(a)(4) claim is precluded by the bona fide dispute rule. The bona fide dispute rule, however, protects an insurer when it has made the "wrong" decision about coverage; it does not permit an insurer to take an unreasonable amount of time to issue a coverage decision. *See Broadhead*, 773 F. Supp. at 905 (holding that "[i]f the sole issue here were whether [insurer] had a reasonable basis for its [position] that the policy did not provide coverage for the [claim], the court would likely be inclined to grant [insurer's] [summary judgment] motion as it pertains to [insured's] bad faith claim," but because "the bad faith issue . . . is not limited solely to [insurer's] decision to deny coverage" but includes "allegations which relate to [insured's] conduct in the adjustment process," including, *inter alia*, insurer's delaying over one year in responding to insured's claims for coverage, the bad faith claims survived summary judgment).

2

Sundown seeks a summary judgment ruling that Mid-Continent's September 20, 2006 letter does not excuse Mid-Continent's delay in denying the Hurricane Rita claim. *See supra* § XII(B). The September 20, 2006 letter referenced the continuing investigation regarding this claim and stated, *inter alia*:

> As information is developed be advised there may be reasons that become known to us that will provide the basis for asserting exclusions, definitions or conditions that could affect our obligations under the above policy of insurance. [Mid-Continent] reserves the right to issue a declination of coverage should it be determined that coverage does not apply.

Ds. May 15, 2008 App. 113.

The court agrees that if Mid-Continent acted unreasonably by denying Sundown's Hurricane Rita claim over one year after the claim was submitted in writing, the boilerplate language contained in the September 20, 2006 letter would not excuse the delay. Rather, the delay can only be excused if it was reasonable. *See* § 541.060(a)(4). And whether the delay was reasonable depends on fact issues that must be determined at trial. *See supra* § XII(C)(1). Accordingly, the court holds that if Mid-Continent failed to deny Sundown's Hurricane Rita claim within a reasonable time, as a matter of law, Mid-Continent cannot avoid bad faith liability under § 541.060(a)(4) by relying solely on its September 20, 2006 letter.

XIII

Because, as the court notes above, Mid-Continent does not adequately address Sundown's common law bad faith claims based on Mid-Continent's failure to conduct a reasonable investigation of the Hurricane Rita claim, and because there are genuine issues of material fact regarding whether Mid-Continent conducted a reasonable investigation of the Hurricane Rita claim, the court denies Mid-Continent's motion for summary judgment on Sundown's § 541.060(a)(7) claim. *See* 3d. Am. Countercl. ¶ 215.

XIV

Sundown seeks summary judgment on its claim that Mid-Continent misrepresented the Primary Policy, in violation of Tex. Ins. Code Ann. § 541.061 (Vernon Supp. 2008) when it denied Sundown's Hurricane Rita claim based in part on failure to timely notify Mid-Continent of the claim.

Section 541.061 provides:

> It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to misrepresent an insurance policy by:
> (1) making an untrue statement of material fact;
> (2) failing to state a material fact necessary to make other statements made not misleading, considering the circumstances under which the statements were made;
> (3) making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact;
> (4) making a material misstatement of law; or
> (5) failing to disclose a matter required by law to be disclosed, including failing to make

- 86 -

a disclosure in accordance with another
provision of this code.

In Mid-Continent's July 19, 2007 letter denying coverage for

Sundown's Hurricane Rita claim, Mid-Continent represented, *inter*

*alia*, that:

> Section IV(d) of the Primary Policy requires
> Sundown to provide notice of a claim to Mid-
> Continent as soon as practicable. Sundown
> knew about a potential claim from Hurricane
> Rita, but waited almost ten months to make a
> claim with Mid-Continent for alleged damages
> due to Hurricane Rita. Because Sundown did
> not provide notice of the claim as soon as
> practicable, there is no coverage under the
> Primary Policy.

Ds. May 15, 2008 App. 134.[33]

Under Texas law and the terms of the Primary Policy, an

insured's failure to timely notify its insurer under an occurrence

policy of a claim or suit does not defeat coverage if the insurer

was not prejudiced by the delay. *See PAJ, Inc. v. Hanover Ins.*

*Co.*, 243 S.W.3d 630, 636 (Tex. 2008) ("Courts [applying Texas

insurance law] have not permitted insurance companies to deny

coverage on the basis of untimely notice under an 'occurrence'

policy unless the company shows actual prejudice from the delay."

