IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MID-CONTINENT CASUALTY COMPANY, | § | |
| | § | |
| | § | Civil Action No. 3:06-CV-1576-D |
| Plaintiff-counterdefendant, | § | consolidated with |
| | § | Civil Action No. 3:06-CV-1578-D |
| | § | |
| VS. | § | |
| | § | **[SEALED OPINION]** |
| ELAND ENERGY, INC., et al., | § | |
| | § | |
| Defendants-counterplaintiffs. | § | |
| | § | |

MEMORANDUM OPINION
AND ORDER

In a prior memorandum opinion and order in this case, *Mid-Continent Casualty Co. v. Eland Energy, Inc.*, 2009 WL 3074618 (N.D. Tex. Mar. 30, 2009) (Fitzwater, C.J.) ("*Mid-Continent I*"), the court decided several issues involving this insurance coverage dispute between plaintiff-counterdefendant Mid-Continent Casualty Co. ("Mid-Continent") and defendants-counterplaintiffs Eland Energy, Inc. and Sundown Energy LP (collectively, "Sundown"). Regarding claims related to Sundown's settlement of the *Blanchard* lawsuit, however, the court largely denied summary judgment for either side. Following *Mid-Continent I*, Sundown filed a fourth amended counterclaim in which it asserts counterclaims for breach of contract, violation of Tex. Ins. Code Ann. § 541.060(a)(2)(A) (Vernon 2009), and breach of the *Stowers*[1] duty arising from Mid-

---

[1] *G. A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex. Comm'n App. 1929, holding approved).

Continent's refusal to participate in or fund the settlement of the *Blanchard* lawsuit. Mid-Continent now moves for partial summary judgment dismissing these counterclaims. For the reasons that follow, the court grants the motion, but it also grants Sundown 21 days to file a supplemental brief that addresses the court's waiver analysis.

I

The background facts and procedural history of this case are set out in *Mid-Continent I* and need not be repeated at length. The court will focus instead on the facts and history necessary to understand today's decision.

This litigation arises from the release of crude oil from storage tanks at Sundown's oil and gas facility near Port Sulphur, Louisiana, caused by Hurricane Katrina, and from the escape of this oil from a containment boom that Sundown was using during Hurricane Katrina cleanup operations, caused by Hurricane Rita. *Mid-Continent I*, 2009 WL 3074618, at *1. Mid-Continent insured Sundown under a commercial general liability policy ("Primary Policy") and an umbrella policy ("Umbrella Policy"). *Id.* Five lawsuits (including three class actions) were filed against Sundown by neighboring property owners and commercial fishermen affected by the Hurricane Katrina spillage. *Id.* at *2. One of the class actions—the *Blanchard* lawsuit—settled after the present case was filed. *Id.* at *36.

Sundown twice demanded that Mid-Continent fund the *Blanchard* settlement. *Id.* Mid-Continent refused each time, contending that Sundown had already exhausted the $6 million combined limits of the Primary and Umbrella Policies by paying that sum into the court's registry. Mid-Continent also advised Sundown that it could use $2 million of the $6 million in the court's registry for this purpose, but Sundown declined. *Id.* at *36.

In *Mid-Continent I* the court addressed the component of Sundown's summary judgment motion in which it contended that the *Blanchard* settlement was reasonable and that Mid-Continent's refusal to fund the settlement constituted breach of contract and a violation of Tex. Ins. Code Ann. § 541.060(a)(2)(A). *Id.* at *35. Regarding Sundown's claim under § 541.060(a)(2)(A), the court denied summary judgment on the basis that Sundown had not established beyond peradventure that either the Primary Policy or the Umbrella Policy covered its claim for funding of the *Blanchard* settlement. *Id.* at *39. The court explained that Sundown had not specified whether Mid-Continent's alleged duty to fund the *Blanchard* settlement arose under the Primary Policy and the Umbrella Policy, or under the Umbrella Policy alone. *Id.* To the extent that Sundown maintained that the Primary Policy covered its *Blanchard* claim, the bona fide dispute rule precluded summary judgment in Sundown's favor. By December 2007 the parties were already embroiled in this litigation, and there was a bona fide

- 3 -

dispute regarding whether there was a basis under the Primary Policy for Sundown to hold its claim in abeyance. *Id*. The court also decided in *Mid-Continent I* that there was no basis under the Primary Policy for Sundown to hold its claim in abeyance. Mid-Continent was therefore entitled to tender the Primary Policy limits when it did, so it did not have a duty under the Primary Policy to fund the *Blanchard* settlement. *Id.*

Concerning whether the Umbrella Policy covered the *Blanchard* claim, the court held that Sundown had failed to show beyond peradventure that Mid-Continent had a duty to reimburse Sundown when it had already paid out the limits of the Umbrella Policy. *Id.* And even assuming that Sundown could prove at trial that Mid-Continent did not by its $5 million payment satisfy its duty to indemnify Sundown, Sundown had failed to establish this beyond peradventure. *Id.*

Concerning Sundown's other summary judgment requests related to the *Blanchard* settlement, the court granted summary judgment for Sundown on the issue that the settlement was reasonable. *Id*. But because Sundown's pertinent briefing focused on the statutory violation rather than on the breach of contract claim, the court denied summary judgment for Sundown as to its breach of contract claim. *Id.* The court did, however, grant Sundown leave to amend its third amended counterclaim to add factual allegations and claims related to the settlement of the *Blanchard* action. *Id. at*

- 4 -

*38.   Specifically,  the  court  granted  Sundown  leave  to  assert counterclaims  against  Mid-Continent  for  breach  of  contract, violation of Tex. Ins. Code Ann. § 541.060(a)(2)(A), and breach of Mid-Continent's *Stowers* duty.

After  Sundown  filed  its  fourth  amended  counterclaim,  Mid-Continent  filed  the  instant  motion  for  partial  summary  judgment seeking  dismissal  of  the  counterclaims  related  to  the  *Blanchard* action.   Sundown  opposes  the  motion.