(quoting *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins.*

---

[33]Although Mid-Continent states that it "is no longer relying
on or asserting the late notice provisions of its Primary Policy as
a basis for denial of the Rita claim," P. June 4, 2008 Br. 20, the
point is inapposite to the question whether Mid-Continent violated
§ 541.061 when it denied Sundown's Hurricane Rita claim for late
notice.

*Co.*, 174 F.3d 653, 658 (5th Cir. 1999)) (brackets added)); Ds. May 15, 2008 App. 10 (Endorsement modifying Primary Policy such that "[w]ith regard to liability for . . . Property Damage . . . , unless we are prejudiced by the Insured's . . . failure to comply with the requirement, no provision of this Coverage Part requiring . . . any insured to give notice of 'occurrence', claim or 'suit' . . . will bar coverage under this Coverage Part.").

Sundown alleges that, when Mid-Continent denied Sundown's Hurricane Rita claim for late notice, it violated § 541.061(1)-(4) in the following ways: it made an untrue statement of fact as to the policy language when it stated that a ten-month delay in submitting a claim would automatically constitute late notice (§ 541.061(1)); it failed to state that the policy had an endorsement that modified the prompt-notice provision, requiring that prejudice be demonstrated and thus enhanced the misleading nature of its representation of the prompt notice provision (§ 541.061(2)); referring only to the prompt-notice provision and not mentioning the endorsement would lead a reasonably prudent person to the false conclusion that late notice alone could void the policy (§ 541.061(3)); and, to the extent that Mid-Continent's statements were an interpretation of policy provisions and thus a statement of law, they were false insofar as they omitted the important prejudice requirement (§ 541.061(4)).

The court agrees that Mid-Continent's statements in its denial

letter were framed so as to lead the reader to conclude that Sundown's claim for Hurricane Rita cleanup costs was not covered simply because the claim was submitted too late. *See* Ds. May 15, 2008 App. 134 ("Because Sundown did not provide notice of the claim as soon as practicable, there is no coverage under the Primary Policy."). As such, Mid-Continent misrepresented the Primary Policy, at least in violation of § 541.061(2) and (3).

Citing *Republic Insurance Co.*, Mid-Continent contends that Sundown's claim is precluded if there is no coverage of the Hurricane Rita claim. As previously discussed, however, *Republic Insurance Co*. does not foreclose the possibility that, under some circumstances, an insurer can be held liable for bad faith handling of a claim even in the absence of coverage. *See Republic Ins*. *Co.*, 903 S.W.2d at 341 ("We do not exclude, however, the possibility that in denying the claim, the insurer may commit some act, so extreme, that would cause injury independent of the policy claim."). Sundown alleges that Mid-Continent's misrepresentation caused injury independent of the policy claim——namely, the legal expenses Sundown has incurred to research and respond to the misrepresentation.[34] The court therefore holds that Sundown has a

---

[34]Based on these alleged damages, the court rejects Mid-Continent's argument that the alleged misrepresentation was harmless. While Mid-Continent would have denied the Hurricane Rita claim even in the absence of the late-notice assertion (based on the other reasons stated in the denial letter), Sundown still appears to have incurred legal expenses directly as a result of the misrepresentation.

viable claim under § 541.061, even if it is later determined that there is no coverage for the Hurricane Rita claim.

Mid-Continent also contends that there is a bona fide dispute regarding coverage of the Hurricane Rita claim, and therefore it cannot be held liable under § 541.061. The court disagrees. Although the bona fide dispute rule protects Mid-Continent from bad faith liability for erroneously denying the Hurricane Rita claim if there was a reasonable basis for the denial, it does not permit Mid-Continent to misrepresent the Primary Policy. *See Lane v. State Farm Mut. Auto Ins. Co.*, 992 S.W.2d 545, 554 (Tex. App. 1999, pet. denied) (reversing summary judgment on Article 21.21 claims (predecessor to § 541.061) because "the insurer's proving that it had a reasonable basis to deny the claim does not prevent the insured from pursuing recovery for the deceptive act of misrepresenting [the policy]" (quoting *Escajeda*, 934 S.W.2d at 408)).