## II

Mid-Continent  moves  for  summary  judgment  on  counterclaims  as to  which  Sundown  will  bear  the  burden  of  proof  at  trial.   Because Sundown  has  this  burden,  Mid-Continent  can  meet  its  summary judgment  obligation  by  pointing  the  court  to  the  absence  of evidence  to  support  Sundown's  counterclaims.   *See Celotex Corp. v. Catrett*,  477  U.S.  317,  325  (1986).   Once  Mid-Continent  does  so, Sundown  must  go  beyond  its  pleadings  and  designate  specific  facts showing  there  is  a  genuine  issue  for  trial.   *See id.* at  324; *Little v. Liquid Air Corp.*,  37  F.3d  1069,  1075  (5th  Cir.  1994)  (en  banc) (per  curiam).   An  issue  is  genuine  if  the  evidence  is  such  that  a reasonable  jury  could  return  a  verdict  in  Sundown's  favor. *Anderson  v.  Liberty  Lobby,  Inc.*,  477  U.S.  242,  248  (1986). Sundown's  failure  to  produce  proof  as  to  any  essential  element  of a  claim  renders  all  other  facts  immaterial.   *See Trugreen Landcare, L.L.C.  v.  Scott*,  512  F.Supp.2d  613,  623  (N.D.  Tex.  2007)

- 5 -

(Fitzwater, J.).  Summary judgment is mandatory if Sundown fails to meet this burden.  *Little*, 37 F.3d at 1076.  The heavy "beyond peradventure" standard, which applied at various times in *Mid-Continent I*, does not control most components of the disposition of Mid-Continent's present motion.

                                III

    Mid-Continent seeks summary judgment dismissing Sundown's breach of contract counterclaim.

    It is undisputed that Texas law applies in this diversity case.[2]  "Texas courts interpret insurance policies according to the rules of contractual interpretation."  *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 291 (5th Cir. 2005) (citing *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998)).  "In applying these rules, a court's primary concern is to ascertain the parties' intent as expressed in the language of the policy."  *Id.*  The court must give effect to all of a policy's provisions so that none is rendered meaningless.  *Id.*  When a "contract is worded so that it can be given a definite meaning, it is unambiguous and a judge must construe it as a matter of law."  *Id.; see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552,

---

[2]In *Mid-Continent I* the court granted summary judgment dismissing Sundown's alternative claims under Louisiana law.  *Mid-Continent I*, 2009 WL 3074618, at *35.  But Sundown asserted that its claims were governed by Texas law; it advanced alternative claims only in the event that Texas law did not provide a remedy.  *See id.*

                               - 6 -

555 (Tex. 1991).   "When a contract is reasonably susceptible of more than one meaning, however, it is ambiguous and a court should adopt a construction that favors the insured." *Id.*   "In particular, exceptions or limitations on liability are strictly construed against the insurer and in favor of the insured." *Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365, 371 (5th Cir. 2008) (quoting *Nat'l Union Fire Ins.,* 811 S.W.2d at 555).   "Whether an insurance contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Int'l Ins.*, 426 F.3d at 291 (citing *Kelley-Coppedge*, 980 S.W.2d at 464).

"To recover for breach of contract, one must show: 1) the existence of a valid contract; 2) performance or tendered performance by the plaintiff; 3) breach of the contract by the defendant; and 4) damages to the plaintiff resulting from the breach." *Palmer v. Espey Huston & Assocs., Inc.*, 84 S.W.3d 345, 353 (Tex. App. 2002, pet. denied) (citing *Adams v. H & H Meat Prods., Inc.*, 41 S.W.3d 762, 771 (Tex. App. 2001, no pet.)).   "A breach occurs when a party fails or refuses to do something he has promised to do." *Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App. 2003, pet. denied).

IV

The court considers first whether a reasonable jury could find that Mid-Continent breached the Primary Policy by failing to participate in and fund the *Blanchard* settlement.

In *Mid-Continent I* the court held that Mid-Continent satisfied its contractual obligations under the Primary Policy by tendering a $1 million check to Sundown on March 22, 2006 as reimbursement for cleanup costs imposed by the U.S. Coast Guard ("Coast Guard"). Mid-Continent had no further duty to indemnify Sundown after that date. *Mid-Continent I*, 2009 WL 3074618, at *12. Sundown alleges in its fourth amended counterclaim that the *Blanchard* case did not settle until December 2007. It acknowledges that it did not demand that Mid-Continent participate in and fund the settlement until December 2007 and thereafter. Because Mid-Continent no longer owed a duty to indemnify Sundown under the Primary Policy, it did not breach its contract by refusing to participate in or fund the *Blanchard* settlement.

V

The court considers next whether a reasonable jury could find that Mid-Continent breached the Umbrella Policy.

A

The court must first decide what terms govern the payment of insurance proceeds under the Umbrella Policy.[3]  To understand today's decision, the court begins by setting out its pertinent holdings from *Mid-Continent I* about coverage under the Umbrella Policy.

In *Mid-Continent I* the court considered whether Mid-Continent had satisfied its duty to indemnify Sundown under the Umbrella Policy with respect to the three class action lawsuits, including *Blanchard*.  *See Mid-Continent I*, 2009 WL 3074618, at *12.  Mid-Continent contended that it had no further duty to indemnify Sundown because it had tendered $5 million for Hurricane Katrina cleanup costs, thereby exhausting the Umbrella Policy limits. Sundown argued that Mid-Continent could not pay for cleanup costs under the Umbrella Policy until Sundown's claim for reimbursement from a fund established under the Oil Pollution Act of 1990 ("OPA Fund") had been determined.  *Id.* at *16.