Accordingly, the court grants Sundown's motion for summary judgment as to liability on its claim that Mid-Continent misrepresented the Primary Policy, in violation of Tex. Ins. Code Ann. § 541.061, and it denies Mid-Continent's motion for summary judgment on the claim.

XV

Sundown alleges several other statutory bad faith claims as to which Mid-Continent moves for summary judgment but does not specifically brief. *See* 3d. Am. Countercl. ¶ 214 (Mid-Continent violated Tex. Ins. Code Ann. § 541.060(a)(6) by "attempting to avoid liability for defense fees and costs in the Underlying Lawsuits by forcing a full and final release of its liability under its policies by sending checks to Sundown in the amount of $6,000,000 on Sundown's Hurricane Katrina clean-up claim (which Sundown was holding in abeyance)"); *id.* at ¶ 222 (Mid-Continent violated § 17.46(b)(12) by misrepresenting characteristics and benefits of Mid-Continent's policies, misrepresenting Mid-Continent's rights and obligations under Mid-Continent's policies, and failing to disclose information while intending to induce Sundown to enter into transactions which Sundown would not have entered into had the information been disclosed); *id.* at ¶ 223 (Mid-Continent violated Tex. Bus. & Com. Code Ann. § 17.50(a)(3) by taking "unconscionable action" that caused damage to Sundown). Essentially, Mid-Continent argues that it cannot be held liable in bad faith under any theory because (1) there can be no extracontractual liability in the absence of coverage under its policy, and (2) it is protected by the bona fide dispute rule. But as discussed above, *see supra* § XI(A)(2), the court rejects Mid-Continent's argument that the determination of the coverage issue

is dispositive of Sundown's bad faith claims. In some circumstances, an insured can be held liable for bad faith handling of a claim even in the absence of coverage. Furthermore, the existence of a bona fide dispute cannot protect the insured against *every* bad faith claim; although the existence of a bona fide dispute would preclude liability for bad faith *denial* of a claim, it does not necessarily preclude liability for bad faith claims predicated on other acts such as the handling of a claim. Therefore, Mid-Continent's general bad faith arguments have failed to shift the burden to Sundown, and the court accordingly denies Mid-Continent's motion for summary judgment on these claims.

XVI

Sundown alleges violations of § 17.50(a)(4) of the DTPA that parallel the violations it alleges under Chapter 541 of the Texas Insurance Code. For the same reasons that the court grants or denies Mid-Continent's motion for summary judgment on Sundown's various Chapter 541 claims, the court grants or denies Mid-Continent's motion for summary judgment on Sundown's parallel DTPA claims.

XVII

A

Mid-Continent moves for summary judgment on Sundown's claim that it is entitled to treble damages under § 541.152(b)[35] for Mid-Continent's knowing violation of § 541. Because the court is granting summary judgment for Sundown as to liability on its claim that Mid-Continent misrepresented the Primary Policy in its letter denying Hurricane Rita coverage, in violation of § 541.061, and because, regarding that claim, Mid-Continent has not pointed the court to the absence of evidence that Mid-Continent knowingly misrepresented the Primary Policy in that letter, the court denies Mid-Continent's motion for summary judgment on Sundown's § 541.152(b) claim.

B

Similarly, Mid-Continent moves for summary judgment on Sundown's claim that it is entitled to treble damages under Tex. Bus. & Com. Code Ann. § 17.50(b)[36] for Mid-Continent's knowing

---

[35]Section 541.152(b): "On a finding by the trier of fact that the defendant knowingly committed the act complained of, the trier of fact may award an amount not to exceed three times the amount of actual damages."

[36]Section 17.50(b):

> In a suit filed under this section, each consumer who prevails may obtain: (1) the amount of economic damages found by the trier of fact. If the trier of fact finds that the conduct of the defendant was committed knowingly, the consumer may also recover

- 93 -

violation of the DTPA.   Because the court is granting summary judgment for Sundown as to liability on its claim that Mid-Continent misrepresented the Primary Policy in its letter denying Hurricane Rita coverage, in violation of § 17.50(a)(4), which parallels Sundown's § 541.061 claim, and because, regarding that claim, Mid-Continent has not pointed the court to the absence of evidence that Mid-Continent knowingly misrepresented the Primary Policy in that letter, the court denies Mid-Continent's motion for summary judgment on this claim.