The court began by identifying three Umbrella Policy provisions that were relevant to this issue.  First, the Umbrella

---

[3]Notably, the roles of these parties are reversed from what the court typically sees in an insurance coverage dispute.  Mid-Continent (the insurer) wants to pay Sundown the policy limits and to construe the Umbrella Policy and the Oil & Gas Endorsement to authorize, if not require, that it tender the policy limits. Sundown (the insured) argues that Mid-Continent is not entitled to tender the limits of the Umbrella Policy and, in the context relevant here, to terminate any obligation to fund the *Blanchard* settlement.

Policy provides that Mid-Continent "will indemnify the insured for ultimate net loss in excess of the retained limit because of . . . property damage to which this insurance applies." *Id.* (ellipsis in original) (quoting P. May 19, 2008 App. 40). Second, the Umbrella Policy defines "Ultimate net loss" as

> the total amount of damages for which the insured is legally liable in payment of . . . property damage . . . . Ultimate net loss must be fully determined as shown in SECTION V — CONDITIONS Item 18. When Loss Payable. Ultimate net loss shall be reduced by any recoveries or salvages which have been paid or will be collected, but the amount of ultimate net loss shall not include any expenses incurred by any insured, by us or by any underlying insurance.

*Id.* (quoting P. May 19, 2008 App. 53). Third, the "When Loss Payable" condition provides:

> [Mid-Continent's] liability for any portion of ultimate net loss shall not apply until the insured or any underlying insurance shall be obligated to actually pay the full and complete amount of the retained limit. When ultimate net loss has been finally determined, the insured may make claim for indemnity under this policy as soon as practicable thereafter. Such insured's obligation to pay any amount of ultimate net loss must have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and [Mid-Continent].

*Id.* (quoting P. May 19, 2008 App. 50).

The court then noted that, although the parties had discussed at length whether Mid-Continent had assumed a duty *to defend* under the Umbrella Policy, they had devoted little discussion to whether

Mid-Continent had performed its duty *to indemnify* Sundown under the Umbrella Policy. Because Mid-Continent had moved for summary judgment on the indemnification issue and would have the burden of proof at trial on its declaratory judgment claim, it was required to prove beyond peradventure that it had satisfied its duty to indemnify. The court concluded that Mid-Continent had not carried this burden. *Id.* Although Mid-Continent tendered payment of the Umbrella Policy limits, it had not proved that this payment complied with the terms of the Umbrella Policy. *Id.* at *17. For example, Mid-Continent had not shown that Sundown's "ultimate net loss" had been "finally determined." The "When Loss Payable" condition provides that Sundown's "obligation to pay any amount of ultimate net loss must have been finally determined either by judgment against [Sundown] after actual trial or by written agreement of [Sundown], the claimant and [Mid-Continent]." *Id.* (quoting P. May 19, 2008 App. 50). Mid-Continent had not established that this condition had been met. There was no summary judgment evidence that Sundown's obligation for the cleanup costs had been determined by judgment after actual trial or by a written agreement among Sundown, the claimant, and Mid-Continent, and there was evidence that Sundown had never incurred covered cleanup costs that met or exceeded the Umbrella Policy limits. *Id.* The court could not grant summary judgment in Mid-Continent's favor because it had not established beyond peradventure that it had satisfied

its duty to indemnify Sundown under the terms of the Umbrella Policy. *Id.* Notably, unlike in today's decision, the court did not address in *Mid-Continent I* how the Oil & Gas Endorsement to the Umbrella Policy impacted the issues presented by Mid-Continent's summary judgment motion.[4]

B

Having recounted the pertinent holdings of *Mid-Continent I*, the court turns to the parties' present contentions. Mid-Continent maintains that the Oil & Gas Endorsement's use of the term "legally obligated to pay" modifies the Umbrella Policy and, at least for expenses related to pollution incidents, displaces the requirement that expenses be finally determined by settlement or trial. Applying the reasoning of *Mid-Continent I* for the Primary Policy, Mid-Continent contends that it can (and must) indemnify Sundown so long as Sundown was legally obligated to pay cleanup expenses. It posits that Sundown's legal obligations exceeded the limits of the Umbrella Policy, and that its tender of $5 million on August 18, 2006 fulfilled its duty to indemnify Sundown under the Umbrella Policy. Mid-Continent reasons that, because its duty to indemnify

---

[4]Unlike in *Mid-Continent I*, Mid-Continent now moves for summary judgment on a breach of contract counterclaim for which Sundown will have the burden of proof at trial. Mid-Continent can therefore meet its summary judgment obligation by pointing the court to the absence of evidence to support Sundown's counterclaim. *See Mid-Continent I*, 2009 WL 3074618, at *5. Sundown is incorrect in asserting that Mid-Continent must meet the beyond peradventure standard to defeat Sundown's breach of contract counterclaim. *See* Ds. Br. 14.

- 12 -

had been fulfilled by the time Sundown requested that it fund the *Blanchard* settlement, it did not breach the Umbrella Policy. Similarly, because it had paid out all that was available under the policy before the settlement demand, Mid-Continent did not breach its statutory or *Stowers* duty to settle. Mid-Continent argues in the alternative that Sundown had spent at least $5,729,394.86 on cleanup, so it cannot be required to pay more than $270,605.14 toward the *Blanchard* settlement.[5]

Sundown counters that the Oil & Gas Endorsement only modifies the coverage of the Umbrella Policy and leaves intact the condition that Mid-Continent had no duty to pay expenses that were not yet finally determined. It contends that Mid-Continent's $5 million tender was premature because Sundown's ultimate liability for cleanup costs was not yet known; therefore, "ultimate net loss" could neither be determined nor paid. Sundown argues that Mid-Continent had no reason to believe that Sundown's cleanup expenses exceeded the policy limits, and that Mid-Continent cannot show that it did not by its conduct breach the Umbrella Policy or its statutory or common-law duty to settle.

### C

The court does not agree entirely with either side's position, although its interpretation of the Umbrella Policy and the Oil &

---

[5]Mid-Continent does not explain how its alternative argument would enable the court to grant summary judgment on any of Sundown's three counterclaims at issue.