## XVIII

Finally, Mid-Continent moves for summary judgment on the alternative claims Sundown asserts under Louisiana law.   Sundown avers that its claims are governed by Texas law.   It asserts, however, that in the event Texas law does not provide a remedy the court should apply Louisiana law.   Specifically, it alleges alternative claims under La. R.S. 22:658 and La. R.S. 22:1220. Because the court holds that Texas law applies and does provide a

---

damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of economic damages; or if the trier of fact finds the conduct was committed intentionally, the consumer may recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of damages for mental anguish and economic damages[.]"

remedy for the claims Sundown asserts,[37] it grants summary judgment dismissing Sundown's alternative claims brought under Louisiana law.

## XIX

The *Blanchard* class action lawsuit has settled since the parties initiated the instant suit.  Sundown moves for summary judgment as to the terms of the settlement and on the issues that the settlement was reasonable and that Mid-Continent's refusal to fund the *Blanchard* settlement constitutes breach of contract and violates Tex. Ins. Code Ann. § 541.060(a)(2)(A) (Vernon Supp. 2008).

## A

Before the court can reach these issues, it must consider whether to grant Sundown's motion for leave to amend its third amended counterclaim to add factual allegations and claims that relate to Sundown's settlement of the *Blanchard* action.  Sundown seeks to add claims for breach of contract, violation of Tex. Ins. Code Ann. § 541.060(a)(2)(A) (relating to unfair settlement practices), and breach of Mid-Continent's *Stowers* duty.  Sundown and the *Blanchard* class reached a tentative $2 million dollar settlement in December 2007.  Sundown twice demanded that Mid-Continent fund the settlement, first in December 2007 and again in

---

[37]This conclusion does not mean that Sundown is entitled to the remedy.  The court has addressed the merits of Sundown's Texas law claims above.

February 2008, when the settlement was finalized and pending preliminary court approval.  Each time Mid-Continent responded that it was not obligated to pay for the settlement because Sundown had already exhausted the combined limits of its policies, thereby extinguishing Mid-Continent's duty to indemnify.  After notice to class members and a fairness hearing, the Eastern District of Louisiana granted final approval to the *Blanchard* settlement in June 2008.

B

The court entered a scheduling order setting February 1, 2007 as the deadline for filing motions for leave to amend pleadings. The deadlines for completion of discovery and filing of summary judgment motions expired in April 2008 and May 2008, respectively. Sundown filed the present motion for leave to amend on July 1, 2008.  The trial is currently scheduled for the two-week docket of June 1, 2009.

When, as here, the deadline to amend pleadings has expired, the court considering a motion for leave to amend must first determine whether to modify the scheduling order under the Rule 16(b)(4) good cause standard.  *See S & W Enters., L.L.C. v. South Trust Bank of Ala., N.A.*, 315 F.3d 533, 536 (5th Cir. 2003); *Am. Tourmaline Fields v. Int'l Paper Co.*, 1998 WL 874825, at *1 (N.D. Tex. Dec. 7, 1998) (Fitzwater, J.).  If the movant satisfies the requirements of Rule 16(b)(4), the court must next determine

- 96 -

whether to grant leave to amend under the more liberal standard of Rule 15(a)(2), which provides that "[t]he court should freely give leave when justice so requires." Rule 15(a)(2); *see S & W Enters.*, 315 F.3d at 536; *Am. Tourmaline Fields*, 1998 WL 874825, at *1.

The court assesses four factors when deciding whether to grant an untimely motion for leave to amend: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *S & W Enters.*, 315 F.3d at 536 (internal quotation marks and brackets omitted).

C

1

Sundown maintains that it could not seek leave to amend before the February 1, 2007 deadline because it could not pursue claims arising out of the *Blanchard* settlement until the settlement received final approval in June 2008. Mid-Continent counters that Sundown improperly delayed in seeking leave to amend. Mid-Continent posits that Sundown could have included *Blanchard*-related claims and allegations in its earlier amended counterclaims because, as early as August 2006, Sundown knew that Mid-Continent considered the combined policy limits to be exhausted and therefore would not fund any subsequent settlement. Mid-Continent further contends that Sundown could have moved for leave to amend at least

by December 2007——when Mid-Continent refused to fund the tentative *Blanchard* settlement——but instead chose to delay until the discovery and summary judgment deadlines had expired.