Gas Endorsement in tandem favors Mid-Continent.  The court holds that, concerning claims for "Bodily Injury" or "Property Damage" liability "caused by a 'pollution incident,'" the Oil & Gas Endorsement *does not* modify the Umbrella Policy's condition precedent to payment.  But because of different language that is consistent with the nature of the coverage provided, the Oil & Gas Endorsement *does* modify the condition precedent concerning mandated "clean-up costs."

Under Texas law, "[a]n insurance policy and its endorsements should be construed together unless they are so much in conflict they cannot be reconciled." *TIG Ins. Co. v. N. Am. Van Lines, Inc.*, 170 S.W.3d 264, 271 (Tex. App. 2005, no pet.) (citing *Mesa Operating Co. v. Cal. Union Ins. Co.*, 986 S.W.2d 749, 754 (Tex. App. 1999, pet. denied) (holding that where "ultimate net loss" was defined by policy to include legal expenses, but defined by endorsement to exclude them, "ultimate net loss" did not include legal expenses).  "Yet, an endorsement cannot be read apart from the main policy, and the added provisions will only supersede the previous policy terms to the extent they are truly in conflict." *Mesa Operating*, 986 S.W.2d at 754 (citing *Westchester Fire Ins. v. Heddington Ins. Ltd.*, 883 F. Supp. 158, 165 (S.D. Tex. 1995), *aff'd*, 84 F.3d 432 (5th Cir. 1996)).

The parties agree that the Oil & Gas Endorsement supplants the Umbrella Policy's exclusion of pollution-related expenses, adding

- 14 -

coverage for bodily injury, property damage, and mandated cleanup costs that Sundown becomes obligated to pay that are caused by a pollution incident. But the parties disagree about whether the endorsement amends the Umbrella Policy concerning when a loss is payable. For losses not covered by the Oil & Gas Endorsement, Mid-Continent's contractual duty to indemnify Sundown does not arise until Sundown's obligation is finally determined by a judgment against Sundown after actual trial or by a written agreement to which Sundown, Mid-Continent, and the claimant are parties. Under the Umbrella Policy, Mid-Continent agreed to "indemnify [Sundown] for ultimate net loss in excess of the retained limit because of bodily injury or property damage to which this insurance applies." *Mid-Continent I*, 2009 WL 3074618, at *13 (quoting P. May 19, 2008 App. 40). As previously noted, "Ultimate net loss" is defined as the "total amount of damages for which the insured is legally liable in payment of . . . property damage[.]" *Id.* at *16 (ellipsis in original) (quoting P. May 19, 2008 App. 53). The definition also limits payment for "ultimate net loss" to damages that have been "fully determined as shown in SECTION V — CONDITIONS Item 18. When Loss Payable." *Id.* (quoting P. May 19, 2008 App. 53). "Item 18. When Loss Payable" provides, in relevant part, that "[Sundown's] obligation to pay an amount of ultimate net loss must have been finally determined either by judgment against [Sundown] after actual trial or by written agreement of [Sundown],

- 15 -

the claimant, and [Mid-Continent]." *Id.* (quoting P. May 19, 2008 App. 50).

Mid-Continent argues that the Oil & Gas Endorsement alters the Umbrella Policy's condition precedent to payment for pollution-related expenses. It contends that, instead of requiring that Sundown's loss be a finally determined ultimate net loss, payment is proper so long as Sundown is legally obligated to pay the sum. Therefore, in Mid-Continent's view, the concept of "ultimate net loss" is inapplicable to pollution-related expenses. It points out that the Oil & Gas Endorsement provides coverage for, *inter alia*, "Bodily Injury," "Property Damage," and "Mandated 'Clean-up Costs'" "caused by a 'pollution incident.'" P. Apr. 29, 2009 App. 29.[6] The Oil & Gas Endorsement states that Mid-Continent will pay "those sums that [Sundown] become[s] *legally obligated to pay* because of 'bodily injury' or 'property damage' to which this insurance applies, caused by a 'pollution incident.'" *Id.* (emphasis added). And it also covers "'clean-up costs' that [Sundown] *become[s] legally obligated to pay* because of 'environmental damage' to which this insurance applies, caused by a 'pollution incident.'" *Id.* (emphasis added). In the case of "Mandated 'Clean-up Costs,'" the obligation "must be asserted under statutory authority of the United States of America or any political subdivision of the United

---

[6]The Oil & Gas Endorsement also covers certain "Voluntary 'Clean-up Costs.'" P. Apr. 29, 2009 App. 29. *See infra* note 8.

States," *id.*, and "[n]otice asserting such obligation must be first received by [Sundown] within 180 days of the 'Pollution Incident,'" *id.*

Mid-Continent's argument is misplaced because it fails to take account of a number of other provisions in the Umbrella Policy that premise the parties' rights and obligations on payment of "ultimate net loss." As Sundown points out, interpreting the Oil & Gas Endorsement to render the term "ultimate net loss" inapplicable would turn the Oil & Gas Endorsement into a policy separate from the underlying Umbrella Policy, not simply an endorsement that adds coverage for pollution-related liability. Key provisions of the Umbrella Policy function independently or together based on the concept of "ultimate net loss." For example, the "Insuring Agreement" for Coverage A provides that Mid-Continent "will indemnify [Sundown] for ultimate net loss in excess of the retained limit because of bodily injury or property damage to which this insurance applies." P. Apr. 29, 2009 App. 14 (bold font omitted). The Oil & Gas Endorsement does not limit liability to sums exceeding the retained limit. If, as Mid-Continent posits, pollution-related expenses are not included within "ultimate net loss," then Mid-Continent's liability to reimburse them begins when Sundown becomes legally obligated to pay them rather than when the expenses together exceed the retained limit. The term "sums that [Sundown] become[s] legally obligated to pay" can instead be read

- 17 -

in harmony with the Umbrella Policy's definition of "ultimate net loss"——i.e., that Sundown is "legally obligated to pay," as that phrase is used in the Oil & Gas Endorsement, when a loss has been finally determined.  The court therefore holds that "ultimate net loss" includes the coverage provided by the Oil & Gas Endorsement.[7]