Sundown has offered a satisfactory explanation for seeking leave to amend after the deadline. Because Sundown did not reach a tentative settlement with the *Blanchard* class until December 2007——approximately ten months after the deadline——it clearly could not have timely moved to amend. Further, the court disagrees with Mid-Continent that Sundown should have anticipated that Mid-Continent would refuse to fund the settlement based on policy exhaustion and sought to add claims on this ground. Sundown could not properly allege that Mid-Continent had breached its insurance policies, engaged in unfair settlement practices, or violated its *Stowers* duty before Mid-Continent had in fact refused to fund the settlement. And, although Sundown potentially could have moved to amend in December 2007, when Mid-Continent refused to pay for the tentative settlement, it was not unreasonable for Sundown to wait until court approval of the settlement made both the fact and amount of its liability certain. Had Sundown moved to amend before this, it would have had to have sought leave to amend yet again to allege final court approval of the settlement. Therefore, this factor weighs in favor of granting Sundown leave to amend.

2

Sundown's proposed amendments are important.  As noted above, Sundown seeks not only to allege new facts but to add three claims that potentially provide additional grounds for Sundown to recover against Mid-Continent.  Moreover, Mid-Continent does not offer a reason why the proposed amendments are not important.  This factor also supports granting Sundown leave to amend.

3

The remaining two factors deal with prejudice, and the court will discuss them together.  Mid-Continent maintains that it will be prejudiced if the court grants the motion because it will be unable to move for summary judgment on the claims that Sundown now seeks to add.  Mid-Continent further points out that the discovery and summary judgment deadlines have expired and the trial date is approaching.  Mid-Continent requests that, if the court grants Sundown's motion, it be permitted to conduct limited discovery regarding the *Blanchard* settlement, allowed to file a supplemental summary judgment motion addressing the added claims, and granted a continuance of the trial.  Sundown counters that Mid-Continent will suffer no prejudice because Mid-Continent has known since December 2007 of the potential for a settlement of the *Blanchard* litigation and Sundown's intention to bring new claims against Mid-Continent if it failed to pay.  Sundown also points out that it included *Blanchard*-related statutory and breach of contract claims in its

summary judgment motion, and Mid-Continent responded to them in its briefing. Sundown maintains that limited discovery relating to the *Blanchard* settlement is unnecessary, but does not oppose it; Sundown does oppose a continuance.

The court recognizes that it must "carefully scrutinize a party's attempt to raise new theories of recovery by amendment when the opposing party has filed a motion for summary judgment." *Parish v. Frazier*, 195 F.3d 761, 764 (5th Cir. 1999). But, as explained above, this is not a case where Sundown is attempting to present seriatim theories or facts that it could have included in its original counterclaim or in previous amendments. *Cf. id.* Rather, it has provided a reasonable explanation for moving for leave to amend after the summary judgment deadline. The court concludes that the prejudice to Mid-Continent can be cured by permitting Mid-Continent to file a supplemental summary judgment motion in which it asserts any reasonable grounds on which it relies to seek summary judgment on the *Blanchard*-related claims. If Mid-Continent desires to file such a motion, the court directs that it do so within 30 days of the date this memorandum opinion and order is filed. Because Sundown avers that it does not oppose limited discovery regarding the *Blanchard* settlement, the parties may by agreement conduct discovery limited to this issue. Absent agreement, a party may move for reasonable relief from the discovery deadline. The court can also grant a reasonable

continuance of the trial date.   In fact, a continuance may be beneficial to both sides because today's opinion is the first to address the viability of many of the claims that are at the heart of the parties' dispute, and the rulings will undoubtedly impact the parties' trial preparations.

Considering the four factors in tandem, the court holds that there is good cause to permit Sundown to amend its third amended counterclaim after the deadline established by the scheduling order.   The court also discerns no compelling reason to deny granting leave under the more liberal Rule 15(a)(2) standard.[38]

XX

The court now turns to the merits of Sundown's claims based on the *Blanchard* settlement.

A

The court first addresses Sundown's statutory claim.

1

Sundown moves for summary judgment that Mid-Continent's refusal to fund the $2 million *Blanchard* settlement violates Tex. Ins. Code Ann. § 541.060(a)(2)(A).   Section 541.060(a)(2)(A) provides:

---

[38]Based on this holding, the court also grants Sundown's motion for leave to file a supplemental appendix to its motion for summary judgment that contains the final order and judgment approving the *Blanchard* settlement.