Similarly, the Oil & Gas Endorsement's extension of coverage to "Bodily Injury" and "Property Damage" caused by a pollution incident does not conflict with the requirement that such damages be finally determined by judgment or three-party settlement.  These losses typically arise from claims asserted by private parties who must bring a claim or a lawsuit because they lack the authority simply to mandate that the insured compensate them for their losses.  But such claims and suits are frequently contested, and Mid-Continent has the right to defend against them and participate in settling them.  By requiring that a loss be finally determined by judgment or settlement, the Umbrella Policy affords Mid-

_____

[7]In doing so, the court concludes that the definition of "ultimate net loss" includes mandated cleanup costs.  The Umbrella Policy actually provides that "'Ultimate net loss' means the total amount of damages for which the Insured is legally liable in payment of bodily injury, property damage, personal injury, or advertising injury."  P. Apr. 29, 2009 App. 27 (bold font omitted). The definition does not include mandated cleanup costs.  As the court has stated above, however, to omit cleanup costs from the determination of "ultimate net loss" would create one or more unintended consequences in the operation of the Umbrella Policy as a whole.  Therefore, the Oil & Gas Endorsement should be read together with the Umbrella Policy to include mandated cleanup costs as damages that fall within the definition of "ultimate net loss."

Continent an opportunity to invoke its right to associate with an underlying insurer and the insured to defend a claim or lawsuit and to participate in settlement negotiations.  The importance of taking part in the settlement process is the same whether the underlying loss is caused by a pollution incident or something else.  The Umbrella Policy and the Oil & Gas Endorsement can be harmonized to provide that sums that Sundown becomes legally obligated to pay are governed by the insuring agreement under Coverage A and are therefore subject to the provision that Mid-Continent will pay for "ultimate net loss in excess of the retained limit," P. Apr. 29, 2009 App. 14 (bold font omitted), i.e., that they will be determined by judgment or settlement.

But the same is not true for mandated cleanup costs.  And it is in this respect that the court agrees with Mid-Continent. Mandated cleanup costs can be legally incurred in the absence of a judgment or three-party settlement.  The Oil & Gas Endorsement implicitly recognizes this fact.  It provides that while Sundown must be legally obligated to pay mandated "clean-up costs," this obligation "must be asserted under statutory authority of the United States of America or any political subdivision of the United States," and "[n]otice asserting such obligation must be first received by [Sundown] within 180 days of the 'Pollution Incident.'" P. Apr. 29, 2009 App. 29.  No similar provision applies to liability for "Bodily Injury" or "Property Damage."  This special

- 19 -

requirement concerning mandated cleanup costs accounts for the nature of pollution regulation. Pollution—at least in the sense of *mandated* cleanup costs—is regulated by various agencies of the United States and its political subdivisions, and they can legally compel entities to clean up pollution without first obtaining a judgment or settlement, as the Coast Guard did here. In apparent recognition of how payment of mandated cleanup costs works in practice, the Oil & Gas Endorsement modifies the Umbrella Policy's condition precedent to payment of such costs.[8] So long as the insured has been compelled to pay by a legal entity under the terms prescribed by the Oil & Gas Endorsement, the insured's liability need not have been finally determined by judgment after actual trial or by written agreement of the insured, the claimant, and Mid-Continent. This interpretation of the Oil & Gas Endorsement gives effect to the scope of coverage that an insured is likely seeking when it purchases insurance for mandated cleanup costs. The court therefore agrees with Mid-Continent that, in indemnifying

---

[8]The court notes that the Oil & Gas Endorsement also provides coverage for "Voluntary 'Clean-up Costs.'" P. Apr. 29, 2009 App. 29. This provision requires that the costs be reasonable and necessary, incurred to curtail or prevent a pollution incident that poses imminent and substantial danger of bodily injury, property damage, or environmental damage to which the insurance provided in the endorsement for bodily injury, property damage, or mandated cleanup costs applies, and that the costs be incurred with Mid-Continent's written consent. This is a further indication that the parties contemplated that cleanup costs were by their nature different from other liabilities and should be governed by different conditions precedent to payment.

Sundown for mandated cleanup costs, it was not necessary for Mid-Continent to await a judgment after actual trial or a written agreement of the insured, the claimant, and Mid-Continent.

Sundown's interpretation of the Umbrella Policy and the Oil & Gas Endorsement is skewed in this case, perhaps because it is not taking the position of the typical insured. Because of its concern that Mid-Continent's reimbursement of cleanup costs will entitle Mid-Continent to any recovery from the OPA Fund, Sundown maintains that Mid-Continent was not entitled to tender the policy limits when it did. But while Sundown's interpretation of the Umbrella Policy and Oil & Gas Endorsement fits Sundown's theory for this case, the court would perforce be obligated to apply the same interpretation to insureds who *want* their mandated cleanup costs paid. Adopting Sundown's view would enable insurers under policies and endorsements like the ones at issue here to avoid reimbursing insureds for government-mandated cleanup costs before a judgment has been entered or a tri-party settlement reached. This is not what the Umbrella Policy and Oil & Gas Endorsement objectively intend with respect to mandated cleanup costs.

Sundown also argues that the Umbrella Policy's definition of "ultimate net loss" prevents Mid-Continent from paying policy proceeds until Sundown has recovered from the OPA Fund. Under the policy, "ultimate net loss" is "reduced by any recoveries or salvages which have been paid or will be collected." *Mid-Continent*

*I*, 2009 WL 3074618, at *16 (quoting P. May 19, 2008 App. 53). Sundown argues that the "ultimate net loss" must be reduced before Mid-Continent indemnifies it, and that the loss cannot be reduced until reimbursement from the OPA Fund occurs. Sundown maintains that, unless the court adopts this view, Sundown would remain liable for the *Blanchard* settlement and related claims while Mid-Continent would be fully reimbursed under the Umbrella Policy for sums it paid in indemnity, without having to reimburse Sundown for any of the other claims. *Id.* at *17.