> It is an unfair method of competition or an
> unfair or deceptive act or practice in the
> business of insurance to engage in the
> following unfair settlement practices with
> respect to a claim by an insured or
> beneficiary:
>
> . . .
>
> (2) failing to attempt in good faith to
> effectuate a prompt, fair, and equitable
> settlement of:
>
> (A) a claim with respect to which the
> insurer's liability has become reasonably
> clear[.]

Under Texas law, an insurer's liability with respect to a third-party claim is reasonably clear——triggering § 541.060(a)(2)'s duty with respect to settlement——when four elements are satisfied: (1) the policy covers the claim; (2) the insured's liability is reasonably clear; (3) the claimant has made a proper settlement demand within policy limits; and (4) the demand's terms are such that an ordinarily prudent insurer would accept it. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002). Section 541.060(a)(2) incorporates common law bad faith principles. *See, e.g., Harris v. Am. Protection Ins. Co.*, 158 S.W.3d 614, 624 n.9 (Tex. App. 2005, no pet. h.) (interpreting analogous provision of predecessor statute) ("This statutory standard is identical to the common law bad faith standard."); *Travelers Indem. Co. v. Page & Assocs. Constr. Co.*, 2002 WL 1371065, at *6 (Tex. App. 2002, pet. denied) (not designated for publication) (interpreting part of predecessor statute) ("[W]hen, as here, the alleged statutory

violations are the functional equivalent of alleged bad faith, the bad faith principles enunciated in [*Universal Life Insurance Co.*, 950 S.W.2d 48] are applicable."). More specifically, the bona fide dispute rule applies under this statutory provision: an insurer will not be found to have violated § 541.060(a)(2)(A) if it had a reasonable basis to deny payment of the claim. *See Harris*, 158 S.W.3d at 624, 626 (holding that insurer did not violate statutory predecessor to § 541.060(a)(2)(A) where it had reasonable basis to deny payment of claim) ("Evidence that merely shows a bona fide dispute about the insurer's liability on the contract does not rise to the level of bad faith."); *see supra* § XI(A) (discussing duty of good faith and fair dealing and bona fide dispute rule).

2

Sundown twice demanded that Mid-Continent fund the *Blanchard* settlement, first in December 2007 when a tentative agreement was reached and again in February 2008, when the settlement was finalized and pending preliminary approval by the Eastern District of Louisiana. Mid-Continent each time responded that it was not obligated to pay for the settlement because Sundown had already exhausted the combined limits of its policies, thereby extinguishing Mid-Continent's duty to indemnify. Mid-Continent further informed Sundown that it was free to use $2 million of the $6 million in the court's registry for the settlement, and in May 2008 Mid-Continent filed a notice of its consent to Sundown's

withdrawal of funds from the registry.  Sundown declined to do so because it believed this would undermine its position in the present lawsuit that the $6 million had been improperly tendered.

The parties' dispute centers on the first statutory element: whether the policies cover the claim.  Mid-Continent maintains that it did not violate § 541.060(a)(2)(A) by failing to pay an additional $2 million for the *Blanchard* settlement because it had already exhausted the combined policy limits and therefore no longer owed any duty to indemnify Sundown.  Sundown contends that Mid-Continent violated § 541.060(a)(2)(A) because the policies would cover the settlement but for Mid-Continent's alleged improper exhaustion of policy limits.

3

The court concludes that Sundown has not satisfied its burden to show beyond peradventure that Mid-Continent violated § 541.060(a)(2)(A), because it has not shown that either the Primary Policy or the Umbrella Policy covered its claim for funding of the *Blanchard* settlement.  In its argument, Sundown does not specify whether it maintains that Mid-Continent's alleged duty to fund the *Blanchard* settlement arises under the Primary Policy and the Umbrella Policy or under the Umbrella Policy alone.  To the extent that Sundown maintains that the Primary Policy covered its *Blanchard* claim, the bona fide dispute rule precludes summary judgment in Sundown's favor.  By December 2007, when Sundown first

demanded that Mid-Continent fund *Blanchard*, the parties were already embroiled in this litigation.  At that time a bona fide dispute existed as to whether there was a basis under the Primary Policy for Sundown to hold its claim in abeyance.  Morever, the court has now decided that there was no basis under the Primary Policy for Sundown to hold its claim in abeyance and that Mid-Continent was entitled to tender the Primary Policy limits when it did.  *See supra* § III(C).  Therefore, Mid-Continent did not have a duty under the Primary Policy to fund the *Blanchard* settlement.