Because of Sundown's theory in this case, it is invoking a provision that is intended to protect the insurer from paying a loss that the insured has not actually occurred and is interpreting it to effectively render meaningless another part of the policy that affords Mid-Continent a right to subrogation. One clear intent of the definition of "ultimate net loss" is to provide that Mid-Continent is not obligated to indemnify Sundown for any recoveries or salvages that have been paid to Sundown or that Sundown will collect. The purpose is to eliminate indemnification for damages that Sundown is legally liable to pay, but for which it has or will definitely obtain a recovery or salvage (i.e., for which it will not suffer a loss). This provision does not apply to recoveries that are contingent and uncertain. The Umbrella Policy and Texas law require that Sundown make a claim and that Mid-Continent promptly pay the claim. The recovery provision thus does

- 22 -

not apply to potential future recoveries, but to ones that are definite at the time the claim is made and paid.

Sundown argues that Mid-Continent is prevented from paying until Sundown has determined whether it can obtain a salvage or recovery (here, a reimbursement from the OPA Fund). In its view, the entire limits of the Umbrella Policy remain available to fund other claims, including (as pertinent here) the *Blanchard* settlement. This interpretation would render meaningless a separate policy provision that affords Mid-Continent subrogation rights. That provision gives Mid-Continent the right to collect sums owed to Sundown by a third party for a loss that Mid-Continent has already indemnified. Sundown essentially argues that Mid-Continent cannot reimburse Sundown until such third-party claims are settled, rendering Mid-Continent's subrogation rights feckless. Sundown's interpretation effectively places its mandated cleanup claims in abeyance——a concept that the court rejected in *Mid-Continent I*——and also deprives Mid-Continent of its contractual subrogation rights. The court therefore declines to accept Sundown's interpretation of how the relevant parts of the Umbrella Policy and the Oil & Gas Endorsement should be interpreted in tandem.

In sum, the court holds that the Umbrella Policy and the Oil & Gas Endorsement can be read together to provide that losses that Sundown incurs for "Bodily Injury" and "Property Damage" caused by

- 23 -

a pollution incident must be finally determined by judgment or settlement, as provided under the definition of "ultimate net loss," including the "When Loss Payable" provision.  Losses caused by mandated cleanup costs are also subject to that definition, except regarding the requirement that the costs be finally determined by judgment or settlement.  Instead, Mid-Continent must indemnify Sundown for such costs when, as the Oil & Gas Endorsement provides, they are asserted under statutory authority of the United States of America or any political subdivision of the United States, and notice asserting such obligation was first received by Sundown within 180 days of the pollution incident.

VI

Although the court has interpreted the Umbrella Policy and the Oil & Gas Endorsement in a manner that favors Mid-Continent, it must still determine whether summary judgment is warranted on Sundown's contract counterclaim.

A

The record does not clearly show that Sundown was legally obligated to pay $6 million in cleanup costs (i.e., the limits of the Primary Policy and the Umbrella Policy) as of August 18, 2006. Mid-Continent asserts that Sundown's General Counsel, Robin McGuire, Esquire ("McGuire"), informed Mid-Continent on June 16, 2006 that Sundown had spent $5.7 million on cleanup, and that such costs would exceed $6 million.  McGuire sent a letter to Mid-

- 24 -

Continent one month later that stated that, because Sundown had been granted a discount, it had paid $5,469,650.65 in cleanup costs. McGuire argues that he represented at the meeting that cleanup costs *plus the costs of the underlying litigation* would exceed $6 million. He stated that the total of cleanup costs on June 16 was $5.3 million and eventually equaled $5,469,650.65. And he said that Sundown submitted a claim of $5,719,681.53 to the Coast Guard for reimbursement of cleanup costs from the OPA Fund.[9] Sundown asserts that Mid-Continent had previously argued that some of these costs were not covered by the Umbrella Policy because they were for the cleanup of Sundown's own property; however, Sundown does not direct the court to where Mid-Continent made this claim.

There is summary judgment evidence that Sundown was legally obligated to spend at least $5,469,650.65. Mid-Continent's reimbursement of those costs partially exhausted the total amount it owed under the Umbrella Policy. Based on Mid-Continent's conversation with Sundown's counsel, Mid-Continent also had reason to believe that Sundown would eventually incur further covered liability for property damage, thereby exceeding the policy limits.[10] But the court cannot determine that Sundown was liable

---

[9]It is not clear how much of this claim was based on cleanup costs, rather than on property damage.

[10]Sundown and the *Blanchard* class settled for $2 million on February 21, 2008. Mid-Continent consented to the settlement the next day. The *Blanchard* court approved the settlement on June 6, 2008.

for more than the policy limits——either in payment of cleanup costs or judgments or settlements——at the time Mid-Continent tendered the $5 million payment.  The court's reasoning in *Mid-Continent I* and here——that Mid-Continent's reimbursements counted toward policy limits because Sundown was legally obligated to pay the related costs——cannot justify applying reimbursements for cleanup costs that Sundown did not yet legally owe.  Similarly, the reasoning cannot extend to reimbursements for claims of property damage that Sundown would eventually become obligated to pay, since the judgment or settlement requirement applies to those expenses. Accordingly, there is a genuine issue of material fact about whether Sundown had spent $6 million or more in mandated cleanup costs on August 18, 2006.

B

If Mid-Continent was only contractually entitled to indemnify Sundown after the ultimate net loss had been finally determined, summary judgment on Sundown's breach of contract counterclaim would be improper because there is a genuine issue of material fact whether Sundown was legally obligated to pay $6 million in covered damages and/or cleanup costs at the time Mid-Continent tendered the payment.  But if Mid-Continent was entitled to tender the policy limits regardless of whether Sundown was as yet legally obligated to pay $6 million in covered damages and/or cleanup costs, Mid-Continent is entitled to summary judgment because it exhausted the

- 26 -

Umbrella Policy limits before Sundown demanded that Mid-Continent participate in and fund the *Blanchard* settlement.  If Mid-Continent could waive the conditions precedent that benefited Mid-Continent, it could tender policy limits and eliminate further contractual liability to indemnify Sundown.

Under Texas law, "[w]aiver is an intentional relinquishment of a known right or intentional conduct inconsistent with that right." *Comsys. Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 189 (Tex. App. 2003, pet. denied) (citing *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) (per curiam); *United States Fid. & Guar. Co. v. Bimco Iron & Metal Corp.*, 464 S.W.2d 353, 357 (Tex. 1971)).[11]  "Waiver can be established by either an express renunciation of a known right or by silence or inaction for so long a period as to demonstrate an intention to yield that known right."  *Id.* at 189-90 (citing *Tenneco, Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996)).  A condition precedent may be waived by the party to whom the obligation is owed.  *See Ames v. Great S. Bank*, 672 S.W.2d 447, 449 (Tex. 1984) (considering whether condition that certificate of deposit be properly endorsed was waived) (citing *Atomic Fuel Extraction Corp. v. Slick's Estate*, 386 S.W.2d 180 (Tex. Civ. App. 1964), *writ ref'd n.r.e. per curiam*, 403

---

[11]"Like public policy, the doctrines of waiver and estoppel are not rules of interpretation . . . [but are instead] closely related alternatives that may be used to achieve the same result."  1-5 *New Appleman on Insurance Law Library Edition* § 5.07 (2009).

S.W.2d 784 (Tex. 1965)).  An insurer can therefore waive rights and policy provisions that are intended for its benefit.  *See Scottsdale Ins. Co. v. Knox Park Constr., Inc.*, 488 F.3d 680, 688 (5th Cir. 2007) (holding that excess insurer waived right not to pay settlement obtained with its knowledge but without its consent where it had been given opportunity to defend suit) (citing *Gulf Ins. Co. v. Parker Prods., Inc.*, 498 S.W.2d 676, 679 (Tex. 1973)); *Gulf Ins.*, 498 S.W.2d at 679 (holding that insurer could not deny coverage for insured's failure to obtain insurer's consent to settle, where insurer was notified of suit and given opportunity to defend or settle it); *see also Twin City Fire Ins. Co. v. Ohio Cas. Ins. Co.*, 480 F.3d 1254, 1258 (11th Cir. 2007) (holding that excess insurer waived protection of "finally determined" clause when it had right to participate in defense of insured, but refused); *Semtech Corp. v. Royalty Ins. Co. of Am.*, 2005 WL 6192907, at *15 (C.D. Cal. Oct. 11, 2005) (concluding that indemnity insurer could not challenge existence of insured's liability because it had "waive[d] [the] rights to challenge the legally obligated nature of the [insured's] settlement" by agreeing not to raise the defense that the insured's settlement was voluntary).

The question becomes whether Mid-Continent could waive the conditions precedent on which Sundown relies and thereby discharge its policy obligations by indemnifying Sundown for damages and cleanup costs that Sundown did not yet owe.  The conditions

precedent on which Sundown relies were intended to benefit Mid-Continent by limiting when its duty to indemnify arose and eliminating the possibility of Sundown's receiving duplicative payments for recoveries and salvages.  So far as the court is aware, the only (or only relevant) limitation on Mid-Continent's right to waive these conditions precedent is that it cannot have thereby terminated any duty *to defend* Sundown.  Several courts have held that an insurer cannot terminate its duty to defend by tendering policy limits to the insured, another insurer, or, through an interpleader action, to a court registry.  *See* 22 Gordon L. Ohlsson, *Holmes' Appleman on Insurance* 2d § 136.6 (2009).  "[A]n insurer, by resorting to interpleader in a federal court and depositing the proceeds of the policy with the court, should not be relieved of its contractual obligation under state law *to defend the insured*."  7 Charles Alan Wright, et al., *Federal Practice and Procedure* § 1713, at 620 (3d ed. 2001) (emphasis added).  But the duty to defend is not at issue here.  As the court held in *Mid-Continent I*, the Umbrella Policy conferred on Mid-Continent the right, but not the duty, to associate with an underlying insurer and the insured to defend.  *Mid-Continent I*, 2009 WL 3074618, at *2.  Therefore, Mid-Continent's tender of the Umbrella Policy limits could not have constituted an improper attempt to terminate a duty to defend under that policy.

Accordingly, the court holds that Mid-Continent could waive

the conditions precedent intended to benefit it, tender the limits of the Umbrella Policy to Sundown, and terminate further obligations to Sundown, including funding the *Blanchard* settlement. Because Mid-Continent could do so, a reasonable jury could not find that it breached the Umbrella Policy. Mid-Continent is entitled to summary judgment dismissing Sundown's breach of contract counterclaim based on Mid-Continent's failure to participate in and fund the *Blanchard* settlement.

C

In granting Mid-Continent's motion, the court is relying on waiver analysis that Mid-Continent did not present in its motion. To ensure that this is fair, and to comply with the settled rule that summary judgment cannot be granted on a ground that is not raised, *see, e.g., John Deere Co. v. American National Bank, Stafford*, 809 F.2d 1190, 1192 (5th Cir. 1987), the court grants Sundown 21 days to file a supplemental brief that addresses the court's waiver analysis. If Sundown does not timely file a supplemental brief, today's ruling will stand. If Sundown does timely file the brief, the court will decide whether to invite Mid-Continent to file a response.

VII

The court turns next to Sundown's counterclaim that Mid-Continent breached Tex. Ins. Code Ann. § 541.060(a)(2)(A) by failing to effectuate a fair settlement of *Blanchard*.

- 30 -

A

The court previously rejected Sundown's motion for summary judgment on this counterclaim, concluding that Sundown had not shown beyond peradventure that either the Umbrella Policy or the Primary Policy covered the *Blanchard* settlement. *Mid-Continent I*, 2009 WL 3074618, at *39 ("The court concludes that Sundown has not satisfied its burden to show beyond peradventure that Mid-Continent violated § 541.060(a)(2)(A), because it has not shown that either the Primary Policy or the Umbrella Policy covered its claim for funding of the *Blanchard* settlement."). The court now considers Mid-Continent's motion for summary judgment on the same counterclaim.

Section 541.060(a)(2)(A) provides:

> It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to engage in the following unfair settlement practices with respect to a claim by an insured or beneficiary:
>
> . . .
>
> (2) failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of:
>
> (A) a claim with respect to which the insurer's liability has become reasonably clear[.]

Under Texas law, an insurer's liability with respect to a third-party claim is reasonably clear—triggering § 541.060(a)(2)'s duty with respect to settlement—when four elements are satisfied:

- 31 -

(1) the policy covers the claim; (2) the insured's liability is reasonably clear; (3) the claimant has made a proper settlement demand within policy limits; and (4) the demand's terms are such that an ordinarily prudent insurer would accept it. *Rocor Int'l v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002). Section 541.060(a)(2) incorporates common law bad faith principles. *See, e.g., Harris v. Am. Protection Ins. Co.*, 158 S.W.3d 614, 624 n.9 (Tex. App. 2005, no pet.) (interpreting analogous provision of predecessor statute) ("This statutory standard is identical to the common law bad faith standard."); *Travelers Indem. Co. v. Page & Assocs. Constr. Co.*, 2002 WL 1371065, at *6 (Tex. App. 2002, pet. denied) (not designated for publication) (interpreting part of predecessor statute) ("[W]hen, as here, the alleged statutory violations are the functional equivalent of alleged bad faith, the bad faith principles enunciated in [*Universal Life Ins. v.*] *Giles* are applicable."). More specifically, the bona fide dispute rule applies under this statutory provision: an insurer will not be found to have violated § 541.060(a)(2)(A) if it had a reasonable basis to deny or delay payment of the claim. *See Harris*, 158 S.W.3d at 614, 624 (holding that insurer did not violate statutory predecessor to § 541.060(a)(2)(A) where it had reasonable basis to deny payment of claim) ("Evidence that merely shows a bona fide dispute about the insurer's liability on the contract does not rise to the level of bad faith."); *see also supra* § I (discussing

analysis of bona fide dispute rule in *Mid-Continent I*).

Mid-Continent will bear the burden of proving at trial the existence of a bona fide dispute. *See Packer v. Travelers Indem. Co. of R.I.*, 881 S.W.2d 172, 174 (Tex. App. 1994, no writ). Therefore, to obtain summary judgment, it must establish beyond peradventure that such a dispute existed. *See Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) ("In order for the [movant] to obtain summary judgment on an issue on which it will bear the burden of proof at trial, it must establish 'beyond peradventure all of the essential elements of the claim or defense.'") (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).

B

The court held in *Mid-Continent I* that Mid-Continent had properly tendered the Primary Policy limits and therefore had no obligation to fund the *Blanchard* settlement. *Mid-Continent I*, 2009 WL 3074618, at *39. The court has determined today that Mid-Continent's $5 million tender fulfilled its obligations under the Umbrella Policy. Moreover, as the court has previously concluded, the parties were embroiled in this dispute by the time Sundown first demanded in a December 18, 2007 letter that Mid-Continent fund the *Blanchard* settlement. *See id.* There was at the time a bona fide dispute about whether Mid-Continent had properly fulfilled its policy obligations. Mid-Continent has therefore

- 33 -

established beyond peradventure that there was a bona fide dispute, and it is entitled to summary judgment dismissing Sundown's counterclaim alleging a violation of Tex. Ins. Code Ann. § 541.060(a)(2)(A).

## VIII

Finally, the court considers Sundown's counterclaim that Mid-Continent breached the duty of good faith under *Stowers*.

The insurer's *Stowers* duty to settle applies if (1) the claim against the insured is within the scope of coverage, (2) there is a demand within policy limits, and (3) the terms of the demand are such that an ordinarily prudent insurer would accept it.  *Tex. Farmers Ins. Co. v. Soriano*, 881 S.W.2d 312, 314 (Tex. 1994).  In *Texas Farmers Insurance* the Texas Supreme Court determined that an insurer's decision to settle one claim—thus depleting the amount available under the policy—could not be considered a breach of the duty to settle another claim.  It held that

> when faced with a settlement demand arising
> out of multiple claims and inadequate
> proceeds, an insurer may enter into a
> reasonable settlement with one of the several
> claimants even though such settlement exhausts
> or diminishes the proceeds available to
> satisfy other claims.

*Id.* at 315.

The court held in *Mid-Continent I* that Mid-Continent had exhausted its Primary Policy limits before Sundown made a demand to settle the *Blanchard* case.  *Mid-Continent I*, 2009 WL 3074618, at

- 34 -

*21.  The court decides today that Mid-Continent properly exhausted the Umbrella Policy limits before the *Blanchard* settlement was reached.   A reasonable jury could not find that Mid-Continent breached its *Stowers* duty to settle.   The court therefore grants summary judgment dismissing this counterclaim.

*      *      *

Accordingly, the court grants Mid-Continent's April 29, 2009 supplemental motion for partial summary judgment on the *Blanchard* claims and dismisses with prejudice Sundown's counterclaims for breach of contract, violation of Tex. Ins. Code Ann. § 541.060(a)(2)(A), and breach of a *Stowers* duty based on Mid-Continent's failure to participate in and fund the *Blanchard* settlement.   The court grants Sundown 21 days to file a supplemental brief that addresses the court's waiver analysis for granting summary judgment dismissing Sundown's breach of contract counterclaim.

**SO ORDERED.**

October 22, 2009

_____
SIDNEY A. FITZWATER
CHIEF JUDGE