To the extent that Sundown maintains that the Umbrella Policy covered its *Blanchard* claim, it has not shown beyond peradventure that Mid-Continent had a duty to pay an additional $2 million when it had already paid out the limits of the Umbrella Policy.  Even assuming that Sundown can prove at trial that Mid-Continent did not by its $5 million payment satisfy its duty to indemnify Sundown, Sundown has failed to establish this beyond peradventure. Accordingly, the court denies the part of Sundown's motion seeking summary judgment that Mid-Continent's refusal to fund the *Blanchard* settlement violated § 541.060(a)(2)(A).

B

The court next addresses Sundown's other summary judgment requests related to the *Blanchard* settlement.[39]  Based on the

---

[39]Although the court granted Sundown leave to add a claim based on breach of *Stowers* duty, Sundown does not seek summary judgment on this claim.

holding of the Eastern District of Louisiana approving the terms of the settlement, and the fact that Mid-Continent does not contest the reasonableness of the settlement, the court grants summary judgment for Sundown as to the terms of the settlement and on the issue that the settlement is reasonable.  But because Sundown's briefing regarding the *Blanchard* settlement does not discuss the breach of contract claim but instead focuses on the statutory violation, the court denies summary judgment for Sundown on the breach of contract claim.

XXI

The parties have both offered expert testimony.  Mid-Continent maintains that expert testimony is not needed on any liability issue in this case and posits that it designated experts only in response to Sundown's designation.  Sundown moves to strike the testimony of Mid-Continent's two proffered expert witnesses or, in the alternative, to limit their testimony.  Mid-Continent, in turn, moves to exclude the opinions of Sundown's proposed expert.  In their briefing, the parties make general arguments for the exclusion of the entirety of the other's proffered expert testimony on the grounds of qualification, relevance, and reliability. Because today's opinion grants summary judgment on several issues, however, much of the expert testimony offered by both parties is moot.  *See, e.g.*, P. Mot. Exclude App. 26-27 (declaration of Sundown's expert) (opining on claim that Mid-Continent breached

- 106 -

Umbrella Policy by withdrawing defense); D. Mot. Strike App. 164-65 (report of one of Mid-Continent's experts) (same).   The court declines to comb the parties' appendixes in search of specific opinions that may be relevant to an issue that will be decided at trial.   Accordingly, the court denies both parties' motions without prejudice.   *Cf. AMX Corp. v. Pilote Films*, 2007 WL 2428940, at *2-*3 (N.D. Tex. Aug. 27, 2007) (Fitzwater J.) (denying without prejudice motion to exclude expert testimony where court declined to exclude testimony *in toto* and proponent had not identified specific opinions to which it objected).   The parties may re-urge specific objections at the pretrial conference and/or at trial.

*     *     *

In sum, the court (1) grants in part and denies in part Sundown's May 15, 2008 motion for partial summary judgment; (2) grants in part and denies in part Mid-Continent's May 15, 2008 motion for summary judgment on the affirmative claims in its first amended complaint for declaratory judgment and as to all counterclaims of defendants; (3) denies without prejudice Mid-Continent's May 15, 2008 motion to exclude expert testimony; (4) denies without prejudice Sundown's May 15, 2008 motion to strike or alternatively to limit Mid-Continent's expert witnesses; (5) denies Sundown's June 4, 2008 motion for hearing on its motion for partial summary judgment and Mid-Continent's motion for summary judgment; (6) grants Sundown's July 1, 2008 motion for leave to

file unsealed supplemental appendix in connection with its motion
for partial summary judgment; and (7) grants Sundown's July 1, 2008
motion for leave to file fourth amended counterclaim.  Sundown may
file the unsealed supplemental appendix and its fourth amended
counterclaim within 30 days of the date this memorandum opinion and
order is filed.  Mid-Continent may file a supplemental summary
judgment motion limited to the *Blanchard* claims within 30 days of
the date this memorandum opinion and order is filed.

**SO ORDERED.**

March 30, 2009.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE