MID-CONTINENT CASUALTY
COMPANY,

    Plaintiff-
    counterdefendant,

VS.

ELAND ENERGY, INC., et al.,

    Defendants-
    counterplaintiffs.

§
§
§ Civil Action No. 3:06-CV-1576-D
§  consolidated with
§ Civil Action No. 3:06-CV-1578-D
§
§
§
§
§
§
§

## MEMORANDUM OPINION
## AND ORDER

This insurance litigation involves coverage and extra-contractual causes of action arising from the handling of claims made under commercial general liability and umbrella policies following Hurricanes Katrina and Rita. After the court narrowed the case through rulings on pretrial motions, the parties tried the balance of the lawsuit to a jury, which ruled partially in favor of the insurer and partially in favor of the insureds, and the court entered a judgment in accordance with the verdict. Both sides challenge the verdict and judgment by post-judgment motions that present these principal questions: whether Texas recognizes a claim for breach of duty of good faith and fair dealing in the third-party claims handling context presented here; whether the jury could reasonably have found in favor of the insureds on the grounds of their unfair settlement practices counterclaim that the jury decided in their favor; and whether the jury could reasonably have

found against the insureds on their Hurricane Rita breach of contract counterclaim. For the reasons that follow, the court holds that the insureds are not entitled to relief on any counterclaim, and it enters an amended judgment in favor of the insurer.

I

A

To place this litigation and today's decision in context, the court begins by recounting some of the pertinent background facts and procedural history, some of which it draws from its pretrial memorandum opinions and orders.

These consolidated cases concern insurance coverage and extra-contractual claims involving commercial general liability and umbrella policies that covered pollution incidents under an Oil & Gas Endorsement. *See Mid-Continent Cas. Co. v. Eland Energy, Inc.*, 2009 WL 3074618, at *1 (N.D. Tex. Mar. 30, 2009) (Fitzwater, C.J.) ("*Mid-Continent I*"). Plaintiff-counterdefendant Mid-Continent Casualty Co. ("Mid-Continent") initiated this litigation by filing a declaratory judgment action against defendants-counterplaintiffs Eland Energy, Inc. and Sundown Energy LP (collectively, "Sundown," unless the context otherwise requires). Shortly thereafter, Eland and Sundown filed suit asserting contractual and extra-contractual claims against Mid-Continent. After the two cases were consolidated, Mid-Continent was aligned as plaintiff-

counterdefendant and Eland and Sundown as defendants-counterplaintiffs. The parties litigated the case at trial, however, as if Eland and Sundown were the plaintiffs and Mid-Continent the defendant.

The dispute between Sundown and Mid-Continent arose in connection with the escape of crude oil from storage tanks at Sundown's oil and gas facility near Port Sulphur, Louisiana, following Hurricane Katrina, and from the escape of that oil from a containment boom constructed during the Hurricane Katrina cleanup operations, following Hurricane Rita. *Id.* Hurricane Katrina struck the Louisiana coast on August 29, 2005, and Hurricane Rita made landfall on September 24, 2005. *Id.*

At all times pertinent to this litigation, Mid-Continent insured Sundown under a commercial general liability policy ("Primary Policy") and an umbrella policy ("Umbrella Policy"). *Id.* at *2. The Primary Policy had limits of $1 million per occurrence and $2 million in the aggregate, and included a duty to defend. *Id.* An Oil & Gas Endorsement provided coverage for a "Pollution Incident." *Id.* The Umbrella Policy had an aggregate limit of $5 million and included a right, but not a duty, to associate with an underlying insurer and the insured to defend. *Id.*

The U.S. Coast Guard ("Coast Guard") mandated that Sundown clean up the areas surrounding Sundown's facility that were affected by the escape of crude oil. *Id.* at *1-2. Five lawsuits

(the "Underlying Litigation")——including *Blanchard*, a class action lawsuit——were filed against Sundown by neighboring property owners and commercial fishermen affected by the spillage of oil due to Hurricane Katrina. *Id.* at *2. Sundown tendered the Underlying Litigation to Mid-Continent for defense and indemnification, and Mid-Continent informed Sundown that it would provide a defense to the class action lawsuits subject to a reservation of rights. *Id.* Because of Mid-Continent's reservation of rights, Sundown asserted that there was a conflict and that it was entitled to independent counsel. *Id.* Mid-Continent eventually agreed that Sundown could be represented by Jones, Walker, Waechter, Poitevent, Carrère & Denègre, L.L.P. ("Jones Walker") and that Mid-Continent would reimburse Sundown for its attorney's fees at Mid-Continent's typical rates for appointed counsel. *Id.*

Mid-Continent tendered the Primary Policy and Umbrella Policy limits to Sundown on March 22, 2006 and August 18, 2006, respectively. *Id.* Sundown informed Mid-Continent that it was placing its Hurricane Katrina cleanup claim "in abeyance" in order to use the insurance proceeds to pay for the class action lawsuits, and it declined to negotiate the checks. *Id.* Sundown sought to place its claim "in abeyance" so that it could pursue reimbursement for government-mandated cleanup costs from a fund established under the Oil Pollution Act of 1990 ("OPA Fund"). *Id.* at *3, *10. Sundown was concerned that, if Mid-Continent paid for Sundown's

cleanup costs, Mid-Continent would have no further duty to defend Sundown in the Underlying Litigation and, through its subrogation rights, would be entitled to any available reimbursement from the OPA Fund. *Id.* at *10. The court in *Mid-Continent I* held that Sundown did not have the right to place its cleanup claim "in abeyance," and that Mid-Continent exhausted the limits of the Primary Policy when it tendered the $1 million check to Sundown. *Id.* at *11-12.

In *Mid-Continent Casualty Co. v. Eland Energy, Inc.*, No. 3:06-CV-1576-D (N.D. Tex. Oct. 22, 2009) (Fitzwater, C.J.) ("*Mid-Continent II*"), and *Mid-Continent Casualty Co. v. Eland Energy, Inc.*, 2010 WL 610713 (N.D. Tex. Feb. 22, 2010) (Fitzwater, C.J.) ("*Mid-Continent III*"), the court held that Sundown had incurred $5,469,650.65 in covered cleanup costs by the time Mid-Continent tendered the Umbrella Policy limits, and that Mid-Continent's $5 million tender fulfilled its obligations under the Umbrella Policy. *Mid-Continent II*, slip op. at 25; *Mid-Continent III*, 2010 WL 610713, at *1.

Sundown submitted a Hurricane Rita cleanup claim on July 12, 2006. *Mid-Continent I*, 2009 WL 3074618, at *30. Mid-Continent acknowledged receipt of the claim and stated that it was starting an investigation. *Id.* Mid-Continent denied the claim by letter dated July 19, 2007. Pretrial Order ("PTO") ¶ 52. Mid-Continent stated that the Hurricane Rita claim was not covered because

Sundown did not provide notice of the claim as soon as practicable, Hurricane Rita did not cause a second "Pollution Incident," and Sundown did not provide notice of a government mandate for cleanup due to Hurricane Rita. *See* P. JMOL Resp. App. 10-11.

B

In *Mid-Continent I, II,* and *III*, the court granted in part and denied in part the summary judgment motions of both parties. Sundown's remaining counterclaims were tried to a jury, which returned a verdict partially in favor of Sundown and partially in favor of Mid-Continent.

The court submitted the case to the jury on 13 questions. The first five pertained to Sundown's Hurricane Rita contractual or extra-contractual counterclaims, the next five related to Sundown's Hurricane Katrina contractual or extra-contractual counterclaims, and the final four concerned damages. The jury found the following:

- Sundown did not prove its Hurricane Rita duty to indemnify breach of contract counterclaim (Question No. 1);

- Sundown did not prove its bad faith investigation counterclaim—that Mid-Continent failed to affirm or deny coverage of Sundown's Hurricane Rita claim within a reasonable period of time, or that Mid-Continent refused to pay Sundown's Hurricane Rita claim without conducting

- 6 -

a reasonable investigation of the claim (Question No. 2);[1]

- Sundown did not prove that Mid-Continent's misrepresentation of the Primary Policy was a producing cause of damages to Sundown (Question No. 4);[2]

- Sundown proved its unfair settlement practices counterclaim as to Hurricane Katrina on five grounds: (1) Mid-Continent misrepresented to Sundown a material fact or policy provision relating to coverage at issue; (2) Mid-Continent failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when Mid-Continent's liability had become reasonably clear; (3) Mid-Continent failed to provide promptly to Sundown a reasonable explanation of the factual and legal basis in the policy for Mid-Continent's offer of a compromise settlement of a third-party claim; (4) Mid-Continent failed to affirm or deny coverage of Sundown's claim within a reasonable time; and (5) Mid-Continent refused to pay Sundown's claim without conducting a reasonable investigation of the claim (Question No. 6);

---

[1]Because of its answer to Question No. 2, it was unnecessary for the jury to answer Question No. 3.

[2]Because of its answer to Question No. 4, it was unnecessary for the jury to answer Question No. 5.

- with respect to the foregoing five grounds, Mid-Continent acted knowingly only as to ground (3)——when it failed to provide promptly to Sundown a reasonable explanation of the factual and legal basis in the policy for Mid-Continent's offer of a compromise settlement of a third-party claim——but Mid-Continent did not act knowingly with respect to grounds (1), (2), (4), or (5) (Question No. 7);

- Sundown proved its breach of duty of good faith and fair dealing counterclaim as to two grounds: (1) Mid-Continent consciously undermined Sundown's defense in the Underlying Litigation, which caused Sundown injury independent of Sundown's policy claim, and (2) Mid-Continent failed to conduct a reasonable investigation of Sundown's Hurricane Katrina claim, which caused Sundown injury independent of Sundown's policy claim (Question No. 8);

- with respect to both of the foregoing grounds, Mid-Continent acted fraudulently, maliciously, or with gross negligence when it breached its duty of good faith and fair dealing (Question No. 9); and

- Sundown did not prove its Hurricane Katrina duty to defend breach of contract counterclaim as to two grounds: (1) Mid-Continent refused to pay for all of Sundown's

reasonable and necessary defense fees and costs, and (2) Mid-Continent attempted to control and exercise improper influence over the defense through its audits of legal bills (Question No. 10).

The jury found that Sundown was entitled to compensatory damages in the sum of $2 million for the increased cost of the *Blanchard* settlement (Question No. 11). The jury did not award any compensatory damages on any other basis, including for the following: Hurricane Rita cleanup costs; attorney's fees that Sundown incurred cooperating with Mid-Continent's Hurricane Rita investigation and researching and responding to Mid-Continent's denial of the claim on grounds of late notice; the increased cost of settling another class action (*Isla*); the unreimbursed defense costs in the Underlying Litigation under Mid-Continent's contractual duty to defend; or other damages for Mid-Continent's breach of its duty of good faith and fair dealing.

The jury awarded Sundown $1.75 million in additional damages based on its findings that Mid-Continent had knowingly engaged in unfair settlement practices (Question No. 12). And the jury awarded Sundown $4.7 million in exemplary damages based on its findings that Mid-Continent had breached its duty of good faith and fair dealing and had done so fraudulently, maliciously, or with gross negligence (Question No. 13).

In sum, the jury found against Sundown on its Hurricane Rita

duty to indemnify breach of contract counterclaim, Hurricane Rita bad faith investigation counterclaim, Hurricane Rita bad faith misrepresentation counterclaim, and Hurricane Katrina duty to defend breach of contract counterclaim. The jury found in Sundown's favor on its Hurricane Katrina unfair settlement practices counterclaim and, in part, on its counterclaim that the violation was knowing. The jury also ruled in Sundown's favor on its Hurricane Katrina breach of duty of good faith and fair dealing counterclaim, and it found that in breaching this duty, Mid-Continent had acted fraudulently, maliciously, or with gross negligence. The jury awarded Sundown $2 million in compensatory damages, $1.75 million in additional damages for Sundown's unfair settlement practices counterclaim, and $4.7 million in exemplary damages for Sundown's breach of duty of good faith and fair dealing counterclaim.

In post-judgment motions, Mid-Continent renews the motion for judgment as a matter of law that it made during trial, moves for a new trial (subject to its renewed motion for judgment as a matter of law), and moves to alter or amend the judgment (subject to its renewed motion for judgment as a matter of law and motion for new trial).[3] Sundown renews the motion for judgment as a matter of law

---

[3]Mid-Continent also moves for an award of attorney's fees. The court denies this motion *infra* at § XI.

that it made during trial.[4]

II

The court turns first to Mid-Continent's renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b).

"A motion for judgment as a matter of law 'challenges the legal sufficiency of the evidence to support the verdict.'" *Jacobs v. Tapscott*, 516 F.Supp.2d 639, 643 (N.D. Tex. 2007) (Fitzwater, J.) (quoting *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 195 (5th Cir. 2006)), *aff'd*, 277 Fed. Appx. 483 (5th Cir. 2008).

> Judgment as a matter of law is appropriate with respect to an issue if there is no legally sufficient evidentiary basis for a reasonable jury to find for a party on that issue. This occurs when the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary verdict. In considering a Rule 50 motion, the court must review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party; the court may not make credibility determinations or weigh the evidence, as those are jury functions. In reviewing the record as a whole, the court must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

*Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 362 (5th Cir.

---

[4]Sundown also moves for an award of attorney's fees. The court denies this motion *infra* at note 50.

2004) (citations, brackets, and internal quotation marks omitted).

"A jury verdict must stand unless there is a lack of substantial evidence, in the light most favorable to the successful party, to support the verdict." *Am. Home Assurance Co. v. United Space Alliance, LLC*, 378 F.3d 482, 487 (5th Cir. 2004) (citation omitted).

III

Mid-Continent moves for judgment as a matter of law concerning the jury's findings that Mid-Continent knowingly engaged in unfair settlement practices with respect to Hurricane Katrina and that Mid-Continent breached its duty of good faith and fair dealing and, in doing so, acted fraudulently, maliciously, or with gross negligence. The following facts developed during trial, viewed under the applicable standard, *see supra* § II, or established under the PTO are pertinent to Mid-Continent's motion and to the parts of the verdict that enable Sundown to recover from Mid-Continent.

Following Hurricanes Katrina and Rita, Sundown notified Mid-Continent of its claim for coverage and demanded defense and indemnification in the Underlying Litigation, including three class actions filed in the Eastern District of Louisiana. Under a reservation of rights, Mid-Continent undertook Sundown's defense, appointing two Louisiana attorneys, Tony Clayton, Esquire ("Clayton") and Paul Preston, Esquire ("Preston"), to defend Sundown in the Underlying Litigation. Sundown maintained that the

reservation of rights created a conflict of interest between Sundown and Mid-Continent that entitled Sundown to choose its defense counsel. Mid-Continent eventually allowed Sundown to select its counsel, and Sundown chose Jones Walker. Mid-Continent and Sundown disagreed, however, about Jones Walker's hourly rates. While this issue was being resolved, Clayton and Preston continued working secretly for Mid-Continent against Sundown's wishes.

On October 7, 2005 Mid-Continent and Sundown met to discuss how the Underlying Litigation should be handled and the status of Sundown's cleanup operations. During the meeting, Mary Frances Hermes ("Hermes") of Sundown took notes, which Sundown introduced at trial. Michael Chernekoff, Esquire ("Chernekoff"), a Jones Walker partner who represented Sundown, testified that Preston and Clayton had expressed strong interest in visiting Port Sulphur to view the affected areas right away. Hermes testified that Carl Rosenblum, Esquire ("Rosenblum"), a Jones Walker partner who represented Sundown,[5] indicated that all decisions should be cleared through him and that Sundown wanted him to be the contact person.

Following the meeting, Rosenblum attempted to set up a time for Preston, Clayton, Rosenblum, and Steve Haltom ("Haltom"), a Mid-Continent Assistant Vice President and the Home Office Claim

---

[5]Rosenblum is also one of Sundown's trial counsel in this litigation.

Supervisor, to visit the affected area, and Rosenblum agreed to accompany them on October 27, 2005. Three days before the visit, on October 24, 2005, Chernekoff and Rosenblum attempted to reach Haltom and Preston to advise them that Sundown had selected Jones Walker as its counsel and that the services of Preston and Clayton were no longer required. Chernekoff cancelled the visit to Port Sulphur, but he later learned that Preston and Clayton had made a visit despite the cancellation. When Chernekoff asked Haltom if he had sent Preston and Clayton to visit the site, Haltom apologized and admitted that he had. Chernekoff testified that at the October 7 meeting, everyone agreed and understood that Rosenblum would be the point person with respect to any visits to the facilities.

Mid-Continent directed Clayton and Preston to visit the areas affected by the oil spill, and when they did, they met with Chris Leopold ("Leopold"). Preston had learned of Leopold from Scott Yount, Esquire, an attorney who worked with Preston. Leopold owned a Dollar General store and a boat shed near the Sundown facility. Leopold testified that he had attempted to contact Sundown to discuss the cleanup of his property by knocking on the door of Sundown's temporary trailer. Leopold told the person who answered the door that he wanted to have his property cleaned up. The person did not say anything and shut the door. Tom Hilton ("Hilton"), former operations manager for Sundown, testified that he learned of Leopold's visit to the Sundown trailer from Mitch

Thompson, Sundown's on-site manager, and that Leopold wanted Sundown to take some action to clean up his property.

Mid-Continent sent Luther Holloway ("Holloway") to evaluate and settle claims, and Holloway met with Leopold. Due to illness, Holloway was replaced by Dana Futrell ("Futrell"). Haltom hired Futrell as the adjuster to investigate and settle with Leopold and to establish a baseline for settling with other landowners. Leopold was completely dissatisfied with Futrell's work, and he testified that he believed that Futrell was unqualified, incompetent, and "like a used car salesman trying to be an environmental adjuster." Tr. 4A:52-53.

Unbeknownst to Sundown, Mid-Continent hired an environmental engineer, Dennis Lambert ("Lambert"), to test the soil on Leopold's property. Lambert found two so-called "hot spots," or areas of contamination, and he copied Leopold on the email to Mid-Continent relaying the test results. But Lambert's analysis contained mistakes, and Mid-Continent asked Paul Muthig ("Muthig") to review Lambert's findings. Haltom explained that he understood from Muthig that Lambert had applied the wrong standard and had found "hot spots" in error. Muthig informed Mid-Continent that it was unlikely that the diesel spots on Leopold's property originated from Sundown's facility, which contained unrefined crude oil. *See* Tr. 8A:15 ("[T]here is no information to show that the minor amount of diesel range organics impacts in 8 percent of the soil samples

taken by Lambert Engineers is in any way related to a crude oil release[.]")

Without consulting with or informing Sundown, Mid-Continent made a settlement offer of $54,536.00 to Leopold on June 2, 2006. Sundown learned of this offer on July 21, 2006 and demanded that it be immediately withdrawn. After Mid-Continent withdrew the offer, Leopold joined the *Blanchard* class action as a named class representative. Leopold had been provided the faulty Lambert testing, but he had not been given the corrected Muthig analysis. Leopold testified that Mid-Continent's dealings with him could have had a ripple effect on the adjoining landowners and their dealings with Mid-Continent and Sundown. According to Sundown, Mid-Continent's dealings with Leopold reeked havoc for Sundown in its defense of the *Blanchard* class action. The other two class actions were dismissed against Sundown, and Sundown paid nothing in exchange. But Sundown maintains that, had Mid-Continent not engaged in bad faith interference in the investigation and claims handling, Sundown would have settled the *Blanchard* case for no more than $1 million. Instead, Sundown ultimately paid $2 million to settle *Blanchard*. The jury found that $2 million represented the increased cost to Sundown of settling *Blanchard*. Of critical importance to Mid-Continent's motion for judgment as a matter of law, the jury did not find that Sundown was entitled to compensatory damages for any other alleged injuries.

IV

Mid-Continent moves for judgment as a matter of law dismissing Sundown's counterclaim for breach of duty of good faith and fair dealing.

A

The jury found that Sundown proved its counterclaim for breach of duty of good faith and fair dealing on two grounds: (1) Mid-Continent consciously undermined Sundown's defense in the Underlying Litigation,[6] which caused Sundown injury independent of its policy claim; and (2) Mid-Continent failed to conduct a reasonable investigation of Sundown's Hurricane Katrina claim, which caused Sundown injury independent of its policy claim. Mid-Continent posits that Texas law does not provide a common law cause of action, other than under *Stowers*,[7] in the context of third-party[8]

---

[6]In the jury charge, the court defined the term "Underlying Litigation" to mean four pending lawsuits, including *Blanchard*, filed in the Eastern District of Louisiana. *See* Charge at 7.

[7]*G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex. 1929). "An insurer's *Stowers* duty is its duty 'to exercise ordinary care in the settlement of claims to protect its insureds against judgments in excess of policy limits.'" *RLI Ins. Co. v. Phila. Indem. Ins. Co.*, 421 F.Supp.2d 956, 968-69 n.10 (N.D. Tex. 2006) (Fitzwater, J.) (quoting *Am. Phys. Ins. Exch. v. Garcia*, 876 S.W.2d 842, 843 n.2 (Tex. 1994)).

[8]"[A] first-party claim is stated when 'an insured seeks recovery for the insured's own loss,' whereas a third-party claim is stated when 'an insured seeks coverage for injuries to a third party.'" *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 17 (Tex. 2007) (quoting *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 54 n.2 (Tex. 1997)).

claims handling. It also contends that the evidence is legally insufficient for a reasonable jury to have found against Mid-Continent on this counterclaim. Mid-Continent maintains that the court should not have submitted a common law tort question to the jury because the only non-*Stowers* liability of an insurer for handling a third-party claim is *statutory* liability under Tex. Ins. Code Ann. § 541.060(a) (West 2003 & Supp. 2010), not *common law* liability for breaching a duty of good faith and fair dealing.[9]

Sundown argued during and after trial that Mid-Continent breached its duty of good faith and fair dealing in its handling of third-party claims, in connection with Sundown's Hurricane Katrina claim and the Underlying Litigation. *See* Ds. JMOL Resp. 22 ("[D]espite having complied with its payment obligations under the policy, in the course of its handling of the class actions, Mid-Continent committed extreme acts which culminated in Sundown's having to pay $2 million in settlement on the *Blanchard* case.").

---

[9]Mid-Continent maintains that the court should not have submitted this claim to the jury because Texas does not recognize this cause of action. Although the court's decision today vindicates Mid-Continent's position, the court notes that it was simply following the preferred approach. In this circuit, it is considered the better practice for a district court to "reserve ruling on the motion for [judgment as a matter of law] and let the case go to the jury." *Wiltz v. Mobil Oil Exploration & Producing N. Am., Inc.*, 938 F.2d 47, 50 (5th Cir. 1991). "The primary reason we encourage district courts to reserve judgment on motions for [judgment as a matter of law] is that if the court grants a judgment [as a matter of law], a retrial is avoided if we reverse the [judgment as a matter of law] because there is a jury verdict that can be reinstated." *Id.* (internal quotation marks and citation omitted).

The court therefore addresses Mid-Continent's motion on this ground as it pertains to a third-party insurance claim.

Mid-Continent contends that, because the court held in *Mid-Continent I* and the jury found that Mid-Continent did not breach the Primary Policy and the Umbrella Policy in any respect, Mid-Continent cannot be held liable under the common law unless it committed an extreme act that caused Sundown injury unrelated to and independent of Sundown's policy claim. The court instructed the jury that, under Texas law, an insured can recover for breach of the duty of good faith and fair dealing when an insurer commits some act, so extreme, that the act would cause injury independent of the claim. The court first asked the jury to decide whether Sundown had proved this claim on the ground that Mid-Continent had consciously undermined Sundown's defense in the Underlying Litigation, and whether this conduct had caused Sundown injury independent of its policy claim. Mid-Continent argues that the court based this question on two decisions of the Supreme Court of Texas: *Republic Insurance Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995), and *State Farm Mutual Automobile Insurance Co. v. Traver*, 980 S.W.2d 625 (Tex. 1998).

The Supreme Court of Texas stated in *Stoker* that the general rule that there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered does not exclude "the possibility that in denying the claim, the insurer may

commit some act, so extreme, that would cause injury independent of the policy claim." *Stoker*, 903 S.W.2d at 341 (citation omitted). For ease of reference, the court will refer to this statement from *Stoker* as the "*Stoker* language." And in *Traver* the court held that an insurer's *Stowers* duty, coupled with rights provided under the insurance contract, generally protect an insured against an insurer's erroneous refusal to defend a third-party claim against the insured. *Traver*, 980 S.W.2d at 629. But the court also stated that special circumstances were present in *Traver* because "the plaintiff's allegations are not that the insurer merely refused a defense, but that the insurer *consciously undermined* the insured's defense." *Id.* (emphasis added).

Mid-Continent contends that there is no recognized cause of action under Texas law that would support submitting this question to the jury or support the jury's finding in favor of Sundown.[10] Mid-Continent maintains that the *Stoker* language is *dicta*; the *Stoker* language has never been applied by a Texas court; the *Stoker* language has never been applied by a federal court except in one

---

[10]Mid-Continent also argues that the conduct Sundown complains of is expressly allowed by the Primary Policy. The court in *Mid-Continent I* held that "[i]t is clear from the Primary Policy that Mid-Continent has the right to settle third-party claims" and that "Sundown does not have the right to dictate when third-party claims are settled[.]" *Mid-Continent I*, 2009 WL 3074618, at *9. The court also noted that the "Primary Policy does not contain a 'consent to settle' provision, which would require Mid-Continent to obtain Sundown's consent before settling a claim[.]" *Id.* Mid-Continent's exercise of its contractual rights under the Primary Policy cannot also be a tort against Sundown.

distinguishable case; the *Traver* language is *dicta* and has never been applied by a federal or Texas court; and the *Stoker* language has been applied once by the Fifth Circuit in a distinguishable case.

Sundown responds that the jury question was properly based on *Stoker* and *Traver*, and that this court recognized the *Stoker* language in *Nunn v. State Farm Mutual Automobile Insurance Co.*, 729 F.Supp.2d 801 (N.D. Tex. 2010) (Fitzwater, C.J.). Sundown argues that the *Stoker* and *Traver* factors apply precisely to the facts of this case: although Mid-Continent complied with its payment obligations under the policies, Mid-Continent committed extreme acts in the course of handling third-party claims that resulted in Sundown's liability for $2 million for the increased cost of settling the *Blanchard* case. Sundown contends that the cases on which Mid-Continent relies——which address an insurer's discretion to settle claims without the consent of the insured——are inapposite because Mid-Continent failed to conduct an objective investigation of Sundown's liability, offered Leopold a settlement in order to exhaust policy limits and avoid paying for Sundown's defense, and secreted all of its activities from Sundown. Sundown also argues that *Northwinds Abatement, Inc. v. Employers Insurance of Wausau*, 258 F.3d 345 (5th Cir. 2001), applied the *Stoker* language and is binding precedent.

In this diversity case that is governed by Texas law, the court must determine whether Texas recognizes a cause of action for breach of duty of good faith and fair dealing in the context of an insurer's handling a third-party claim.

"'As a general rule there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered.'" *Mid-Continent I*, 2009 WL 3074618, at *27 (quoting *Stoker*, 903 S.W.2d at 341). In other words, if the insurer has not breached the insurance contract, the insurer is generally not liable under the common law. When handling a first-party claim, however, an insurer owes its insured a duty of good faith and fair dealing in the processing of the insured's claim. "Under Texas law, an insurer owes a duty of good faith in handling its *insured's own claim* of loss." *Med. Care Am., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburg*, 341 F.3d 415, 425 (5th Cir. 2003) (emphasis added and citation omitted); *Vandeventer v. All Am. Life & Cas. Co.*, 101 S.W.3d 703, 722 (Tex. App. 2003, no pet.) (citing *Stoker* and noting that "Texas law has long recognized a common law duty of good faith and fair dealing in the context of processing and payment of claims under *first-party* insurance coverage" (emphasis added)). In the first-party claim context, an insurer "breaches its duty of good faith and fair dealing by denying a claim when the insurer's liability has become reasonably clear[,]" although "a bona fide

coverage dispute does not rise to the level of bad faith." *Med. Care Am.*, 341 F.3d at 425-26 (internal quotation marks and citations omitted).

But when handling a third-party claim, an insurer owes the insured no duty of good faith and fair dealing. "An insured, however, has no claim for bad faith premised on the insurer's investigation or defense of a claim brought against it *by a third party*." *Id.* at 425 (emphasis added and citations omitted); *see also Taylor v. Allstate Ins. Co.*, ___ S.W.3d ___, 2011 WL 1233331, at *6 (Tex. App. Mar. 31, 2011, no pet.) (holding that insured's claims against insurer arose out of its conduct in handling a third-party claim and that insured was fully protected by his contractual and *Stowers* rights such that it was unnecessary for court to recognize cause of action for tortious interference in that context); *Fed. Ins. Co. v. Infoglide Corp.*, 2006 WL 2050694, at *15 (W.D. Tex. July 18, 2006) (noting that "Texas law on the issue of the viability of a claim for breach of the duty of good faith and fair dealing with respect to third party claims appears to be clear" and that courts have refused to recognize such a duty in handling third-party insurance claims). Rather, "[a]n insurer's common law duty in this third party context is limited to the *Stowers* duty to protect the insured by accepting a reasonable settlement offer within policy limits." *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 776 (Tex. 2007) (citation

omitted). "This is because 'an insured is fully protected against his insurer's refusal to defend or mishandling of a third-party claim by his contractual and *Stowers* rights,' which give rise to causes of action sounding in contract and negligence." *Med. Care Am.*, 341 F.3d at 425 (quoting *Md. Ins. Co. v. Head Indus. Coatings & Servs., Inc.*, 938 S.W.2d 27, 28-29 (Tex. 1996)).[11]

Texas law does not provide a cause of action for breach of the duty of good faith and fair dealing in the context of an insurer's handling of a third-party claim. The court therefore holds that Sundown's only common law remedy in the context of a third-party claim is under *Stowers*. *See, e.g., Liberty Mut. Ins.*, 236 S.W.3d at 776 (holding that insurer's common law duty to act reasonably when handling insured's defense is limited to *Stowers* duty).

---

[11]In *Texas Farmers Insurance Co. v. Soriano*, 881 S.W.2d 312 (Tex. 1994), the court stated that Texas has "never recognized a cause of action for breach of the duty of good faith and fair dealing where the insurer fails to settle third-party claims against its insured." *Id.* at 317. Although the *Soriano* court "stopped short of *rejecting* a duty of good faith in third-party insurance cases," the court in *Head Industrial* held that "Texas law recognizes only one tort duty in this context, that being the duty stated in [*Stowers*]." *Head Indus.*, 938 S.W.2d at 28 (emphasis added). *Head Industrial* has been partially superseded by statute; the Texas Insurance Code now allows an insured to sue its insurer for unfair claim settlement practices with respect to third-party claims. *See Methodist Hosp. v. Zurich Am. Ins. Co.*, 329 S.W.3d 510, 517 n.6 (Tex. App. 2009, pet. denied); *see also* Tex. Ins. Code Ann. § 541.060(a)(2). But "*Head Industrial* has not been overruled relative to an insured's attempt to impose *common-law*, as opposed to *statutory*, duties on an insurer with respect to settling third-party claims." *Methodist Hosp.*, 329 S.W.3d at 517 n.6 (emphasis added).

Sundown argues that the jury question was properly based on *Traver*, and that the *Traver* factors apply precisely to the facts of this case. Sundown suggests that *Traver* provides an exception to the general prohibition against a claim for breach of good faith and fair dealing in the third-party claim context. Mid-Continent responds that the statement in *Traver* on which the court framed Question No. 8 is *dicta* and has never been applied by a state or federal court. It also contends that, in *Traver*, the insurer purposely attempted to lose the insured's case in an effort to avoid *Stowers* liability to another insured. Mid-Continent posits that it did the opposite in this case. Sundown does not respond to Mid-Continent's argument that the "consciously undermine" language of *Traver* is *dicta*; it argues instead that the evidence supports the jury's finding that Mid-Continent consciously undermined Sundown's defense.

The court holds that the "consciously undermine" language in *Traver* is *dicta*. In *Traver* the plaintiff ("Traver") sued his insurer ("State Farm") alleging malpractice in State Farm's defense of a personal injury claim, breach of duty of good faith and fair dealing, negligence, breach of duty to defend, breach of the *Stowers* duty, and violations of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA") and the Texas Insurance Code. *Traver*, 980 S.W.2d at 626. Traver was the executor for the

estate of the insured, Mary Davidson. *Id.* The trial court granted summary judgment for State Farm on all grounds, and the court of appeals reversed and remanded the malpractice, DTPA, and Insurance Code claims, holding that an insurer is responsible for the malpractice of an attorney it provides an insured. *Id.* at 627. The court of appeals also held that Traver could not recover on his claim for breach of the duty of good faith and fair dealing because "an insurer owes no duty of good faith to its insured in the context of a third-party liability claim." *Id.* The Supreme Court of Texas reversed the judgment of the court of appeals, holding that an insurer is not vicariously liable for the malpractice of an attorney it provides an insured. *Id.* at 629. Because Traver did not apply for a writ of error on his breach of good faith and fair dealing claim, the courts of appeals' judgment was final in this respect. *Id.*

On the issue of breach of duty of good faith and fair dealing, the court of appeals held that, "in the context of third-party insurers, Texas law recognizes only one tort duty, which is the duty stated in *Stowers*." *Traver v. State Farm Mut. Auto. Ins. Co.*, 930 S.W.2d 862, 870 (Tex. App. 1996) (citing *Soriano*, 881 S.W.2d at 319 ("A 'bad faith' version of the duty to settle, like that imposed by some other jurisdictions, would presumably supplant the negligence standard recognized in *Stowers* . . . . [T]he *Stowers* doctrine is the exclusive common-law remedy available to an insured

in [the third-party claim] situation.") (Cornyn, J., concurring)),
*rev'd*, 980 S.W.2d 625 (Tex. 1998). Traver's claim for breach of
duty of good faith and fair dealing was not before the Texas
Supreme Court, and it therefore had no basis to reverse the
decision of the court of appeals in this respect. The Texas
Supreme Court stated that "the court of appeals' judgment regarding
[the duty of good faith and fair dealing] is final." *Traver*, 980
S.W.2d at 629.

Although the issue was not before it, the Texas Supreme Court
noted that the facts of *Traver* were quite different from those in
*Head Industrial*, in which the court held that the *Stowers* duty,
together with the rights conferred by the insurance contract, were
sufficient to protect the insured in the context of a third-party
claim. *Id.* (citing *Head Industrial*, 938 S.W.2d at 29). The *Traver*
court surmised that the facts of *Traver* were different because, in
*Head Industrial*, the plaintiff alleged that the insurer merely
refused to defend him, and in *Traver* the plaintiff alleged that the
insurer consciously undermined the insured's defense. *Id.* Because
the claim for breach of duty of good faith and fair dealing was not
before the *Traver* court, its discussion of that claim is *dicta*.

Likewise, Sundown has not cited, nor has the court found, any
federal case citing or quoting *Traver*'s "consciously undermined"
language or adopting it as a standard for imposing liability.
*Traver* was decided in 1998, and in the ensuing years only one Texas

court has mentioned the "consciously undermined" language. *See Southstar Corp. v. St. Paul Surplus Lines Ins. Co.*, 42 S.W.3d 187, 192 (Tex. App. 2001, no pet.). In *Southstar* the court noted that *Traver* distinguished its facts from those in *Head Industrial*, and the *Southstar* court concluded that "an insured who alleges *only* that the insurer wrongfully refused a defense is limited to bringing *Stowers* claims and claims under the insurance contract." *Id.* Ultimately, the *Southstar* court held that "[b]ecause the act giving rise to liability for negligence is breach of the insurer's duty to defend under the insurance agreement, [the insureds'] claims for negligence and gross negligence are barred as a matter of law." *Id.* at 194. *Southstar* did not apply or discuss *Traver*'s "consciously undermine" language. Accordingly, this court holds that *Traver*'s language is *dicta* and is not a recognized basis in Texas law for imposing liability.

D

Sundown argues that a cause of action for breach of duty of good faith and fair dealing is available if Mid-Continent committed an extreme act that caused injury independent of the policy claim. It posits that the jury question was properly based on *Stoker*, and that the *Stoker* factors apply precisely to the facts of this case.

*Stoker* does not provide Sundown a remedy in this case because, as the court will explain, (1) *Stoker* addressed a first-party insurance claim, and in that context a claim exists under Texas law

for breach of duty of good faith and fair dealing; (2) the *Stoker* language is *dicta*; and (3) *Stoker* has never been applied by a Texas or federal court to find a breach of duty of good faith and fair dealing.

1

First, *Stoker* addressed a claim of breach of good faith and fair dealing in the context of a first-party insurance claim, not a third-party insurance claim. After a multiple-car accident, the Stokers submitted a claim to Republic Insurance Co. ("Republic") to recover under their uninsured/underinsured vehicle coverage. *Stoker*, 903 S.W.2d at 339. Republic denied the Stokers' uninsured motorist claim, and they sued Republic for breach of the insurance contract, breach of duty of good faith and fair dealing, and violations of the DTPA and the Texas Insurance Code. *Id.* Because the Stokers sought recovery for *their own loss,* their claim was a first-party claim. *See Lamar Homes*, 242 S.W.3d at 17. The *Stoker* court stated that in handling an insured's first-party claim, "[a]n insurer has a duty to deal fairly and in good faith with its insured in the processing and payment of claims." *Stoker*, 903 S.W.2d at 340 (citing *Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987)). And in the first-party context, the *Stoker* court stated that while "[a]s a general rule there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered," it did not exclude the possibility

- 29 -

that "in denying the claim, the insurer may commit some act, so extreme, that would cause injury independent of the policy claim." *Id.* at 341 (citing *O'Malley v. U.S. Fid. & Guar. Co.*, 776 F.2d 494, 500 (5th Cir. 1985); *Aranda v. Ins. Co. of N. Am.*, 748 S.W.2d 210, 214 (Tex. 1988)).

As the court notes *supra* at § IV(A), the relevant insurance claims in this case are third-party claims; Sundown complains that Mid-Continent's handling of third-party claims damaged Sundown. *Stoker* says nothing regarding an insurer's duty of good faith and fair dealing in its handling of third-party claims.

2

Mid-Continent also contends that the *Stoker* language is *dicta* and that it has been referred to as a "theoretical possibility." The court agrees. *See SnyderGeneral Corp. v. Century Indem. Co.*, 907 F. Supp. 991, 1006 (N.D. Tex. 1995) (Fitzwater, J.) ("[T]he [*Stoker*] court also said, albeit in *dicta*, that there are exceptions [to the general rule]"), *aff'd in part and vacated in part on other grounds*, 113 F.3d 536 (5th Cir. 1997); *see also Toledo-Lucas Cnty. Port Auth. v. Axa Marine & Aviation Ins. Ltd.*, 220 F.Supp.2d 868, 874 n.7 (N.D. Ohio 2002) (noting that the *Stoker* language is *dicta*), *rev'd on other grounds*, 368 F.3d 524 (6th Cir. 2004); *Gen. Star Indem. Co. v. Sherry Brooke Revocable Trust*, 243 F.Supp.2d 605, 612 (W.D. Tex. 2001) ("[The insureds] hang their extra-contractual claims on a single line of *dictum* in *Stoker*, in

which the Texas Supreme Court stated [the *Stoker* language]");
*Potomac Ins. Co. v. Woods*, 1996 WL 450687, at *6 (E.D. Tex. July
22, 1996) ("In dicta the [*Stoker*] court left open the theoretical
possibility that in a case in which the insurer has no liability
under the policy there could be a bad faith claim; however, the
court made clear that only the most extreme acts could subject an
insurer to bad faith liability."); *Laas v. State Farm Mut. Auto.
Ins. Co.*, 2001 WL 1479228, at *4 (Tex. App. 2001, no pet.) (not
designated for publication) ("Indeed, the supreme court in *Stoker*,
mentioned in *dicta* the possibility, that in denying a claim, an
insurer might commit some act, so extreme, there could be an injury
independent of the policy claim." (citation omitted)).

Courts, including the Texas Supreme Court, have referred to
the *Stoker* language as expressing a possibility that the court
contemplated but did not decide. *See, e.g., Stoker*, 903 S.W.2d at
341 (noting possibility that insurer may commit an extreme act that
causes injury independent of policy claim, but that "[t]hese
circumstances are not present in this case."); *Am. Motorists Ins.
Co. v. Fodge*, 63 S.W.3d 801, 804 (Tex. 2001) (noting that the
*Stoker* court "did not exclude the possibility" of an extreme act
exception and "cited no examples"); *Provident Am. Ins. Co. v.
Castaneda*, 988 S.W.2d 189, 199 (Tex. 1998) (describing the possible
exception in *Stoker* as one that the *Stoker* court "contemplated");
*Gates v. State Farm Cnty. Mut. Ins. Co. of Tex.*, 53 S.W.3d 826, 831

(Tex. App. 2001, no pet.) ("The [insureds] rely on the following language from *Stoker* indicating a bad faith claim might exist . . . . *Assuming, without deciding*, an insurer in denying a claim may commit an act so extreme to cause an injury independent of the policy claim, we conclude an insured may not recover under this theory unless the insured can establish 'extreme' conduct by the insurer during the claims process." (emphasis added)). "[T]he *Stoker* court did not find that any extreme act had occurred in that instance and *did not offer any insight* into what might be considered an extreme act justifying a bad faith finding." *Valley Forge Ins. Co. v. Shah*, 2009 WL 291080, at *11 n.84 (S.D. Tex. Jan. 30, 2009) (emphasis added) (citing *Stoker*, 903 S.W.2d at 341).

The court therefore holds that *Stoker* language is *dicta* and expresses a mere possibility that bad faith liability could be imposed in regard to a first-party claim in specific circumstances that the Supreme Court of Texas has yet to identify.

3

Mid-Continent also maintains that the *Stoker* language has not been applied by any Texas court. Sundown does not directly respond to this allegation, focusing instead on the Fifth Circuit's decision in *Northwinds*. Sundown has not cited, and the court has not located, any Texas decision that relies on the *Stoker* language to hold that an insurer can be liable based on a common law claim for breach of duty of good faith and fair dealing. Several Texas

courts discuss the language used in *Stoker,* and some appear to assume that it *could* apply, but none expressly holds that *Stoker* or the *Stoker* language creates a common law claim under the facts of a particular case.

In *Castaneda* the Supreme Court of Texas held that any "extreme" act by the insurer in handling the insured's claim in that case did not cause any independent injury, "as *contemplated* in *Stoker*." *Castaneda*, 988 S.W.2d at 199 (emphasis added). The court premised this conclusion on the fact that the only damages awarded by the jury that were not policy benefits were for loss of credit reputation, and this loss stemmed from the denial of benefits. *Id.*

In *Deschenes ex rel. Patton v. Farmers Insurance Exchange*, 2002 WL 971911 (Tex. App. May 13, 2002, pet. denied) (not designated for publication), the insured argued that he presented summary judgment evidence of extreme conduct sufficient to separate his breach of conduct claim from his bad faith claim. *Id.* at *4. The insured's evidence included an affidavit by his attorney that the insurance agent gave the insured inappropriate information regarding coverage and failed to notify the insurer about a potentially serious claim. *Id.* The court implicitly held that the *Stoker* language might provide an exception but found that the summary judgment evidence failed to raise a fact issue as to extreme conduct. *Id.*

In *Gates* the insured relied on language from *Stoker*

"indicating a bad faith claim *might exist* despite the absence of a breach of the insurance policy[.]" *Gates*, 53 S.W.3d at 831 (emphasis added). The court assumed *arguendo* that there could be a bad faith claim, but it held that the insured did not present sufficient evidence of an extreme act to create an issue of material fact that would defeat summary judgment. *Id.* As evidence of the insurer's extreme act, the insureds argued that the insurer breached an agreement entered into under Tex. R. Civ. P. 11 after litigation had begun. *Id.* The court affirmed the trial court's award of summary judgment for the insurer because the insureds failed to point to any evidence of extreme conduct by the insurer during the claims process. *Id.*

In *Betco Scaffolds Co. v. Houston United Casualty Insurance Co.*, 29 S.W.3d 341 (Tex. App. 2000, no pet.), the court implicitly assumed that the *Stoker* language could possibly provide an exception to the general rule, but it held that the insured's allegation that the insurer committed spoliation of the claim file was not "so extreme as to cause [the insured] injury independent of its policy or bad faith claims." *Id.* at 348. The court therefore affirmed the judgment for the insurer. *Id.*[12]

---

[12]Other state courts have declined to apply the *Stoker* language. *See, e.g., Bailey v. Progressive Cnty. Mut. Ins. Co.*, 2004 WL 1193917, at *1 (Tex. App. June 1, 2004, no pet.) (mem. op.) (affirming summary judgment for insurer because insureds failed to allege any claims independent of claim under policy); *Staglik v. Gov't Pers. Mut. Life Ins. Co.*, 2003 WL 22300006, at *2 (Tex. App. Oct. 8, 2003, pet. denied) (mem. op.) (holding that "[t]o the

The court has found no Texas state court that holds that a recovery is available under the *Stoker* language in the first-party claim context, much less in the context of handling of a third-party claim. Moreover, the Texas Supreme Court has noted that there are no examples of what conduct would result in such recovery, which confirms the absence of controlling authority. *See Fodge*, 63 S.W.3d at 804 (noting that, in *Stoker*, the court did not exclude the possibility that an insurer's denial of a claim might be in bad faith if its conduct were extreme and produced damages unrelated to and independent of the policy claim but that the Texas Supreme Court "cited no examples"); *see also Shah*, 2009 WL 291080, at *11 n.84 ("[T]he *Stoker* court did not find that any extreme act had occurred in that instance and did not offer any insight into what might be considered an extreme act justifying a bad faith finding."). In *Potomac Insurance* the court noted that the *Stoker* court "hinted that wholesale failure to investigate might be the type of act that could expose an insurer to a meritorious bad faith claim." *Potomac Ins.*, 1996 WL 450687, at *6 (citing *Stoker*, 903

---

extent [the insured's] appellate issues claim she can recover extra-contractual damages for [the insurer's] bad faith conduct even in the absence of policy coverage, we conclude such claims lack merit" because the record contained no evidence of an extreme act that caused independent injury); *Laas*, 2001 WL 1479228, at *5 (noting the possibility of an exception, but holding that because appellants waived this issue, the court need not address their "complaint that appellee's alleged dealings . . . constituted an 'act, so extreme, there could be an injury independent of the policy claim.'" (quoting *Stoker*, 903 S.W.2d at 341)).

S.W.2d at 341; *SynderGeneral*, 907 F. Supp. at 1006).

Mid-Continent also posits that no federal court, other than the Fifth Circuit in *Northwinds*,[13] has applied the *Stoker* language.[14]

In *Shah* the Southern District of Texas noted that the *Stoker* court "left open the possibility that an insurer could act in bad faith in legitimately denying a claim *if* the insurer committed 'some act, so extreme, that . . . cause[d] injury independent of the policy claim.'" *Shah*, 2009 WL 291080, at *11 (quoting *Stoker*, 903 S.W.2d at 341). The insured argued that the insurer's "conduct has been extreme[;] it has caused independent injuries such as mental anguish, anxiety and concern over financial ruin, lost wages, and the cost of a defense, the cost to assert its contractual right to a defense, health issues and the like." *Id.* (internal quotation marks and citation omitted). Although the *Shah* court agreed that the insured's difficulty with the insurer's claim processing had caused the insured misery and difficulty, it required that the insured "point to actions by [the insurer] that

---

[13]Of course, if *Northwinds* is binding precedent, it does not matter whether it stands alone. This court would be bound by it. But as the court explains *infra* at § IV(E), *Northwinds* does not address a cause of action for breach of duty of good faith and fair dealing in the context of a third-party insurance claim, does not represent the present state of Texas law, and is factually distinguishable.

[14]This court in *Nunn* mentioned but did not apply the *Stoker* language. *See Nunn*, 729 F.Supp.2d at 806, 810. Moreover, *Nunn* involved a first-party claim.

were extreme, rather than to the extreme nature of [the insured's] alleged damages." *Id.*

In *General Star* the court characterized the insureds' extra-contractual claims as hanging "on a single line of *dictum* in *Stoker*, in which the Texas Supreme Court stated that it did not 'exclude the possibility that in denying the claim, the insurer may commit some act, so extreme, that would cause injury independent of that claim.'" *Gen. Star*, 243 F.Supp.2d at 612 (quoting *Stoker*, 903 S.W.2d at 341). The insureds maintained that the *Stoker* language applied directly to their case because the insurer waited too long to investigate and deny their claim. *Id.* at 612-13. The court granted summary judgment for the insurer on the insureds' extra-contractual claims because the insureds failed to provide evidence of causation or damages. *Id.* at 613. The court declined to recognize that there was a tort such as "bad faith unreasonable delay in denying a claim," and it did not determine whether the insured presented sufficient evidence on that claim to survive a summary judgment motion. *Id.*

In *Woods* the Eastern District of Texas acknowledged that *Stoker* "in dicta . . . left open the theoretical possibility" of an exception to the general rule. *Woods*, 1996 WL 450687, at *6. The court held that because a detailed factual investigation was not required to properly deny the insured's claim where the responsive pleading and requests for admission established a legal defense,

the theoretical possibility of a *Stoker* exception for extreme conduct did not apply. *Id.* at \*7. The court therefore granted the insurer's motion for summary judgment as to the insured's bad faith counterclaim. *Id.*[15]

In sum, no federal court (including *Northwinds*, as the court will explain below) has held that an insured can recover under the *Stoker* language for breach of duty of the duty of good faith and fair dealing.

E

Sundown maintains that *Northwinds* provides a cause of action under Texas law, is directly on point, and is controlling. According to Sundown, in *Northwinds* the insurer solicited another party to file a baseless claim against the insured. Sundown argues that the facts of the instant case fall under *Northwinds* because Mid-Continent sought out Leopold and encouraged him to make a baseless claim against Sundown, even though Mid-Continent had no evidence that any oil on Leopold's property came from Sundown's facility. For several reasons, the court disagrees with Sundown

---

[15]This and other federal courts have declined to apply the *Stoker* language, either as a matter of law or under the facts of the case. *See, e.g., TRI Core Inc. v. Northland Ins. Co.,* 2002 WL 31548754, at \*6 (N.D. Tex. Nov. 12, 2002) (Kaplan, J.) (mentioning the *Stoker* language and holding that the insureds failed to adduce any evidence of extreme conduct that caused injury independent of the policy claim); *Loya v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 2001 WL 682111, at \*5 (W.D. Tex. Mar. 2, 2001) (considering whether insured was required to exhaust administrative remedies before pursuing claim for breach of duty of good faith and fair dealing and holding that there was no evidence of insurer misconduct).

concerning the precedential value of *Northwinds*.

First, the *Northwinds* panel did not hold that an exception to the general rule applied with respect to a claim for breach of duty of good faith and fair dealing.  Second, although district courts must follow "a legally indistinguishable decision of the Fifth Circuit . . . unless overruled *en banc* or by the United States Supreme Court," *MCI Telecommunications Corp. v. United Showcase, Inc.*, 847 F.Supp. 510, 512 (N.D. Tex. 1994) (Fitzwater, J.) (citation omitted), in a diversity case, this court is obligated "to follow subsequent state court decisions that are clearly contrary to a previous decision of [the Fifth Circuit]." *Farnham v. Bristow Helicopters, Inc.*, 776 F.2d 535, 537 (5th Cir. 1985) (citing *Broussard v. S. Pac. Transp. Co.*, 665 F.2d 1387, 1389 (5th Cir. 1982)).  The Fifth Circuit decided *Northwinds* in July 2001. Several Texas cases decided after *Northwinds* indicate that the *Stoker* language is not well-established Texas law.  Third, *Northwinds* is factually distinguishable from the present case.

1

*Northwinds* did not apply the *Stoker* language in the context of a claim for breach of the duty of good faith and fair dealing.  In *Northwinds* the panel discussed the *Stoker* language in a section entitled "STATUTORY CLAIMS," and it permitted the insured to recover on its *statutory causes of action* under the DTPA and the Insurance Code.  *See Northwinds*, 258 F.3d at 352-53.  The panel

noted that the insured could have a statutory remedy even if the insured had no viable breach of contract claim. *Id.* But the panel explained that "[w]here, as here, *there has been no . . . violation of the duty of good faith and fair dealing*, the bar for establishing extra-contractual liability is high: the insurer must 'commit some act, so extreme, that it would cause injury independent of the policy claim.'" *Id.* (quoting *Stoker*, 903 S.W.2d at 341) (emphasis added). The panel therefore mentioned the *Stoker* language in affirming the insurer's liability under the Insurance Code and the DTPA (extra-contractual remedies) in the absence of a breach of contract remedy and in light of the insured's extreme acts. The panel did not allow for or apply an exception to the general rule that there is no cause of action for breach of duty of good faith and fair dealing. This court therefore concludes that *Northwinds* does not hold that the *Stoker* language provides an exception to the general rule that there is no cause of action for breach of duty of good faith and fair dealing in the third-party claims handling context.

2

Moreover, even if *Northwinds* applied the *Stoker* language in the third-party claims handling context, several Texas cases decided after *Northwinds* indicate that the *Stoker* language is not well-established Texas law.

In 2005, the Texas Supreme Court decided *Progressive County*

*Mutual Insurance Co. v. Boyd*, 177 S.W.3d 919 (Tex. 2005). The court stated: "[w]e have *left open the possibility* that an insurer's denial of a claim it was not obliged to pay might nevertheless be in bad faith if its conduct was extreme and produced damages unrelated to and independent of the policy claim." *Id.* at 922 (emphasis added) (citing *Stoker*, 903 S.W.2d at 341). *Boyd*—which was decided several years after *Northwinds*—does not mention *Northwinds*, and it characterizes liability under the *Stoker* language as a mere "possibility."

Likewise, the Texas Supreme Court decided *Fodge* in November 2001, four months after the Fifth Circuit decided *Northwinds*. *Fodge* observed that "[in *Stoker*], we did not exclude the possibility that an insurer's denial of a claim it was not obliged to pay might nevertheless be in bad faith if its conduct were 'extreme' and produced damages unrelated to and independent of the policy claim. We cited no examples." *Fodge*, 63 S.W.3d at 804 (quoting *Stoker*, 903 S.W.2d at 341). Like *Boyd*, *Fodge* did not mention *Northwinds*. And *Fodge* seemed to emphasize the undeveloped state of the doctrine by highlighting the absence of cited examples in *Stoker* of what would qualify as bad faith conduct.

Three decisions of Texas courts of appeals issued after *Northwinds* indicate that the *Stoker* language is not well-established Texas law, and none mentions *Northwinds*: *Laas*, decided in November 2001; *Gates*, decided in August 2001; and *Crocker v.*

*American National General Insurance Co.*, 211 S.W.3d 928 (Tex. App. 2007, no pet.), decided in January 2007. *See Laas*, 2001 WL 1479228, at *4 ("Indeed, the supreme court in *Stoker*, mentioned in dicta the possibility, that in denying a claim, an insurer might commit some act, so extreme, there could be an injury independent of the policy claim."); *Gates*, 53 S.W.3d at 831-32 (noting that *Stoker* indicated that bad faith claim might exist despite absence of breach of insurance contract and "[a]ssuming, *without deciding*, an insurer in denying a claim may commit an act so extreme to cause an injury independent of the policy claim") (emphasis added); *Crocker*, 211 S.W.3d at 936 (noting that although "the court in *Stoker* did not exclude 'the possibility that in denying the claim, the insurer may commit some act, so extreme, that it would cause injury independent of the policy claim,'" the insureds did not argue that such exception applied).[16]

---

[16]Likewise, federal district court decisions that post-date *Northwinds* indicate that the *Stoker* language is not established Texas law and do not mention *Northwinds*: *Shah*, decided in January 2009; *Watson v. Allstate Texas Lloyds Ins. Co.*, 2005 WL 1607452, at *5 (S.D. Tex. July 5, 2005); and *General Star*, decided September 10, 2001. *See Shah*, 2009 WL 291080, at *11 & n.84 ("[In *Stoker*] the Texas Supreme Court explicitly *left open* the possibility that an insurer could act in bad faith in legitimately denying a claim *if* the insurer committed 'some act, so extreme, that caused injury independent of the policy claim.' . . . The court notes that the *Stoker* court did not find that any extreme act had occurred in that instance and did not offer any insight into what might be considered an extreme act justifying a bad faith finding.") (quoting *Stoker*, 903 S.W.2d at 341); *Watson*, 2005 WL 1607452, at *5 ("The Texas Supreme Court left open the possibility that an insurer could commit an act that was so extreme that it would cause injury independent of the policy claim."); *Gen. Star*, 243 F.Supp.2d at 612

Based on the decisions of the Supreme Court of Texas that mention the *Stoker* language and the decisions of Texas courts of appeals that have addressed the question, the court holds that there is no cause of action against an insurer for breach of duty of good faith and fair dealing in the context of third-party claims handling under Texas law. The common law remedies available in this context are limited to *Stowers* claims and breach of contract claims.

3

Even if the court assumes *arguendo* that such a cause of action is available under *Northwinds*, the facts of *Northwinds* are materially distinguishable from those of this case.

In *Northwinds* a company ("Northwinds") in the asbestos abatement business obtained workers' compensation insurance from the Texas Workers' Compensation Insurance Facility (the "Facility"). *Northwinds*, 258 F.3d at 348. Employers Insurance of Wausau ("Wausau") was the designated servicing company that issued

("[The insureds] hang their extra-contractual claims on a single line of *dictum* in *Stoker*, in which the Texas Supreme Court stated that it did not 'exclude the possibility that in denying the claim, the insurer may commit some act, so extreme, that would cause injury independent of that claim.'") (quoting *Stoker*, 903 S.W.2d at 341); *see also Papa v. Noone*, 132 Fed. Appx. 759, 762-63 (10th Cir. 2005) ("The [*Stoker*] court did state that it would not 'exclude . . . the possibility that in denying the claim, the insurer may commit some act, so extreme, that would cause injury independent of [the policy] claim.'") (quoting *Stoker*, 903 S.W.2d at 341). Sundown has not cited, and the court has not found, any cases following or citing the *Stoker* language as applied by *Northwinds.*

Northwinds' policy.  *Id.*  Essentially, the Facility was the insurer and divided reinsurance liability in proportion to the premiums received by each member (e.g., Wausau), and Wausau was the servicer and issued the policy, investigated, reported, and paid claims, and provided legal support under the policy.  *Id.* at 348 & n.2.

Northwinds sued Wausau for mishandling workers' compensation claims filed by Northwinds employees, specifically alleging that Wausau paid the claims without investigating them, resulting in increased insurance premiums for Northwinds and lost business due to customer perception that Northwinds was a safety risk.  *Id.* at 348.  Northwinds also sued for defense costs it had incurred in defending a baseless suit brought against it by the Facility at Wausau's prompting.  *Id.* at 349.  The jury found in favor of Northwinds on several claims and awarded damages for, *inter alia*, Northwinds' attorney's fees incurred in defending the lawsuit brought by the Facility.  *Id.*

The Fifth Circuit held that Northwinds could not recover under Texas law on its common law claims for negligent claims handling and fraud on the contract.  *Id.* at 352.  Texas law does not recognize either cause of action unless the defendant's conduct "'would give rise to liability independent of the fact that a contract exists between the parties [such that] the plaintiff's claim may *also* sound in tort.'"  *Id.* (quoting *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991)).  Northwinds' common law

claims were based on the allegation that Wausau falsely stated that it was fully investigating the workers' compensation claims, and on the damages Northwinds suffered when it was unable to contest the claims. *Id.* The panel held that Wausau could not be held liable for common law claims because "[n]o liability independent of the contractual duty to handle claims exists as a result of this false statement." *Id.*

In addressing the statutory claims under the DTPA and the Insurance Code, the panel essentially restated the *Stoker* language. It held that "[w]here, as here, there has been no breach of contract or violation of the duty of good faith and fair dealing, *the bar for establishing extra-contractual liability is high*: the insurer must 'commit some act, so extreme that [it] would cause injury independent of the policy claim.'" *Id.* at 353 (emphasis added) (quoting *Stoker*, 903 S.W.2d at 341). The panel explained its rationale for upholding the verdict under the *Stoker* standard:

> Wausau's successful efforts to persuade the Facility to sue Northwinds baselessly involved acts that a reasonable jury could find extreme, and they clearly caused Northwinds extra-contractual damages, as the company had to spend over $55,000 defending itself against the lawsuit. Examined under the deferential standard of appellate review, the evidence supports the finding of an extreme extra-contractual act sufficient to satisfy the *Stoker* standard.

*Id.* The *Northwinds* panel affirmed the verdict in this respect because Wausau had successfully encouraged the Facility (the

insurer) to baselessly sue Northwinds (the insured).  This "extreme act" by Wausau was entirely unrelated to Wassau's handling of the underlying workers' compensation claims about which Northwinds complained.   Northwinds sued Wausau, complaining of Wausau's handling of four workers' compensation claims, and, *independently*, of Wausau's encouragement of the baseless suit by the Facility against Northwinds, which Northwinds spent over $55,000 to defend. It is clear that Wausau's conduct in prompting the Facility to sue its insured (Northwinds) had nothing to do with Wausau's claims processing, settlement practices, or anything related to the underlying workers' compensation claims.

The present case is distinguishable from *Northwinds*.  Sundown contends that Mid-Continent encouraged third-party claims against Sundown and made unreasonable offers to third-parties for the sole purpose of terminating defense costs.  According to Sundown, Mid-Continent intentionally deceived Sundown, which led it to assert an Act of God defense to the class actions, and kept Sundown in the dark when disseminating erroneous test results, estimating worst-case scenarios, and making exorbitant settlement offers to putative class members.  Sundown asserts that Mid-Continent designed its investigation (presumably of Leopold's property) to prove a manufactured claim rather than to determine the true facts. Sundown maintains that the jury found that Mid-Continent knew exactly what it was doing and that its conduct was wrong, and found

that Mid-Continent failed to comply with its duty of good faith and fair dealing when it made the Leopold offer for purposes of exhausting policy limits and terminating defense costs.

Assuming *arguendo* that these are extreme acts under the *Stoker* language, *Northwinds* is distinguishable because Northwinds suffered injury that was entirely independent and separate from Wausau's handling of Northwinds' workers' compensation claims. In *Northwinds* the servicing company (Wausau) persuaded the insurer (the Facility) to baselessly sue the insured (Northwinds). Northwinds in turn sued Wausau, not only for its handling of the workers' compensation claims, but also for prompting the Facility to file a lawsuit against Northwinds that caused it to suffer an injury (defense costs) that was completely unrelated to the workers' compensation claims. In contrast to *Northwinds*, Sundown does not rely on actions by Mid-Continent or injuries by Sundown that are independent of Sundown's policy claim. Sundown tendered *Blanchard* to Mid-Continent and requested defense and indemnification on September 23, 2005. *See* PTO 21 ¶ 20. Sundown complains that, in handling third-party claims against Sundown, Mid-Continent acted unreasonably in its investigation and in making offers to third parties (namely, Leopold). In fact, Sundown specifically argues that Mid-Continent acted with the purpose of exhausting Sundown's *policy limits*. All of the behavior by Mid-Continent of which Sundown complains, and Sundown's alleged

injuries, flow directly from Mid-Continent's handling of third-party claims pursuant to its defense and indemnification of Sundown under the insurance policies. And, unlike the plaintiff in *Northwinds*, Sundown does not assert that Mid-Continent encouraged a party to sue Sundown for purposes unrelated to Mid-Continent's defense and indemnification of Sundown; rather, Sundown alleges that Mid-Continent incited and encouraged third parties to sue Sundown for injuries that were the subject of the insurance policies.

The court therefore holds that, even if Texas law recognizes a cause of action for breach of the duty of good faith and fair dealing in the third-party claims handling context, and even if the court assumes that Mid-Continent committed an extreme act, Mid-Continent is not liable under *Stoker* because there is legally insufficient evidence that Sundown suffered an injury independent of the policy claim.[17]

F

For the foregoing reasons, the court holds as a matter of law that Sundown cannot recover from Mid-Continent on its counterclaim for breach of the duty of good faith and fair dealing. The court therefore grants Mid-Continent's motion for judgment as a matter of

---

[17]Likewise, even if the court assumes *arguendo* that Sundown is complaining of Mid-Continent's handling of a *first-party* claim, *Northwinds* is distinguishable because a reasonable jury could not find that Sundown incurred an independent injury.

law.  Because Sundown cannot recover under Texas law for breach of duty of good faith and fair dealing, and because the award of $4.7 million in exemplary damages is predicated entirely upon this counterclaim, it follows that Mid-Continent is entitled to judgment as a matter of law vacating the award of exemplary damages.

V

Mid-Continent moves for judgment as a matter of law dismissing Sundown's statutory unfair settlement practices counterclaim.

A

The jury found that Mid-Continent engaged in unfair settlement practices in the investigation and handling of Sundown's Hurricane Katrina claim, in violation of Tex. Ins. Code Ann. § 541.060(a). The verdict is based on five separate grounds that are unlawful acts or omissions under § 541.060(a)(1), (2)(A), (3), (4)(A), and (7).  The jury also found that each ground was a producing cause of damages to Sundown.[18]  Mid-Continent maintains that it is entitled to judgment as a matter of law because the evidence is legally insufficient for a reasonable jury to find in Sundown's favor on any ground, or to find that any violation of § 541.060(a) was a producing cause of damages to Sundown.

The court begins by briefly recounting the facts pertinent to Sundown's unfair settlement practices counterclaim.  In doing so,

---

[18]In the jury charge, the court defined producing cause as "a substantial factor in bringing about an injury, and without which the injury would not have occurred."  Charge at 12.

- 49 -

the court views the evidence in the light most favorable to
Sundown, draws all reasonable inferences in favor of Sundown, and
disregards all evidence favorable to Mid-Continent that the jury
was not required to believe.  As the court has already explained,
*see supra* § III, following Hurricanes Katrina and Rita, Sundown
notified Mid-Continent of its claim for coverage and demanded
defense and indemnification in the Underlying Litigation, including
three class actions filed in the Eastern District of Louisiana.
Under a reservation of rights, Mid-Continent undertook Sundown's
defense, appointing two Louisiana attorneys, Clayton and Preston,
to defend Sundown.  Sundown maintained that the reservation of
rights created a conflict of interest between Sundown and Mid-
Continent that entitled Sundown to choose its defense counsel. Mid-
Continent eventually allowed Sundown to select its counsel, and
Sundown chose Jones Walker.  Mid-Continent and Sundown disagreed,
however, about Jones Walker's hourly rates.  While this issue was
being resolved, Clayton and Preston continued working secretly for
Mid-Continent against Sundown's wishes.  Mid-Continent directed
Clayton and Preston to visit the areas affected by the oil spill,
and they met with persons who could become members of a class
action.  Mid-Continent sent adjusters to evaluate and settle
claims, and the adjusters met with Leopold.  One adjuster evaluated
Leopold's claim and set a baseline to serve as a model for
evaluating other landowners' claims.  Mid-Continent secretly hired

Lambert, an environmental engineer, to test the soil on Leopold's property. Lambert's analysis contained mistakes, and Mid-Continent arranged for his findings to be reviewed by an expert, Muthig. Muthig explained to Mid-Continent that it was impossible for the diesel spots on Leopold's property to have come from Sundown's property. Without consulting or informing Sundown, Mid-Continent made a settlement offer of $54,536.00 to Leopold on June 2, 2006. Sundown learned of this offer on July 21, 2006, and Robin McGuire, Esquire ("McGuire"), Sundown's General Counsel, demanded that the offer be withdrawn. Mid-Continent withdrew the offer, and Leopold joined the *Blanchard* class action as a named class representative. Leopold had been given the faulty Lambert testing but not the Muthig report. Sundown argues that Mid-Continent's dealings with Leopold wreaked havoc for Sundown in its defense in *Blanchard*, and that, but for Mid-Continent's bad faith interference in the investigation and claims handling, Sundown would have settled *Blanchard* for at most $1 million. Sundown ultimately settled *Blanchard* for $2 million.

B

As a preliminary matter, the court holds that Sundown did not adduce evidence that would have enabled a reasonable jury to find a causal link between any action of Mid-Continent and the increased cost of the *Blanchard* settlement. The jury found that Sundown proved its unfair settlement practices counterclaim as to Hurricane

Katrina on five grounds: (1) Mid-Continent misrepresented to Sundown a material fact or policy provision relating to coverage at issue; (2) Mid-Continent failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when Mid-Continent's liability had become reasonably clear; (3) Mid-Continent failed to provide promptly to Sundown a reasonable explanation of the factual and legal basis in the policy for Mid-Continent's offer of a compromise settlement of a third-party claim; (4) Mid-Continent failed to affirm or deny coverage of Sundown's claim within a reasonable time; and (5) Mid-Continent refused to pay Sundown's claim without conducting a reasonable investigation of the claim. The jury also found that each ground was the producing cause of the increased cost of the *Blanchard* settlement.[19] Although the court will discuss below the absence of evidence of producing cause as to specific grounds, the court concludes at a general level that Sundown failed to adduce legally sufficient evidence from which a reasonable jury could have found that any of Mid-Continent's actions was the producing cause of the increased cost of the *Blanchard* settlement.

In sum, and as explained more fully below, Sundown generally complains that, because of Mid-Continent's activities, Sundown was

---

[19]Under the instructions in the jury charge, the jury necessarily made these findings in returning a verdict in favor of Sundown on this question and awarding compensatory damages only in the form of the increased cost of the *Blanchard* settlement.

unaware of the complete circumstances surrounding the Leopold offer. Sundown maintains that, but for Mid-Continent's misconduct, Sundown would have had the opportunity to discuss the offer with Leopold and to persuade him not to join the *Blanchard* class, not to become the *Blanchard* class representative, and not to discuss his offer with his neighbors or other class members. Sundown suggests that, had it been given that opportunity, it would have been able to settle *Blanchard* for less than $2 million. Sundown did not adduce any evidence, however, from which a reasonable jury could have found that, given the opportunity and the information it needed, and without any interference from Mid-Continent, Sundown would have been successful in its attempts to discuss the offer with Leopold or to persuade Leopold not to join the *Blanchard* class, not to become the class representative, or not to discuss his offer with others. In other words, although Sundown argued that it *would have tried* to accomplish these goals, it offered no evidence from which a reasonable jury could have found it more likely than not that Sundown would have succeeded. Moreover, Sundown's motivation to settle *Blanchard* was not solely based on Mid-Continent's investigation of the damage to Leopold's property and the Leopold offer. McGuire testified that one reason Sundown settled *Blanchard* was out of concern about jury sympathy for hurricane victims. *See* Tr. 6A:87.

The court therefore holds that Sundown failed to produce

evidence from which a reasonable jury could have found that Mid-Continent's actions were a producing cause of the *Blanchard* case's settling for $2 million rather than for a lesser sum.

C

The court now addresses the jury's finding that Mid-Continent violated the Texas Insurance Code on five grounds.

1

The jury found in ground one that Mid-Continent misrepresented a material fact or policy provision relating to the coverage at issue, and that this was a producing cause of damages to Sundown in the form of the increased cost of the *Blanchard* settlement.[20] Such a misrepresentation is a violation of Tex. Ins. Code Ann. § 541.060(a)(1).[21]

---

[20]Under the instructions in the jury charge, the jury necessarily made these findings in returning a verdict in favor of Sundown on this question and awarding compensatory damages only in the form of the increased cost of the *Blanchard* settlement.

[21]Section 541.060(a)(1) provides:

> It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to engage in the following unfair settlement practices with respect to a claim by an insured or beneficiary:
> . . .
> misrepresenting to a claimant a material fact or policy provision relating to coverage at issue[.]

The court instructed the jury:

> Misrepresenting to a claimant a material fact
> or policy provision relating to the coverage
> at issue includes: (1) making an untrue
> statement of material fact; (2) failing to
> state a material fact that is necessary to
> make other statements not misleading,
> considering the circumstances under which the
> statements are made; (3) making any statement
> in such a manner as to mislead a reasonably
> prudent person to a false conclusion of a
> material fact; or (4) making a material
> misstatement of law.[22]

Charge at 13.

Sundown argues in response that the trial record contains ample evidence of untrue statements, misleading omissions, misleading statements, and material misstatements of law made by Mid-Continent. Sundown avers that Mid-Continent made at least four misrepresentations:[23] first, Mid-Continent misstated the law when

---

[22]Section 541.061 lists five types of misrepresentations, including:

> (1) making an untrue statement of material
> fact;
> (2) failing to state a material fact necessary
> to make other statements made not misleading,
> considering the circumstances under which the
> statements were made;
> (3) making a statement in a manner that would
> mislead a reasonably prudent person to a false
> conclusion of a material fact; [and]
> (4) making a material misstatement of law[.]

[23]Sundown argues that Mid-Continent made three misrepresentations in its response to Mid-Continent's renewed motion for judgment as a matter of law. Sundown posits that Mid-Continent made a fourth misrepresentation in its response at trial to Mid-Continent's trial presentation of its motion for judgment as a matter of law. *See* Tr. 9A:49-50.

it failed to acknowledge a conflict of interest between Mid-Continent and Sundown that Mid-Continent created by its reservation of rights letters; second, Mid-Continent made a misrepresentation when it stated that it did not pay more than $200 per hour for Louisiana lawyers; third, Mid-Continent misstated the law when it told Sundown there was no coverage for Hurricane Katrina cleanup costs unless Sundown could produce a written order from the Coast Guard; and, fourth, Mid-Continent misstated the law when it maintained that it had an unavoidable duty to investigate Leopold's claim.

Mid-Continent posits that there is legally insufficient evidence that it made any misrepresentation of a material fact or policy provision relating to the coverage at issue or that any misrepresentation was a producing cause of the increased cost of the *Blanchard* settlement.

2

After Mid-Continent moved during trial for judgment as a matter of law, the court asked Sundown to state the evidentiary basis for each ground of its unfair settlement practices counterclaim. *See* Tr. 9A:48. Sundown responded that ground one is based on Mid-Continent's repeated representations to Sundown that no conflict of interest existed that would permit Sundown to select its own counsel at Mid-Continent's expense, and that it would only accept counsel selected by Sundown under certain conditions, such

as with limited hourly rates and review of attorney bills by an independent billing review company. *See* Tr. 9A:50.

The parties stipulated in the PTO that, by letter dated October 24, 2005, Sundown advised Mid-Continent of its position that the reservation of rights letters created a conflict of interest sufficient to allow Sundown to retain counsel of its choosing at Mid-Continent's expense. *See* PTO 22 ¶ 31. Essentially, Sundown posits that Haltom misrepresented to Sundown that no conflict of interest existed, even though Mid-Continent created a conflict of interest by the reservation of rights letters.

During the testimony of Gregg Allen ("Allen"), an owner of Sundown, Mid-Continent introduced a reservation of rights letter dated October 6, 2005. Mid-Continent stated in the letter that "this [*Blanchard*] defense is being provided under a Reservation of Rights as to the terms and conditions of the policies issued by [Mid-Continent.]" P. Exh. 49 at 1. Sundown asked Allen about an October 24, 2005 letter from Sundown to Mid-Continent in which Sundown stated that it had reviewed six reservation of rights letters that Mid-Continent had sent, and that Mid-Continent had a conflict of interest. In response, Mid-Continent stated in an October 31, 2005 letter that it did not see such a conflict of interest. Haltom also testified that Mid-Continent never admitted that there was a conflict. Because the court holds that a reasonable jury could not have found that any such

misrepresentation was a producing cause of the increased cost of the *Blanchard* settlement, *see infra* § V(C)(3), the court assumes *arguendo* that Mid-Continent misrepresented to Sundown that there was no conflict of interest.

Sundown also argued at trial that Mid-Continent misrepresented the rates it would agree to pay for Sundown's counsel. Sundown retained Jones Walker to defend it in the Underlying Litigation, and Sundown and Mid-Continent disagreed regarding how much Mid-Continent would pay these attorneys. Sundown decided that it would pay Jones Walker's fees even if Mid-Continent would not fully reimburse Sundown. Sundown maintains that Mid-Continent misrepresented that $200 per hour was the most Mid-Continent paid lawyers in Louisiana to defend similar cases. Allen testified that, in his experience, the best litigators charged $300, $400, or more per hour. Sundown eventually accepted Mid-Continent's position that it would pay $200 per hour for Jones Walker partners. Allen testified that, had he known that Mid-Continent paid Louisiana attorneys more than $200 per hour, he would not have agreed to the $200 hourly rate for Jones Walker partners. Allen also testified that he later learned that Mid-Continent was paying partners $250 per hour. Viewing the evidence in the light most favorable to Sundown, the court holds that a reasonable jury could have found that Mid-Continent misrepresented to Sundown the fees it had paid or would pay for Louisiana attorneys.

Sundown also contends that Mid-Continent misrepresented that there was no coverage for Hurricane Katrina cleanup unless Sundown could produce a written order from the Coast Guard. Sundown avers that although Mid-Continent told Sundown that it needed a mandate for coverage, Mid-Continent informed its reinsurers that there were no coverage disputes. During Sundown's examination of Gary Ray ("Ray"), Sundown's retail insurance agent, Sundown introduced a letter from Mid-Continent to Sundown dated September 16, 2005, in which Mid-Continent asked if Sundown had received an order from the Coast Guard, the Environmental Protection Agency, or another agency to commence the cleanup. Mid-Continent also stated, "[w]e have not issued any authorization for voluntary clean up costs." Jt. Exh. 8.

Ray testified that, by this letter, Mid-Continent made a strong point that if Sundown did not have a mandate from the Coast Guard or Mid-Continent's approval for voluntary cleanup, Mid-Continent would not cover the cleanup. Ray also testified that, at a meeting with Mid-Continent, Steven Levine, Esquire, an attorney for Mid-Continent, advised Sundown that, if Sundown paid the cleanup costs itself, it could seek reimbursement from the OPA Fund because the pollution event was an Act of God. In that event, Ray testified, Sundown would pay the cleanup costs itself and secure reimbursement from the OPA Fund, and the balance of the policy limits would be available for Sundown's use in defending lawsuits.

Chernekoff testified that Mid-Continent decided not to allow Sundown to place its cleanup claim "in abeyance" and seek OPA Fund reimbursement. Viewing the evidence in the light most favorable to Sundown, the court holds that a reasonable jury could have found that Mid-Continent misrepresented to Sundown that there was no coverage for Sundown's cleanup costs absent a Coast Guard mandate by making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact.

Finally, Sundown argues that Mid-Continent misstated the law when it said that it had not only the right, but the *duty*, to investigate Leopold's claim. Michael Sean Quinn, Esquire ("Quinn"), an expert witness for Sundown, testified that the duty of an insurer only arises under Texas law when a claim is formally presented to the insurer. Quinn also testified that it was prudent for Mid-Continent to investigate Leopold's claim after he knocked on the door of the Sundown trailer. Sundown posits that because it did not present to Mid-Continent a third-party claim made by Leopold, Mid-Continent had no duty to investigate the claim. Sundown cites a May 15, 2006 letter from Mid-Continent's attorney, Robert Dees, Esquire ("Dees"),[24] to Rosenblum stating that Mid-Continent had the duty to investigate claims against Sundown. Mid-Continent relies on a May 4, 2006 letter and argues that, in that

---

[24]Dees is also one of Mid-Continent's trial counsel in this litigation.

letter, Sundown tendered the Leopold claim to Mid-Continent.
Because the court holds that a reasonable jury could not have found
that any such misrepresentation was a producing cause of the
increased cost of the *Blanchard* settlement, *see infra* § V(C)(3),
the court assumes *arguendo* that Mid-Continent misstated the law by
saying that Mid-Continent had a duty to investigate the Leopold
claim.

3

Mid-Continent also argues that there is legally insufficient
evidence that any of these alleged misrepresentations was a
producing cause of the increased cost of the *Blanchard* settlement.

In the jury charge, the court submitted a compensatory damages
question that asked the jury to consider six categories of possible
damages. As the court recounts *supra* at § I(B), the jury awarded
no damages for the following: Hurricane Rita cleanup costs;
attorney's fees that Sundown incurred cooperating with Mid-
Continent's Hurricane Rita investigation and researching and
responding to Mid-Continent's denial of the claim on grounds of
late notice; the increased cost of the *Isla* settlement; the
unreimbursed defense costs in the Underlying Litigation under Mid-
Continent's contractual duty to defend; and other damages for Mid-
Continent's breach of its duty of good faith and fair dealing. The
jury awarded compensatory damages only for the increased cost of
the *Blanchard* settlement. The dispositive question, therefore, is

whether any unfair settlement practice that Mid-Continent committed was a producing cause *of the increased cost of the* Blanchard *settlement.*

"In actions such as this involving alleged violations of the DTPA or the [Insurance] Code, the party seeking recovery of damages bears the burden of establishing that the actions complained of were a 'producing cause' of the injuries suffered." *Travelers Indem. Co. v. Page & Assocs. Constr. Co.*, 2002 WL 1371065, at *9 (Tex. App. June 25, 2002, pet. denied) (not designated for publication) (citing *Doe v. Boys Club of Greater Dall., Inc.,* 907 S.W.2d 472, 478 (Tex. 1995)). "In doing so, the plaintiff must show an unbroken causal connection between the alleged misrepresentation and injuries suffered by the complaining party." *Id.* (citing *Boys Club of Greater Dall.*, 907 S.W.2d at 481).

In *State Farm Fire and Casualty Co. v. Gros*, 818 S.W.2d 908 (Tex. App. 1991, no pet.), a jury found that State Farm violated Tex. Ins. Code. Ann. art 21.21[25] by misrepresenting through an agent to its insureds (the Groses) that their insurance policy covered damage or loss to their home from a landslide. *Id.* at 911. On appeal, State Farm challenged the factual and legal sufficiency of the evidence that supported the jury finding that the misrepresentation was a producing cause of damages to the Groses.

---

[25]Article 21.21 is the precursor of Tex. Ins. Code Ann. § 541.060.

*Id.* at 913.  The Groses testified that, had they known their policy did not cover damage from landslides, they would have tried to obtain other coverage.  *Id.*  State Farm argued that the misrepresentation was not a producing cause of the Groses' damages because other insurance coverage was not available in the market.  *Id.*  The court rejected State Farm's argument, concluding that it was unnecessary for the Groses to prove that other coverage could have been obtained.  The court reasoned that, but for State Farm's misrepresentation, the Groses might have taken steps to fortify their home against landslide damage.  *Id.* at 913-14.

In *Page & Associates* the insureds argued that the insurer's conduct resulted in repeated and continuous delays in the reimbursement of the insured's defense costs.  *Page & Assocs.*, 2002 WL 1371065, at *9.  The insureds argued that they incurred attorney's fees in connection with an indemnification agreement with a third party for retained independent counsel and engineering experts.  *Id.*  The court held that "[t]here is nothing in the record other than speculation to show that [the third party] would not have retained independent counsel . . . if [the insurer] had not questioned its coverage[.]"  *Id.*  The court of appeals reversed the judgment in favor of the insured and rendered judgment for the insurer on the misrepresentation claim.  *Id.* at *11.

This court will uphold the verdict in favor of Sundown on the first ground of its unfair settlement practices claim if it

determines under the controlling standard that a reasonable jury could have found that even one misrepresentation was a producing cause of the increased cost of the *Blanchard* settlement. Stated another way, there must be legally sufficient evidence that at least one of the misrepresentations on which Sundown relies was a substantial factor in bringing about the increased cost of the *Blanchard* settlement, and without that misrepresentation, the cost of the *Blanchard* settlement would not have increased. The court will address each misrepresentation in turn.

First, Sundown posits that Mid-Continent misstated the law when it failed to acknowledge a conflict of interest between Mid-Continent and Sundown that Mid-Continent created by its reservation of rights letters. Sundown asserts that Mid-Continent's refusal to acknowledge a conflict "was part of the entire scheme of Mid-Continent whereby the cost of settling the *Blanchard* case was caused by a chain of Mid-Continent's actions." Ds. JMOL Resp. 30. Mid-Continent replies that there is no legally sufficient evidence that, if Haltom had not said that he did not see a conflict between Mid-Continent and Sundown, the *Blanchard* case would have settled for less money. In fact, Mid-Continent points to testimony by McGuire that Sundown settled *Blanchard* because Sundown was worried that the Leopold offer would be used against Sundown, and about jury sympathy.

The court holds that the evidence was legally insufficient for

a reasonable jury to have found that Mid-Continent's failure to acknowledge a conflict of interest between Sundown and Mid-Continent was a producing cause of the increased cost of the *Blanchard* settlement. Sundown was obligated at trial to establish an unbroken causal connection between the alleged misrepresentation and the injury it suffered. Sundown did not introduce evidence that would have allowed a reasonable jury to find what would have occurred absent Mid-Continent's misstatement. In other words, the trial record does not contain evidence that would have permitted a reasonable jury to find that, had Mid-Continent acknowledged the existence of a conflict, Sundown would not have suffered damages in the form of the increased cost of the *Blanchard* settlement. Rather, Sundown argues that Mid-Continent's failure to acknowledge a conflict of interest was part of Mid-Continent's general behavior and tactics in its dealings with Sundown. But even assuming that Mid-Continent misstated the law when it failed to acknowledge a conflict of interest between Mid-Continent and Sundown that Mid-Continent created by its reservation of rights letters, that this misrepresentation was part of a scheme, and that Sundown suffered injury, Sundown failed to introduce legally sufficient evidence of a causal link between Mid-Continent's misstatement and the increased cost of the *Blanchard* settlement.

Second, Sundown argues that Mid-Continent misrepresented that it did not pay more than $200 per hour for Louisiana lawyers. At

trial, Sundown argued that Mid-Continent's misrepresentation as to the rates it would pay "caused damage to Sundown by getting Sundown to agree under false pretenses to Mid-Continent's defenses." Tr. 9A:51.

The court holds that there was legally insufficient evidence for a reasonable jury to have found that Mid-Continent's statement that it did not pay more than $200 per hour for a Louisiana attorney was a producing cause of the increased cost of the *Blanchard* settlement. The trial record contains no evidence that, had Mid-Continent not misrepresented the rates it paid or was willing to pay, Sundown would have been able to settle *Blanchard* for less. Instead, Sundown argues that Mid-Continent's statement is part of its deceptive behavior in its dealings with Sundown. Even if Mid-Continent's behavior was wrong and deceitful, the trial evidence was not sufficient to have enabled a reasonable jury to find that, absent the misrepresentation, Sundown would not have suffered the increased cost of the *Blanchard* settlement.

Third, Sundown maintains that Mid-Continent misstated the law when it told Sundown there was no coverage for Hurricane Katrina cleanup costs unless Sundown could produce a written order from the Coast Guard. Sundown argues that Mid-Continent's misstatement of the law led to Mid-Continent's advice that Sundown could pursue reimbursement from the OPA Fund and put its Hurricane Katrina cleanup claim "in abeyance." According to Sundown, Mid-Continent's

statements resulted in Mid-Continent's desperate attempt to exhaust its policy limits to cut off attorney's fees, which in turn led to the Leopold offer, which in turn led to the increased cost of the *Blanchard* settlement. Mid-Continent replies that there is no evidence that this misrepresentation was a producing cause of the increased cost of the *Blanchard* settlement.

The court holds that there was legally insufficient evidence for a reasonable jury to have found that Mid-Continent's misrepresentation that Sundown's claim was not covered without an order from the Coast Guard was a producing cause of the increased cost of the *Blanchard* settlement. The trial record contains no evidence from which a reasonable jury could find that, had Mid-Continent not stated that it required an order from the Coast Guard, Sundown would not have suffered injury in the form of the increased cost of the *Blanchard* settlement. Rather, Sundown argues that Mid-Continent's statements were part of Mid-Continent's attempt to cut off its responsibility to pay for Sundown's attorney's fees. Even assuming that this was Mid-Continent's motive for making the misrepresentation, Sundown has not shown how a jury could reasonably have found that the misrepresentation caused the specific injury for which the jury awarded damages: the increased cost of the *Blanchard* settlement.

Fourth, Sundown argues that Mid-Continent misstated the law when it maintained that it had an unavoidable duty to investigate

Leopold's claim.  Regarding producing cause, Sundown avers that this misstatement led to Mid-Continent's clandestine investigation of the Leopold claim, which in turn led to the Leopold offer, which in turn resulted in the increased cost of the *Blanchard* settlement. Mid-Continent replies that there is no evidence that this misrepresentation was a producing cause of the increased cost of the *Blanchard* settlement.

The court holds that there was legally insufficient evidence for a reasonable jury to have found that Mid-Continent's misstatement that it had an unavoidable duty to investigate Leopold's claim was a producing cause of the increased cost of the *Blanchard* settlement.  The trial record contains no evidence that, had Mid-Continent not represented to Sundown that it had a duty to investigate Leopold's claim, Sundown would not have suffered injury in the form of the increased cost of the *Blanchard* settlement. Essentially, Sundown is arguing that had Mid-Continent not *acted* on its alleged duty to investigate Leopold's claim, Sundown would not have suffered injury in the form of the increased cost of the *Blanchard* settlement.  But viewed in the light most favorable to the verdict, the trial evidence at most permitted the finding that *Mid-Continent's investigation*, including its dealings with Leopold—*not* its misstatement to Sundown—was a producing cause of the increased cost of the *Blanchard* settlement.  If Mid-Continent had conducted the investigation of the Leopold claim exactly as it

did, without making any statement to Sundown about its duty to investigate, Sundown would have suffered the same harm. Therefore, a reasonable jury could only have found that the investigation itself, not any misstatement of law, was a producing cause. But Sundown did not allege, nor did the jury find, that *the investigation* was a producing cause of the increased cost of the *Blanchard* settlement.

Accordingly, assuming *arguendo* that a reasonable jury could have found that Mid-Continent committed an unfair settlement practice based on one or more of four misrepresentations, a reasonable jury could *not* have found that any of these alleged misrepresentations was a producing cause of the increased cost of the *Blanchard* settlement. Mid-Continent is therefore entitled to judgment as a matter of law as to the first ground of Sundown's unfair settlement practices claim.

D

1

The jury found in ground two that Mid-Continent failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when Mid-Continent's liability had become reasonably clear, and that this was a producing cause of the increased cost of the *Blanchard* settlement.[26] Such a failure is a

---

[26]Under the instructions in the jury charge, the jury necessarily made these findings in returning a verdict in favor of Sundown on this question and awarding compensatory damages only in

violation of Tex. Ins. Code Ann. § 541.060(a)(2)(A).[27]

Mid-Continent contends that there is no legally sufficient basis for the jury's findings on this ground. It maintains that § 541.060(a)(2) applies in the third-party context only to settlement demands within policy limits. Sundown responds that the jury found that Mid-Continent did the opposite of what the Insurance Code requires: it attempted in bad faith to effectuate an unfair and excessive settlement of a claim for which Sundown's liability was not clear.

Sundown argued at trial that Mid-Continent failed in bad faith to effectuate a prompt, fair, and equitable settlement of the *Blanchard* case. Sundown avers that Mid-Continent failed to settle a "claim" in the form of a $9.5 million settlement demand that Sundown received in the *Blanchard* case and tendered to Mid-

_____

the form of the increased cost of the *Blanchard* settlement.

[27]Section 541.060(a)(2)(A):

> It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to engage in the following unfair settlement practices with respect to a claim by an insured or beneficiary:
> . . .
> failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear[.]

Continent.[28] Sundown argued at trial that Mid-Continent believed that its liability in the *Blanchard* case was reasonably clear because it made an offer to Leopold shortly after Sundown tendered the $9.5 million *Blanchard* settlement offer to Mid-Continent. Sundown maintains that, because Mid-Continent believed that its liability in *Blanchard* was reasonably clear, Mid-Continent should have responded to the $9.5 million settlement demand.

2

"An insurer faces [liability under § 541.060(a)(2)(A)] if it does not attempt in good faith to effectuate prompt, fair, and equitable settlements of claims submitted in which liability has become reasonably clear." *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 260 (Tex. 2002) (internal quotation marks and citation omitted). In *Rocor* the Supreme Court of Texas stated that "[t]here is nothing to indicate that the Legislature had in mind any standard other than the familiar *Stowers* standard" in promulgating § 541.060(a)(2). *Id.* The court held that "*Stowers* provides an appropriate framework for understanding and applying the statutory standard." *Id.* at 261. The court also noted that, "in Texas, the common law imposes no duty on an insurer to accept

_____

[28]*See* Tr. 9A:51-52 & 57-58. When the court questioned Sundown regarding the "claim" to which it referred (the court had granted summary judgment dismissing the § 541.060(a)(2) claim based on the December 2007 settlement demand), Sundown emphasized that the "claim" at issue is the May 2005 *Blanchard* settlement demand of $9.5 million.

a settlement demand in excess of policy limits or *to make or solicit settlement proposals*," and it stated that "[w]e see no reason why an insurer's duty to its insured under [§ 541.060(a)(2)(A)] should not be similarly circumscribed." *Id.* at 261-62 (emphasis added). *Rocor* held that, for an insurer's duty under § 541.060(a)(2)(A) to be activated, the claimant must make a settlement demand within policy limits with terms that an ordinarily prudent insurer would accept. *Id.* at 262.

> Under Texas law, an insurer's liability with respect to a third-party claim is reasonably clear——triggering § 541.060(a)(2)'s duty with respect to settlement——when four elements are satisfied: (1) the policy covers the claim; (2) the insured's liability is reasonably clear; (3) the claimant has made a proper settlement demand within policy limits; and (4) the demand's terms are such that an ordinarily prudent insurer would accept it.

*Mid-Continent I*, 2009 WL 3074618, at *38 (citing *Rocor*, 77 S.W.3d at 262).

3

Sundown does not appear to argue on the basis of the *Rocor* factors that Mid-Continent violated § 541.060(a)(2)(A). It does not contend that it tendered to Mid-Continent a claim covered by the Primary Policy and/or the Umbrella Policy for which Sundown's liability was reasonably clear, and that a claimant made a proper settlement demand within policy limits with terms that an ordinarily prudent insurer would have accepted. Instead, Sundown argues that, under the statute, Mid-Continent had a duty to *attempt*

*to settle* or to *respond* to a settlement offer with a counteroffer. Sundown maintains that Mid-Continent breached its duty to settle when it failed to attempt to settle the *Blanchard* case and when it failed to respond to the $9.5 million settlement offer. Mid-Continent replies that the duty imposed by § 541.060(a)(2)(A) is not triggered unless and until there is a proper settlement demand within policy limits.

Sundown does not cite, and the court has not found, any support for Sundown's argument to extend Texas law as Sundown requests. According to *Rocor*, § 541.060(a)(2)(A) does not apply unless and until a claimant presents a settlement demand within policy limits. In other words, as a matter of law, Mid-Continent had no duty to attempt to settle with the *Blanchard* class on behalf of Sundown absent presentment of a claim to Mid-Continent within policy limits. Therefore, Mid-Continent cannot be held liable on this ground of Sundown's unfair settlement practices claim because, as a matter of law, Mid-Continent had no duty to attempt to settle under § 541.060(a)(2)(A). Mid-Continent is entitled to judgment as a matter of law on the second ground of Sundown's unfair settlement practices claim.

E

1

The jury found that Sundown proved ground three of its unfair settlement practices claim: that Mid-Continent failed to provide

promptly to Sundown a reasonable explanation of the factual and legal basis in the policy for Mid-Continent's offer of a compromise settlement of Leopold's claim, and that this was a producing cause of the increased cost of the *Blanchard* settlement.[29]  Such a failure is a violation of Tex. Ins. Code Ann. § 541.060(a)(3).[30]

Mid-Continent maintains that there is no legally sufficient basis for the jury's finding on this ground because Mid-Continent provided a reasonable explanation of the basis for the Leopold offer.  Mid-Continent also contends that, even if it failed to provide a prompt, reasonable explanation for the Leopold offer, a reasonable jury could not have found that its failure was a producing cause of the increased cost of the *Blanchard* settlement.

---

[29]Under the instructions in the jury charge, the jury necessarily made these findings in returning a verdict in favor of Sundown on this question and awarding compensatory damages only in the form of the increased cost of the *Blanchard* settlement.

[30]Section 541.060(a)(3) provides:

> It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to engage in the following unfair settlement practices with respect to a claim by an insured or beneficiary:
> . . .
> failing to promptly provide to a policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim or offer of a compromise settlement of a claim[.]

Tex. Ins. Code Ann. § 541.060(a)(3) prohibits an insurer from "failing to promptly provide to a policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim or offer of a compromise settlement of a claim[.]" "This court must interpret the statute according to the plain meaning of its words." *Bear Stearns Cos. Inc. v. Lavalle*, 2000 WL 34339773, at *6 (N.D. Tex. Oct. 27, 2003) (Fitzwater, J.) (citing *United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989)). "'When a statute does not define its terms, we employ the ordinary meaning of the words.'" *Id.* (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 983 (9th Cir. 1999) (defining words by dictionary definitions)). The court will therefore interpret and apply § 541.060(a)(3) according to its plain meaning.

Under the court's interpretation, to establish a violation of § 541.060(a)(3), a plaintiff must prove that the insurer's explanation of the factual and/or legal basis in the policy for an offer of compromise settlement was not provided promptly or was not reasonable. The plaintiff must also prove that the violation was a producing cause of damages to the plaintiff. *See, e.g., Page & Assocs.*, 2002 WL 1371065, at *9. The court has found several cases in which the court faced the question whether the insurer promptly provided the insured a reasonable explanation of the basis in the

policy, in relation to the facts or applicable law, for the denial or offer to settle a claim. The court has not located any case, however, in which a court *found* that an explanation given to the insured was not reasonable or was not prompt; in other words, Sundown has not cited, and the court has not located, a case in which an insurer was found to have violated § 541.060(a)(3). The court has therefore looked to several cases for guidance in determining what constitutes a reasonable explanation of an offer of a compromise settlement.

In *Russell v. State Farm Lloyds*, 2001 WL 1326501 (N.D. Tex. Oct. 15, 2001) (Fitzwater, J.), the defendants, an insurance adjuster and insurer ("State Farm"), moved to dismiss, *inter alia*, plaintiffs' cause of action under Tex. Ins. Code Ann. art. 21.21 § 4(10)(a)(iv) (West 1981 & Pamp. Supp. 2001), against the adjuster. *Russell*, 2001 WL 1326501, at *1. Section 4(10)(a)(iv) is the predecessor to § 541.060(a)(3), and it prohibited an insurer from failing "to provide promptly to a policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim or for the offer of a compromise settlement of a claim." Tex. Ins. Code Ann. art. 21.21 § 4(10)(a)(iv) (repealed and recodified by Acts 2003, 78th Leg., ch. 1274 § 2, eff. Apr. 1, 2005) (current version at Tex. Ins. Code. Ann. § 541.060(a)(3)). State Farm argued that the plaintiffs did not plead sufficient facts to support a cause of

action under § 4(10)(a)(iv). *Russell*, 2001 WL 1326501, at *3. The plaintiffs demanded an explanation for the denial of coverage of damage to the foundation of their residence. *Id.* The court noted that the plaintiffs' complaint was in this respect similar to their complaint that the adjuster disregarded pertinent evidence in determining what caused the damage and failed to fully and properly investigate the plaintiffs' claim. *Id.* The court held that both of these assertions, if true, indicated that the adjuster had failed to promptly provide a *reasonable* explanation of the basis in the policy for the denial of the plaintiffs' claim. *Id.* Thus the court looked to the allegations of the adjuster's diligence in other respects to see if there was evidence of a reasonable explanation.

In *South Texas Medical Clinics, P.A. v. CNA Financial Corp.*, 2008 WL 450012 (S.D. Tex. Feb. 15, 2008), the plaintiff-clinic alleged that the defendant-insurer failed to promptly provide the clinic a reasonable explanation of the basis in the policy for the insurer's denial of the clinic's claim. *Id.* at *10. The court held that, to succeed on a claim under § 541.060, a plaintiff must establish that it suffered actual damages. *Id.* at *11. The court noted that "[t]he Insurance Code does not explain what 'actual damages' are sufficient to support a private cause of action under Chapter 541." *Id.* The plaintiff had not identified actual damages that it suffered as a result of the defendants' alleged failure to

provide a timely and reasonable explanation for denying the clinic's claim. *Id.* The court also held that "[t]here is a fact issue as to whether the defendants promptly provided a reasonable explanation, 'in relation to the facts or applicable law,' for denying [the clinic's] claim." *Id.* (quoting § 541.060(a)(3)). The court therefore denied both parties' motions for summary judgment as to the claim under § 541.060(a)(3). *Id.* at *12.

In *Greil v. Geico*, 184 F.Supp.2d 541 (N.D. Tex. 2002) (Sanders, J.), the plaintiff alleged that the insurer violated Tex. Ins. Code Ann. art. 21.21 § 4(10)(a)(iv) by refusing to provide a written breakdown of its settlement offer to the plaintiff. *Greil*, 184 F.Supp.2d at 546. Judge Sanders noted that the plaintiff failed to cite any authority that required an insurer to provide such a breakdown. *Id.* at 547. One week after the plaintiff sent a letter to Geico disputing its valuation of her claim, Geico sent a letter to Greil offering to discuss its offer. *Id.* at 546-47. Greil did not respond to Geico's multiple offers to discuss the settlement offer. *Id.* at 547. Judge Sanders pointed out that the plaintiff cited no authority or evidence that Geico's actions were insufficient to satisfy the requirements of the statute, and he granted Geico's motion for summary judgment in this respect. *Id.*

In *National American Insurance Co. v. Columbia Packing Co.*, 2003 WL 21516586 (N.D. Tex. Apr. 7, 2003) (Kaplan, J.), the insured moved for summary judgment on its extra-contractual claims for

violations of Tex. Ins. Code Ann. art. 21.21 § 4(10)(iv). *Nat'l Am. Ins.*, 2003 WL 21516586, at *6. In its letter denying the insured's claim, the insurer explained that coverage was not available under certain clauses of the policy because there was no physical evidence to show damage to the property at issue, and because stolen materials were taken by authorized representatives or people entrusted with the property. *Id.* at *7. Judge Kaplan held that whether this explanation was reasonable was a fact issue to be decided after the jury determined whether the stolen materials were entrusted to an authorized representative. *Id.* He therefore denied the insured's motion for summary judgment in this respect. *Id.*

In *AIG Aviation, Inc. v. Holt Helicopters, Inc.*, 198 S.W.3d 276 (Tex. App. 2006, pet. denied), the court held that "[r]easonableness, is an objective standard focusing on whether a reasonable insurer under the circumstances would have acted in a similar manner." *Id.* at 285 (citing *Aranda v. Ins. Co. of N. Am.*, 748 S.W.2d 210, 213 (Tex. 1988) (holding that determining whether insurer had reasonable basis for denying or delaying payment of claim "requires an objective determination of whether a reasonable insurer under similar circumstances would have delayed or denied the claimant's benefits"). The relevant inquiry, therefore, is an objective one: whether a reasonable insurer would have acted similarly under the same or similar circumstances.

In sum, these cases provide this guidance: the trier of fact can look to the insurer's diligence in other respects to determine whether the insurer gave a reasonable explanation, *see Russell*, 2001 WL 1326501, at *3; to succeed under § 541.060(a)(3), the plaintiff must prove that it suffered actual damages, *see South Texas Medical Clinics*, 2008 WL 450012, at *11; to satisfy § 541.060(a)(3), an insurer is not required to provide a breakdown of specific details in the offer to the insured, *see Greil*, 184 F.Supp.2d at 547; the court must first resolve whether there is a basis in the policy for the insurer's denial of a claim before determining whether the corresponding explanation for the denial is reasonable, *see National American Insurance*, 2003 WL 21516586, at *7; and the relevant inquiry is an objective one——whether a reasonable insurer would have acted similarly under the same or similar circumstances, *see AIG Aviation*, 198 S.W.3d at 285.

### 3

Mid-Continent maintains that on July 10, 2006 it provided Sundown notice and a reasonable explanation of the Leopold offer. The letter stated: "based on the findings of no contamination to the property of Mr. Leopold other than some oil residue on some of the debris, we have extended an offer of $54,536.00 to Mr. Leopold." P. JMOL App. 332; Ds. Exh. 266. Mid-Continent argues that this statement is itself a reasonable explanation of the Leopold offer.

Mid-Continent attached an estimate, prepared by Futrell (the "Futrell Estimate"), that broke down the settlement offer. The Futrell Estimate started with the proposal prepared by Greco Construction of $98,560 and subtracted the costs of grubbing the entire site ($20,200) and one-fourth of the debris load ($23,824.00), for a total estimate of $54,536.00. Haltom testified that, when he saw the results of the testing for oil, he was not convinced that there was any need for grubbing. Haltom subtracted from the proposal the charges for grubbing and for one of the loads of debris haul-off. By email, Haltom explained to Chernekoff that the Futrell Estimate was based on a proposal of Greco Construction, and Haltom sent the Greco Construction proposal to Sundown on July 26, 2006. Greco Construction estimated that the cost of the work would be $98,560—$800 for disconnecting power lines, $6,000 for pressure washing, $20,200 for grubbing, $12,000 for demo, and $59,560 for debris removal.

In a letter dated August 8, 2006, Mid-Continent, through Dees, explained to Sundown that it made the offer after investigating the Leopold claim. The letter stated that Mid-Continent retained Futrell to investigate and adjust the claim, and part of the investigation included bore samplings performed by Lambert Engineers. Mid-Continent explained that the offer was based on the estimate for cleanup provided by Futrell Adjusting and Lambert Engineers.

Mid-Continent also argues that the report by Muthig (the "Muthig Report") was not the only basis for the Leopold offer because Mid-Continent received it after it made the offer to Leopold. The Muthig Report is dated June 11, 2006, and Mid-Continent argues that the report confirmed the validity of the Leopold offer because it indicated slight oil staining eight to ten feet above ground level. At trial, Mid-Continent introduced a video of Leopold's property taken by Holloway, the independent adjuster hired by Mid-Continent. Mid-Continent contends that the video corroborates the Muthig Report's finding of crude oil on the Dollar General store ceiling. Haltom testified that a picture supplied by Muthig confirmed to Haltom that there was oil on the property, and that the Muthig Report did not change his opinion about the Leopold offer.

Sundown posits that the trial evidence enabled a reasonable jury to find that Mid-Continent failed to provide promptly to Sundown a reasonable explanation of the factual and legal basis in the policy in relation to the facts or applicable law for the Leopold offer. Sundown relies on the following evidence. First, McGuire testified that in his conversation with Haltom on July 21, 2006 (11 days after Mid-Continent sent the letter to Sundown informing it of the Leopold offer), Haltom offered no valid explanation for the Leopold offer. According to McGuire, Chernekoff telephoned him on July 21, 2006 to tell him that

Chernekoff had received a letter from Haltom stating that Mid-Continent had made an offer to Leopold. McGuire stated that he called Haltom right away and asked why Mid-Continent had extended an offer to Leopold if no Sundown oil had been found on the land, and Haltom answered that he did not know. McGuire testified that Haltom said that McGuire was getting upset during the call and that they should talk later, and McGuire agreed to terminate the call. McGuire referenced the July 10, 2006 letter to Chernekoff that stated that Mid-Continent had offered Leopold $54,536.00 because Mid-Continent had found no oil on the property other than oil residue on debris. After the telephone call with McGuire, Haltom withdrew the offer to Leopold by emailing Leopold's attorney, Peter Wanek, Esquire ("Wanek"). McGuire testified that Haltom told McGuire that the Leopold offer had already been rejected.

Sundown also maintains that it introduced evidence that Mid-Continent lied about documents it had in its possession and that Sundown had requested. In an email exchange on July 25 and 26, 2006 between Haltom and Chernekoff, Haltom advised Chernekoff that Lambert had not made reports of his work. Chernekoff asked Haltom for copies of draft reports by Lambert and copies of work plans or proposals from Lambert, proposals or documents Futrell Adjusting received from Lambert, proposals of Greco Construction, and any other records Futrell Adjusting had gathered or prepared. Haltom replied that Lambert reported that he had not prepared any reports,

including draft reports and work plans, and that he (Haltom) would forward to Chernekoff the Greco Construction proposal. Haltom also represented that Futrell had no other documents concerning the Leopold property. Chernekoff in turn requested a document referenced in Futrell's letter attached to Haltom's July 10, 2006 letter as a "scope of testing." Haltom replied that he had no other documents and that Lambert and Futrell had told him they had no other documents that they had not previously sent to Haltom.

Chernekoff testified that he followed up with Haltom regarding documents he was sent, that he requested more information on Lambert's testing, and that he did not receive what he had requested. Chernekoff stated that there were holes in the documents provided to him, e.g., the date of the Futrell letter was missing; that Sundown learned during the litigation of this lawsuit that there was an individual named Muthig whom Mid-Continent had hired to review Lambert's work; that Chernekoff was not provided the Muthig Report or told that Muthig was reviewing Lambert's work; and that, in Chernekoff's opinion, the Muthig Report was included in the request to Haltom for all documents associated with the Leopold investigation.

Sundown also points to an August 9, 2006 letter from Dees on behalf of Mid-Continent to Rosenblum for Sundown, which stated:

> You will recall that Mid-Continent first
> learned of Mr. Leopold's name from you in a
> meeting in Dallas on October 6, 2005. At the
> conclusion of that meeting, all in attendance
> agreed that Mid-Continent should contact Mr.
> Leopold and investigate his claim as Mid-
> Continent has the right and duty to do under
> its policy of insurance with Eland. Mid-
> Continent and its representatives proceeded to
> contact Mr. Leopold and investigate the claim.
> During the investigation, Mr. Leopold obtained
> Peter J. Wanek of the law firm of McCranie,
> Sistrunk, Anzelmo, Hardy, Maxwell & McDaniel,
> P.C. in Metairie.
>
> Mid-Continent retained Futrell Adjusting to
> investigate and adjust the claim. Part of
> Mid-Continent's investigation included bore
> samplings obtained by Lambert Engineers on
> March 17, the results of which have been
> provided to Mr. Chern[e]koff by Steve Haltom.
> Mid-Continent obtained an estimate for clean-
> up of disputed damage to Mr. Leopold's
> property.
>
> An offer was made to Mr. Leopold on June 2 by
> Steve Haltom, based upon the estimate for
> clean-up provided by Lambert Engineers and
> Futrell Adjusting. The offer of $54,536 was
> made by e-mail to Mr. Peter Wanek.

Ds. JMOL Resp. App. 236. Sundown maintains that Mid-Continent made

many misstatements in this letter: Sundown did not provide

Leopold's name at the October 7, 2005 meeting; neither Sundown nor

Jones Walker agreed that Mid-Continent would contact Leopold and

investigate his claim; Leopold hired Wanek at Mid-Continent's

urging as a predicate to his offer; neither Lambert nor Futrell

Adjusting provided an estimate for cleanup; rather, Futrell

obtained an estimate from a friend of Leopold (presumably, Greco of

Greco Construction); and the letter failed to mention the

discrepancy between the results of the Lambert testing and the Muthig analysis.

Sundown argues that Mid-Continent never offered a reasonable explanation for the Leopold offer because the real explanation was unreasonable: Mid-Continent made the Leopold offer to exhaust its policy limits and extinguish its duty to defend Sundown in the Underlying Litigation. Sundown maintains that the explanation Mid-Continent offered was dishonest, and that Mid-Continent withheld the Muthig analysis from Sundown, which would have assisted Sundown in defending the Underlying Litigation.

As to producing cause, Mid-Continent maintains that Sundown only presented evidence that proves, if anything, that the *existence* of the Leopold offer, rather than the *explanation* Mid-Continent provided Sundown of the Leopold offer, was a producing cause of the increased cost of the *Blanchard* settlement. Mid-Continent posits that Sundown introduced no evidence that, but for Mid-Continent's faulty explanation of the Leopold offer, Sundown would have avoided part or all of the increased cost of the *Blanchard* settlement. Haltom testified that Wanek (Leopold's attorney) responded to the withdrawal of the offer by threatening to file suit. Sundown asserts that because Mid-Continent did not give a prompt and complete explanation of the basis of the Leopold offer, Sundown could not rectify the harm done by the Leopold offer before it negatively impacted the *Blanchard* case.

The court must decide whether, viewing the evidence in the light most favorable to Sundown, a reasonable jury could have found that Mid-Continent failed to provide a reasonable explanation[31] of the basis in the policy, in relation to the facts or applicable law, for the Leopold offer, and that such failure was a producing cause of the increased cost of the *Blanchard* settlement.

The court first determines whether a reasonable jury could have found from the evidence that a reasonable insurer would not in these circumstances have provided a similar explanation to Sundown. Section 541.060(a)(3) requires insurers keep insureds informed about important developments with their claim. The statute does not obligate an insurer to provide an insured every piece of information or every written document the insurer has regarding the offer or the investigation. Rather, the statute requires the insurer to provide a *reasonable explanation* of the factual or legal basis in the policy, in relation to the facts or applicable law.

Sundown's reasons for contending that Mid-Continent's explanation was not reasonable are addressed in detail above. In

---

[31]Sundown does not appear to argue that the explanation given for the Leopold offer was not prompt. Mid-Continent made the offer to Leopold's attorney on June 6, 2006, and Mid-Continent sent on July 10, 2006 the letter that it contends was a reasonable explanation of the offer. Because Sundown has not argued that Mid-Continent did not promptly provide an explanation for the Leopold offer, and because the explanation followed the offer by a little more than one month, the court will assume *arguendo* that the explanation was prompt.

sum, Sundown maintains that, because of a series of misleading statements and omissions regarding the Leopold offer, Sundown was unaware of the complete circumstances surrounding the offer. Sundown introduced evidence that Haltom gave McGuire no explanation for the Leopold offer and lied to him about the status of the Leopold offer during their July 21, 2006 telephone conversation; Mid-Continent was not forthcoming when Sundown asked for all documents related to the Leopold offer in Mid-Continent's possession (particularly the Muthig Report); and Dees's August 9, 2006 letter contained several misrepresentations and omissions about circumstances surrounding the Leopold offer. Sundown does not directly address Mid-Continent's averment that the July 10, 2006 letter to Sundown was a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the Leopold offer.

The court concludes that a reasonable jury could only have found that the July 10, 2006 letter was a reasonable explanation *of the basis in the policy*, in relation to the facts or applicable law, for Mid-Continent's offer to Leopold. In that letter, Mid-Continent stated that, "based on the findings of no contamination to the property of Mr. Leopold other than some oil residue on some of the debris, we have extended an offer of $54,536.00 to Mr. Leopold." P. JMOL App. 332. Attached to this letter, Mid-Continent submitted the Futrell Estimate, which provided a list of

the damages and the remedial work that Leopold's property required. A reasonable jury could not have found from the trial evidence that a reasonable insurer would in these circumstances have provided a different explanation for the Leopold offer. If Sundown proved anything at trial, it established that a reasonable insurer *would not have made the offer*, but this is a different question from the one the jury answered, and it is not pertinent to the claim under consideration.

And although Sundown argues that Mid-Continent should have provided the Muthig Report in response to Chernekoff's request for all documents related to the Leopold offer, the statute does not require that the insurer provide everything the insured requests. The statute only obligates the insurer to provide a reasonable explanation for the basis in the policy, in relation to the applicable facts or law, for the offer. Moreover, even if Haltom was not forthcoming regarding the documents within his possession, that does not make Mid-Continent's July 10, 2006 explanation unreasonable. Haltom's later conduct would not of itself have enabled a reasonable jury to find that Mid-Continent's prior *explanation of the offer* was unreasonable. The jury could only reasonably have found from the evidence that Sundown was upset *that an offer of settlement was made*, not that Mid-Continent failed to provide a prompt explanation of the factual or legal basis in the policy for the offer.

As to producing cause, the court held in *Mid-Continent I* that Sundown had not adduced evidence from which a reasonable jury could find that, had Sundown been notified of the Leopold offer within ten days, it could have persuaded Leopold not to join the *Blanchard* class. *Mid-Continent I*, 2009 WL 3074618, at *23. "A reasonable jury could only find that Sundown was injured by the *making of the settlement offer itself*, coupled with Mid-Continent's failure to inform Leopold that Sundown's spills may not have impacted his property." *Id.* (emphasis added).

Leopold testified at trial that his decision to be a *Blanchard* class representative was based, in part, on his impression of Futrell, Futrell's apparent incompetence, and Sundown's lack of responsiveness when he knocked on the Sundown trailer door. He stated that he had no intention of being involved in any lawsuits or going to court. Leopold testified that, after Sundown denied his claim, he enlisted other property owners to sue Sundown. On cross-examination, McGuire testified that Jones Walker sent him a letter regarding the *Blanchard* settlement offer of $ 2 million in which Jones Walker opined that the offer was reasonable given the danger of a high verdict that could exceed Mid-Continent's policy limits because of jury sympathy for hurricane victims. Leopold testified that if he had been given an opportunity to review the Muthig Report before joining the *Blanchard* class, his opinion of

Sundown might have changed. Leopold also stated that he was "pretty sure" that his attorney (Wanek) had informed him that the $54,000 offer was withdrawn. Leopold confirmed that there was no offer in his mind to be withdrawn, and that "[i]t's all just a bunch of hearsay. Oral——oral offers." Tr. 4A:93.

Sundown did not introduce evidence that would have enabled a reasonable jury to find that, had Mid-Continent provided every report, detail, and fact known to it and relevant to the Leopold offer, Sundown would not have incurred the increased cost of the *Blanchard* settlement. A reasonable jury could only have found from the evidence that the Leopold *offer* or the *withdrawal* of the Leopold offer——which arguably was necessary only because the offer was made in the first place——was a producing cause of the increased cost of the *Blanchard* settlement. In fact, the explanation of the offer occurred *after* the offer was made, in accordance with the Primary Policy. *See* P. May 19, 2008 App. 35 ("We will notify [Sundown] in writing of [a]n initial offer to compromise or settle a claim made or 'suit' brought against any insured under this coverage . . . not later than the 10th day *after the date on which the offer is made.*") (emphasis added)). Mid-Continent was therefore permitted under the Primary Policy to wait 10 days after making an offer to inform Sundown that it had done so. This confirms the court's holding that, at most, a reasonable jury could have found that the *making of the offer* was a producing cause of

Leopold's decision to join the class action; the offer was made before the explanation was given, so the explanation of the offer could not have been a producing cause of the increased cost of the *Blanchard* settlement.

The court acknowledges that a reasonable jury could have found that, had Mid-Continent not made an offer to Leopold, Sundown and Mid-Continent could have worked together to satisfy Leopold's desire for Sundown to take care of the damage to his property without joining the *Blanchard* case. But even assuming *arguendo* that, but for the offer, Leopold would not have joined the *Blanchard* case, the trial evidence would not have enabled a reasonable jury to find that, without Leopold as class representative or class member, *Blanchard* would have settled for less than $2 million.[32]

Moreover, it is unclear from the evidence what action Sundown would have taken had it possessed the information that it argues would have been included in a "reasonable explanation." A reasonable jury could not have determined what steps Sundown would have taken had it been armed with the Muthig Report on July 10, 2006, when it was informed of the Leopold offer. Sundown immediately demanded that the offer be withdrawn; therefore, a reasonable jury could only have found that Sundown was extremely

_____

[32]*See also* the general discussion of producing cause, *supra* at § V(B).

unhappy that the offer had been made and that it would have demanded that the offer be withdrawn *regardless of Mid-Continent's explanation for making the offer*. Had Mid-Continent provided Sundown the Muthig Report when it explained the basis for the offer, Sundown would still have demanded that the offer be withdrawn. And as the court notes *supra* at note 10, under the Primary Policy, Mid-Continent had the right to settle third-party claims without Sundown's consent, and Sundown did not have the right to dictate when third-party claims were settled. *See Mid-Continent I*, 2009 WL 3074618, at *9.

Moreover, a reasonable jury could not have found that, even if Sundown were permitted under the Primary Policy to do so, and had Sundown been aware of the Muthig Report on July 10, 2006, it could have persuaded Leopold not to join the *Blanchard* class, not to be a class representative, or not to discuss his offer with his neighbors or other class members. Sundown simply argues that it would have had *the opportunity* to approach Leopold in an effort to avoid the increased cost of the *Blanchard* settlement and to stem the consequences of the "ripple effect." Further, Mid-Continent introduced evidence in the form of Leopold's deposition testimony that he joined the *Blanchard* class in part because of his concern about Futrell's competence and because of Sundown's initial lack of responsiveness. In sum, Sundown did not adduce evidence from which a reasonable jury could have found that, but for Mid-Continent's

unreasonable or incomplete explanation for the Leopold offer, the *Blanchard* case would have settled for less than $2 million.

The court holds that, even if there was legally sufficient evidence that Mid-Continent failed to provide Sundown a prompt and reasonable explanation of the basis of the Leopold offer, the evidence was legally insufficient for a reasonable jury to have found that this failure was a producing cause of the increased cost of the *Blanchard* settlement. Accordingly, Mid-Continent is entitled to judgment as a matter of law as to the third ground of Sundown's unfair settlement practices claim.

F

1

The jury found in ground four that Mid-Continent failed to affirm or deny coverage of Sundown's claim within a reasonable time, and that this was a producing cause of the increased cost of the *Blanchard* settlement.[33] Such a failure is a violation of Tex. Ins. Code Ann. § 541.060(a)(4)(A).[34]

---

[33]Under the instructions in the jury charge, the jury necessarily made these findings in returning a verdict in favor of Sundown on this question and awarding compensatory damages only in the form of the increased cost of the *Blanchard* settlement.

[34]Section 541.060(a)(4)(A) provides:

It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to engage in the following unfair settlement practices with respect to a claim by an insured or beneficiary:

Mid-Continent argues that Sundown did not plead in its fourth amended counterclaim ("counterclaim") or include in the PTO that Mid-Continent failed to affirm or deny coverage of a claim within a reasonable time *as to Hurricane Katrina*; Mid-Continent timely affirmed or denied each of Sundown's seven Hurricane Katrina claims; and even if it failed to affirm or deny a Hurricane Katrina claim within a reasonable time, this failure was not a producing cause of the increased cost of the *Blanchard* settlement.

2

Mid-Continent maintains that Sundown failed to plead in its counterclaim or include in the PTO the claim that Mid-Continent failed to affirm or deny coverage of a Hurricane Katrina claim within a reasonable time. Sundown apparently concedes this in its response, but it posits that Mid-Continent waived this argument when it failed during the charge conference to object on this basis to the submission of the fourth ground of Question No. 6. Mid-Continent replies that, at the beginning of the charge conference, it incorporated by reference its oral motion for judgment as a matter of law, and that it objected to the submission of each ground of Question No. 6.

The court permitted Mid-Continent to incorporate by reference

_____

. . .
failing within a reasonable time to affirm or
deny coverage of a claim to a policyholder[.]

in its objections to the charge the same legal and factual arguments that Mid-Continent had made when moving for judgment as a matter of law. Mid-Continent objected to Question No. 6 as follows:

> With respect to question number 6 and each of its individual subparts, as to each individual subpart, as if made individually, we object to the lack of evidence, or in the alternative insufficient evidence, that would justify the submission of these.
> We also object to the *lack of pleadings* with any factual specificity as to 1, 2, 4, and 5 in the court's charge[35]. We also object to the factual insufficiency in addition to pleading insufficiency as to each of these that would justify the submission of a claim.
>
> And we also object to the lack of evidence as to producing cause of damages as to each of these.

Tr. 9A:66 (emphasis added). During its motion for judgment as a matter of law, counsel for Mid-Continent argued:

> The final point I want to make with respect to all of those six subparts within this statutory claim that I've called argument number six is that their pleadings we believe are facially defective to justify this claim.
>
> . . .
>
> [I]t is clear to us after micro-analyzing their pleadings and after looking at what's been submitted in the final [PTO], that with respect to 1, 2, 4, 5, and 6,[36] in other

---

[35]In context, the reference to "1, 2, 4, and 5" means subparts 1, 2, 4, and 5 of Question No. 6.

[36]In the initial draft of the court's charge, the court asked the jury whether Sundown had proved that Mid-Continent violated

> words, with respect to everything except that
> ten day versus 31 day issue on Chris Leopold,
> their *pleadings don't set forth one specific*
> *fact* that justifies a submission of 1, 2, 4,
> 5, or 6 to the jury.

Tr. 9A:24 (emphasis added).

In the bad faith settlement practices component of its counterclaim, Sundown alleged:

> Mid-Continent also violated Tex. Ins. Code
> § 541.060(a)(4) by failing within a reasonable
> period of time to either affirm or deny
> coverage of Sundown's *Hurricane Rita* clean-up
> claim or issue a reservation of rights as to
> Sundown's *Hurricane Rita* clean-up claim.
> Further, the reservation of rights language
> which it did eventually issue as to the
> *Hurricane Rita* clean-up claim was inadequate
> as a matter of insurance industry custom and
> law, and therefore Mid-Continent waived and/or
> is estopped from urging the policy coverage
> defenses it ultimately asserted as a reason to
> deny the *Hurricane Rita* clean-up claim.

Counterclaim ¶ 225 (emphasis added). Sundown did not aver that Mid-Continent violated § 541.060(a)(4) in relation to *Hurricane Katrina*. The PTO lists as a contested issue of law "[w]hether Mid-Continent violated section 541.060(a)(4) of the Texas Insurance Code by failing within a reasonable time to either affirm or deny coverage for Sundown's *Hurricane Rita* claim." PTO 29 ¶ 7 (emphasis added). There is no corresponding issue for *Hurricane Katrina*.

------

§ 541.060 on six possible grounds. Sundown agreed during the charge conference that the court should not submit one of the six grounds to the jury. Thus Mid-Continent's references to ground or subpart *six* in its motion for judgment as a matter of law or in its objections to the charge are to the *fifth* ground that the court submitted in the jury charge.

"The joint pretrial order supersedes all pleadings and governs the issues and evidence to be presented at trial." *E.E.O.C. v. Serv. Temps, Inc.*, 2010 WL 5108733, at *3 (N.D. Tex. Dec. 9, 2010) (Fitzwater, C.J.) (citing *Quick Techs., Inc. v. Sage Grp., PLC*, 313 F.3d 338, 345-46 n.5 (5th Cir. 2002)), *appeal docketed*, No. 11-10262 (5th Cir. Mar. 15, 2011). "'Once the [pretrial] order is entered, it controls the scope and course of the trial.'" *Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 392-93 n.4 (5th Cir. 1998) (quoting Rule 16). "A party has presented an issue in the trial court if that party has raised it in either the pleadings or the pretrial order, or if the parties have tried the issue by consent." *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 331 (5th Cir. 1994). "If a claim or issue is omitted from the order, it is waived." *Schadler*, 147 F.3d at 392-93 n.4.

The court holds that Mid-Continent preserved its objection to the submission of ground four. Because Sundown did not plead this counterclaim or include it in the PTO, Mid-Continent is entitled to judgment as a matter of law as to ground four of Question No. 6.[37]

3

Assuming *arguendo* that the court properly submitted ground four of Question No. 6 to the jury, the court holds that there was

---

[37]Although Mid-Continent correctly objected to the charge on the ground that Sundown did not plead this counterclaim or include it in the PTO, the court's decision to submit ground four conformed to the preferred approach in this circuit. *See supra* note 9.

legally insufficient evidence for a reasonable jury to have found that Mid-Continent failed to affirm or deny coverage of Sundown's Hurricane Katrina claim within a reasonable time and that this failure was a producing cause of the increased cost of the *Blanchard* settlement.

Mid-Continent argues that Sundown offered no evidence that enabled a reasonable jury to find that Mid-Continent failed to affirm or deny Sundown's Hurricane Katrina claim within a reasonable time. Sundown responds that the evidence establishes that Mid-Continent attempted to avoid paying the Hurricane Katrina cleanup claim by telling Sundown that it needed a written order from the Coast Guard and requiring Sundown to wait while Mid-Continent determined whether it would exercise its reservation of rights power. Sundown apparently argues that the period from September 16, 2005, when Sundown sent the Hurricane Katrina cleanup claim, to October 12, 2005, when Mid-Continent sent its reservation of rights letter, was an unreasonable delay. Mid-Continent posits that it affirmed coverage in both of these letters.

Mid-Continent maintains that Sundown submitted five claims for defense, one claim for cleanup, and one claim for the *Blanchard* settlement concerning Hurricane Katrina. Regarding the claims for defense of the class actions, the parties stipulated in the PTO that Sundown tendered three lawsuits to Mid-Continent and requested defense and indemnity in September 2005. PTO 21 ¶¶ 20-22. Mid-

Continent accepted defense of the three suits subject to reservations of rights on October 6, 2005. Sundown submitted *Farac v. Sundown Energy, LP* for defense and indemnification on September 8, 2006. By letter dated September 20, 2006, Mid-Continent declined to defend or indemnify Sundown on the basis that Mid-Continent had expended the limits of the Primary Policy. Likewise, Sundown submitted *Isla Corp. v. Sundown Energy LP* for defense and indemnification on October 10, 2006. By letter dated October 23, 2006, Mid-Continent declined to defend or indemnify Sundown.

Regarding the cleanup claim, Sundown submitted an invoice for $1,076,850.60 for cleanup on October 6, 2005. Mid-Continent sent Sundown a check for $853,943.15 on November 14, 2005, and Sundown returned it on December 2, 2005. Mid-Continent also tendered the $1 million Primary Policy limits on March 22, 2006. When Mid-Continent received notice from Sundown on July 12, 2006 that Sundown's expenses were $5.7 million, Mid-Continent sent Sundown on August 18, 2006 a check in the sum of $5 million for the Umbrella Policy limits.

Finally, Sundown submitted the $2 million *Blanchard* settlement to Mid-Continent on December 18, 2007. On December 20, 2007 Mid-Continent declined to fund the *Blanchard* settlement on the ground that the limits of the Primary Policy and the Umbrella Policy were exhausted, but it allowed Sundown to use $2 million of the $6 million that Sundown had placed in the court's registry to fund the

settlement.

Mid-Continent maintains that it timely affirmed or denied coverage of each of Sundown's Hurricane Katrina claims. Sundown does not appear to argue that Mid-Continent failed to timely affirm or deny coverage of any of these Hurricane Katrina claims. At the charge conference, when asked the basis for this counterclaim, Sundown stated that Mid-Continent reserved rights on September 15, 2005 for the Hurricane Katrina claim and did not withdraw its demand for a written mandate until October 12, 2005. Sundown argued that Mid-Continent's failure to affirm or deny coverage because of the outstanding mandate issue placed in question the OPA Fund reimbursement, caused confusion at Sundown, and set in motion the chain of events that led to this lawsuit. Sundown maintains in its response that Mid-Continent initially attempted to avoid paying the Hurricane Katrina cleanup claim by telling Sundown that Mid-Continent would not pay for cleanup unless Sundown had a written mandate from the Coast Guard. Sundown argues that Mid-Continent delayed this claim from September 16, 2005[38] to October 12, 2005, when Mid-Continent withdrew its reservation of rights. The court assumes that Sundown argues that Mid-Continent's reservation of

[38]The court assumes that Sundown intends to refer to the September 15, 2005 letter instead of the September 16, 2005 letter. Sundown referred to the September 15, 2005 letter in its argument during the charge conference, see Tr. 9A:53, and Mid-Continent's October 12, 2005 letter specifies that it modifies the September 15, 2005 reservation of rights letter. The court will therefore address the September 15, 2005 and October 12, 2005 letters.

rights from September 15, 2005 to October 12, 2005 was a failure to affirm or deny coverage.

Mid-Continent replies that it specifically affirmed coverage for Sundown's claim in the letters of September 16, 2005——which the court assumes is a reference to a September 15, 2005 letter[39]——and October 12, 2005.  In its September 15, 2005 letter, Mid-Continent acknowledged receipt of Sundown's claim arising from the spill. Mid-Continent stated that it had begun an investigation of the Hurricane Katrina claim but reserved the right to deny coverage. Mid-Continent also explained that the policy provided that property damage resulting from a pollution incident included mandated cleanup costs, and that Mid-Continent understood that "the clean-up operations Sundown is currently undertaking [are] voluntary, rather than mandatory."  Jt. Exh. 6 at 2.  Mid-Continent also acknowledged that it had begun an investigation of Sundown's loss subject to a reservation of rights, and it told Sundown that there was no coverage provided for voluntary cleanup costs incurred without Mid-Continent's permission.

In the October 12, 2005 letter, Mid-Continent stated that it had received additional information since the September 15, 2005 letter that warranted a revision of the reservation.  Mid-Continent

_____

[39]The court assumes that Mid-Continent's reference to the September 16, 2005 letter was based on Sundown's erroneous reference to that letter in its response. *See supra* note 38.  The court assumes that Mid-Continent, like Sundown, intends to refer to the September 15, 2005 letter.

informed Sundown that a policy exclusion precluded coverage for property damage to property Sundown owned, rented, or occupied. Mid-Continent did not specify in the October 12, 2005 letter any other exclusions or grounds for denying coverage.

The court holds that, viewing the evidence in the light most favorable to Sundown, there was no legally sufficient evidence for a reasonable jury to have found that Mid-Continent failed to promptly affirm or deny coverage of a Hurricane Katrina claim. Moreover, Mid-Continent has pointed to uncontradicted evidence that it timely affirmed or denied coverage for each Hurricane Katrina claim that Sundown submitted.

4

Assuming *arguendo* that Sundown sufficiently pleaded this counterclaim and that the evidence was legally sufficient for a reasonable jury to have found that Mid-Continent failed to timely affirm or deny a Hurricane Katrina claim, the court holds that there was no legally sufficient evidence for a reasonable jury to have found that this failure was a producing cause of the increased cost of the *Blanchard* settlement. As the court discusses *supra* at § V(F)(3), Sundown apparently argues that Mid-Continent failed to timely affirm or deny the Hurricane Katrina cleanup claim when it reserved its right to deny coverage for voluntary cleanup costs paid by Sundown. The court assumes *arguendo* that Mid-Continent's reservation of rights in relation to the voluntary cleanup costs

was a failure to timely affirm or deny Sundown's Hurricane Katrina claim.

With respect to producing cause, Sundown argues that Mid-Continent represented that Sundown could pay for the cleanup and be reimbursed by the OPA Fund with an Act of God defense and that Mid-Continent would not spend the policy limits on cleanup costs but would reserve the policy limits to pay for the lawsuits against Sundown. Sundown maintains that this interaction, together with the reservation of rights issue, led Sundown to believe that it could place its cleanup claim "in abeyance." Sundown argues that "[a]ll of this was fodder for the grist mill that eventually led to the Leopold offer and the damage to Sundown." Ds. JMOL. Resp. 36.

Viewing the evidence in the light most favorable to Sundown, a reasonable jury could not have found that, but for Mid-Continent's failure to timely affirm or deny coverage, Sundown would not have suffered the increased cost of the *Blanchard* settlement. Sundown relies on the premise that Mid-Continent's reservation of rights was part of Mid-Continent's behavior that misled Sundown to believe it could place its claim "in abeyance"; however, Sundown has not shown how Mid-Continent's failure to affirm or deny coverage of a claim resulted in the increased cost of the *Blanchard* settlement. Accordingly, Mid-Continent is entitled to judgment as a matter of law as to the fourth ground of Sundown's unfair settlement practices claim.

The jury found in ground five that Mid-Continent refused to pay Sundown's Hurricane Katrina claim without conducting a reasonable investigation of the claim and that this was a producing cause of the increased cost of the *Blanchard* settlement.[40]  Such a refusal is a violation of Tex. Ins. Code Ann. § 541.060(a)(7).[41]

At trial, Sundown argued that, at the June 16, 2006 meeting, at the solicitation of Raymond Corley ("Corley"), formerly of Mid-Continent, Sundown offered to settle with Mid-Continent for $7 million, full attorney's fees through that date, and a waiver of Mid-Continent's OPA subrogation rights.  Sundown averred that Mid-Continent did not investigate the merits of this offer, which Sundown calls a "claim."  Sundown maintains that Mid-Continent

---

[40]Under the instructions in the jury charge, the jury necessarily made these findings in returning a verdict in favor of Sundown on this question and awarding compensatory damages only in the form of the increased cost of the *Blanchard* settlement.

[41]Section 541.060(a)(7):

> It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to engage in the following unfair settlement practices with respect to a claim by an insured or beneficiary:
> . . .
> refusing to pay a claim without conducting a reasonable investigation with respect to the claim[.]

turned the offer down, tendered the $5 million Umbrella Policy limits to Sundown, and withdrew its defense. It contends that Mid-Continent presented Sundown's offer to its reinsurers, and when the reinsurers did not agree, Mid-Continent should have investigated whether the offer was meritorious. Sundown argued at trial that Mid-Continent did not investigate whether it was reasonable to pay $7 million for a complete policyholder's release, and that, when the reinsurers told Mid-Continent that they were unwilling to waive the OPA Fund and Sundown learned of the Leopold offer, Mid-Continent stopped "investigating" the offer. Sundown made no argument at trial, and offers none in opposition to Mid-Continent's motion for judgment as a matter of law, regarding producing cause.

Mid-Continent contends that it is entitled to judgment on these grounds: Sundown did not plead in its counterclaim or include in the PTO that Mid-Continent refused to pay a *Hurricane Katrina* claim without conducting a reasonable investigation; Mid-Continent did not refuse to pay a Hurricane Katrina claim without conducting a reasonable investigation; and even if Mid-Continent refused to pay a Hurricane Katrina claim without conducting a reasonable investigation, this refusal was not a producing cause of the increased cost of the *Blanchard* settlement.

2

Mid-Continent contends that Sundown did not plead in its counterclaim or include in the PTO that Mid-Continent refused to

pay a Hurricane Katrina claim without conducting a reasonable investigation. Sundown does not directly address this argument in its response, but it avers that Mid-Continent had notice of the settlement offer through discovery and by its attorney's presence at the June 16, 2006 meeting. Mid-Continent replies that, although it was aware of the $7 million offer, it did not have notice that Sundown alleged a claim for failure to investigate as an independent basis for liability. Mid-Continent incorporated its oral motion for judgment as a matter of law by reference at the beginning of the charge conference and objected to the submission of each ground of Question No. 6.

In the bad faith settlement practices component of its counterclaim, Sundown alleged:

> Mid-Continent also violated Tex. Ins. Code 541.060(a)(7) by failing to conduct a reasonable investigation into Sundown's *Hurricane Rita* clean-up claim, by using the sham investigation as a pretext to put off paying anything on the claim, by using the sham, contrived and biased investigation as a pretext in order to obtain confidential information from Sundown related to this litigation which did not at the time include the *Hurricane Rita* clean-up claim, and by ultimately refusing to pay Sundown's *Hurricane Rita* clean-up claim without having conducted a reasonable and complete investigation thereof.

Counterclaim ¶ 227 (emphasis added). Sundown did not assert that Mid-Continent violated § 541.060(a)(7) in relation to *Hurricane Katrina*. *See* Counterclaim ¶¶ 132, 227, 239. The PTO lists as a contested issue of fact whether Mid-Continent performed a

reasonable investigation of Sundown's *Hurricane Rita* claim, *see* PTO 26 ¶ 12, and as contested issues of fact and law whether Mid-Continent refused to pay Sundown's *Hurricane Rita* claim without conducting a reasonable investigation of the claim, in violation of § 541.060(a)(7), *see* PTO 26 ¶ 19 & 29 ¶¶ 11-12.  There are no corresponding issues in the PTO as to a *Hurricane Katrina* claim.

Mid-Continent preserved its objection to the submission of this ground of Question No. 6.  Sundown did not plead this as a ground of its bad faith settlement practices counterclaim or include it in the PTO; therefore, the court grants Mid-Continent's motion for judgment as a matter of law as to this ground.[42]

3

Assuming *arguendo* that Sundown properly preserved this counterclaim, the court holds that there was no legally sufficient evidence for a reasonable jury to have found that Mid-Continent refused to pay a Hurricane Katrina claim without conducting a reasonable investigation.

Sundown argued at trial, and it maintains in its response to Mid-Continent's motion, that Sundown's $7 million settlement offer was a "claim" that Mid-Continent refused to pay without conducting a reasonable investigation.  Mid-Continent posits that it did not

---

[42]Although Mid-Continent correctly objected to the charge on the ground that Sundown did not plead this counterclaim or include it in the PTO, the court's decision to submit ground five conformed to the preferred approach in this circuit.  *See supra* note 9.

improperly refuse to pay any Hurricane Katrina claims; rather, it paid the limits of the Primary Policy and the Umbrella Policy and had no further duty to pay any Hurricane Katrina claims. Mid-Continent maintains that the "claim" of which Sundown complains is a settlement offer, and that the term "claim" in § 541.060(a)(7) refers to first- and third-party claims, not to an insured's settlement offer to an insurer. Mid-Continent also contends that it conducted a reasonable investigation of each Hurricane Katrina claim that Sundown submitted.

On June 16, 2006 Sundown offered to release Mid-Continent in exchange for $7 million (which included the Primary Policy limits of $1 million for Hurricane Katrina and $1 million for Hurricane Rita and the Umbrella Policy limits of $5 million), payment of Sundown's defense costs through that date, and Mid-Continent's waiver of its subrogation rights in the OPA Fund. Sundown argues that Mid-Continent did not investigate whether it was reasonable to pay $7 million for a full and complete policyholder's release. Mid-Continent maintains that Sundown has provided no support for its theory that an insurer must conduct a reasonable investigation before declining an insured's settlement offer regarding existing claims.

Section 541.060(a) prohibits an insurer from engaging in certain unfair settlement practices "with respect to *a claim* by an insured or beneficiary[.]" *Id.* § 541.060(a) (emphasis added).

"This court must interpret the statute according to the plain meaning of its words." *Lavalle*, 2000 WL 34339773, at *6 (citing *Ron Pair Enters.*, 489 U.S. at 242). "'When a statute does not define its terms, we employ the ordinary meaning of the words.'" *Id.* (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at 983). And "in ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute *as a whole*." *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 239 (2004) (emphasis added and internal quotation marks omitted). "The court is required to read the statute as a whole to ascertain the meaning of the language in the context of the desired goals that Congress envisioned." *United States v. Herrera*, 29 F.Supp.2d 756, 759 (N.D. Tex. 1998) (Fitzwater, J.) (citing *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 448 (5th Cir. 1995) (per curiam)). And "[i]dentical words used in different parts of the same statute are generally presumed to have the same meaning." *IBP v. Alvarez*, 546 U.S. 21, 34 (2005).

Section 541.060(a)(1)-(9) lists nine unfair settlement practices. Section 541.060(a)(7) makes it an unfair settlement practice to "refus[e] to pay a *claim* without conducting a reasonable investigation with respect to the claim[.]" *Id.* (emphasis added). Section 541.060(a) uses the terms "settlement offer" and "settlement" in addition to the term "claim." For

example, § 541.060(a)(2)(A) prohibits an insurer from "failing to attempt in good faith to effectuate a prompt, fair, and equitable *settlement* of a *claim* with respect to which the insurer's liability has become reasonably clear[.]" *Id.* (emphasis added). And § 541.060(a)(3) prohibits an insurer from "failing to promptly provide to a policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a *claim* or *offer of a compromise settlement of a claim*." *Id.* (emphasis added). It is therefore clear from § 541.060 that a "claim" is distinct from an "offer of a *compromise settlement of a claim*."

Sundown has not presented, and the court has not found, any support for Sundown's position that an insured's offer to settle with the insurer can qualify as a "claim" within the meaning of § 541.060(a)(7). Nor is it apparent what purpose would be served by requiring an insurer to conduct a reasonable investigation of an insured's settlement offer. In fact, to the extent § 541.060 addresses this concept, it does so already in § 541.060(a)(2)(A) (failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear), (a)(4)(A) (failing within a reasonable time to affirm or deny coverage of a claim to a policyholder), and (a)(5) (refusing, failing, or unreasonably delaying a settlement offer under first-party coverage on the basis

that other coverage may be available or other parties may be responsible for the damages suffered).

Instead, § 541.060(a)(7) prohibits an insurer from denying an insured's claim made under the insurance policy without first reasonably investigating the claim. "As part of its common law duty, and as codified in the Insurance Code, an insurer has an obligation to conduct an adequate investigation before denying a claim." *Tex. Mut. Ins. Co. v. Ruttinger*, 265 S.W.3d 651, 661 (Tex. App. 2008, pet. granted) (citation omitted). "'An insurer will not escape liability merely by failing to investigate a claim so that it can contend that liability was never reasonably clear.'" *Id.* (quoting *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 n.5 (Tex. 1997)). In *Ruttinger* the court held that there was legally sufficient evidence to support the jury's finding that the insurer violated the Insurance Code by refusing to pay a claim without conducting a reasonable investigation because a reasonable jury could have found that the adjuster "made his decision to deny [the insured's] claim after conducting an extremely limited, one-sided investigation that produced nothing more than highly suspicious rumors and speculation from two, related employer representatives." *Id.* at 665. These cases make clear that § 541.060(a)(7) applies to an insured's claim made under the policy rather than to an insured's offer to settle and release its insurer from its obligations under the policy.

The court holds that there was legally insufficient evidence for a reasonable jury to have found that Mid-Continent denied a Hurricane Katrina "claim"——as opposed to an offer of a compromise settlement of a claim——without conducting a reasonable investigation of the claim.

4

Assuming *arguendo* that Sundown properly pleaded that Mid-Continent denied a Hurricane Katrina claim without conducting a reasonable investigation and that there was legally sufficient evidence from which a reasonable jury could have found such denial, the court holds that the evidence was legally insufficient for a reasonable jury to have found that any improper denial of a Hurricane Katrina claim was a producing cause of the increased cost of the *Blanchard* settlement.

Sundown made no argument at trial or in response to Mid-Continent's motion for judgment as a matter of law regarding its burden of proving producing cause. Viewing the evidence in the light most favorable to Sundown, a reasonable jury could not have found that, but for Mid-Continent's failure to "investigate" Sundown's $7 million offer to settle, Sundown would not have suffered the increased cost of the *Blanchard* settlement. The premise of Sundown's argument must necessarily be that, had Mid-Continent conducted a reasonable investigation, it would have accepted Sundown's offer. But the evidence would not have enabled

a reasonable jury to make this finding.  It is equally plausible, if not more likely, that Mid-Continent would have rejected the offer.  And because the components of Sundown's settlement offer had nothing to do specifically with settling the *Blanchard* case, a reasonable jury could not have found that, had Mid-Continent accepted the offer, this would have had any effect whatsoever on the *Blanchard* settlement.  Accordingly, Mid-Continent is entitled to judgment as a matter of law as to the fifth ground of Sundown's unfair settlement practices claim.

VI

Mid-Continent moves for judgment as a matter of law as to the jury's finding that Mid-Continent knowingly committed an unfair settlement practice, i.e., that it knowingly failed to provide Sundown a prompt and reasonable explanation of the policy basis for the Leopold offer.

Of the five grounds on which the jury found that Sundown had established its unfair settlement practices counterclaim, the jury found that Mid-Continent acted knowingly only as to the third ground.[43]  Mid-Continent argues that there is legally insufficient evidence to support the jury's finding of a knowing violation. Mid-Continent points to the trial testimony of Ron Hendy ("Hendy"), an

---

[43]The court instructed the jury that "knowingly" means "actual awareness of the falsity, unfairness, or deceptiveness of the act or practice on which a claim for damages is based.  Actual awareness may be inferred if objective manifestations indicate that a person acted with actual awareness."  Charge at 11.

expert witness for Sundown, who testified that he was unaware of any statement made by Mid-Continent that Mid-Continent knew it was violating Texas law. *See* Tr. 4B:68. For a violation to be knowing, the actor must think, "Yes, I know this is false, deceptive, or unfair to [the victim], but I'm going to do it anyway." *St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 974 S.W.2d 51, 54 (Tex. 1998).

Because the court has already held that there was legally insufficient evidence for a reasonable jury to have found that Mid-Continent failed to provide Sundown a prompt and reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the Leopold offer, it follows that a reasonable jury could not have found that Mid-Continent knowingly failed to do so. Alternatively, because the evidence of causation was legally insufficient, Sundown cannot recover for a knowing violation based on ground 3 of Question No. 6. Mid-Continent is therefore entitled to judgment as a matter of law regarding the jury's answer to Question No. 7, ground 3, which is predicated on the jury's finding in answer to Question No. 6, ground 3.

VII

In light of the foregoing, the court holds that there was legally insufficient evidence to support the jury's findings on Questions Nos. 6, 7, 8, and 9 (and, in some instances, that Sundown did not preserve a counterclaim by pleading it or including it in

the PTO).  The court therefore enters judgment as a matter of law for Mid-Continent on all Hurricane Katrina-based counterclaims that the jury found in Sundown's favor.

VIII

Subject to its motion for judgment as a matter of law, Mid-Continent also moves for a new trial on the same grounds.[44]

The court "'has discretion to grant a new trial under Rule 59(a) of the Federal Rules of Civil Procedure when it is necessary to do so to prevent an injustice.'"  *Barrow v. Greenville Indep. Sch. Dist.*, 2005 WL 1867292, at *9 (N.D. Tex. Aug. 5, 2005) (Fitzwater, J.) (quoting *Gov't Fin. Servs. One Ltd. P'ship v. Peyton Place, Inc.*, 62 F.3d 767, 774 (5th Cir. 1995)), *aff'd*, 2007 WL 3085028 (5th Cir. 2007).  A new trial may be granted "for any reason for which a new trial has heretofore been granted in an

_____

[44]Under Rule 50(c)(1), the court must conditionally rule on Mid-Continent's motion for a new trial.

> If the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed.  The court must state the grounds for conditionally granting or denying the motion for a new trial.

Rule 50(c)(1).  If the court conditionally grants a new trial and the appellate court finds that the grant of judgment was in error, "the new trial must proceed unless the appellate court orders otherwise."  Rule 50(c)(2).  If the court conditionally denies a new trial and the appellate court reverses judgment, "the case must proceed as the appellate court orders."  *Id.*

action at law in federal court[.]" Rule 59(a)(1).  Rule 59(a) "confirms the trial court's historic power to grant a new trial based on its appraisal of the fairness of the trial and the reliability of the jury's verdict." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985).  For example, a new trial may be granted if the court finds that the verdict is against the weight of the evidence, that the trial was unfair, or that prejudicial error was committed in the course of the trial.  *See id.* at 613.

The court has granted judgment as a matter of law for Mid-Continent as to all of Sundown's Hurricane Katrina-based counterclaims.  Except to the extent conditionally denied in the next paragraph, the court conditionally grants Mid-Continent a new trial on each counterclaim for which the court has held that the evidence was legally insufficient to support the jury verdict.  The court grants this relief on the basis that the verdict is against the weight of the evidence as to each such counterclaim.

The court conditionally denies Mid-Continent's motion for a new trial, however, to the extent it is addressed to Sundown's counterclaim for breach of the duty of good faith and fair dealing.  The court has principally rejected this counterclaim on the ground that Texas does not recognize a cause of action for breach of the duty of good faith and fair dealing in the context of an insurer's handling a third-party claim.  Common law liability is limited to

*Stowers* liability in the absence of a breach of contract.  Because Sundown cannot recover on this cause of action as a matter of law, there is no need to grant a new trial that would conclude with the granting of judgment as a matter of law after Sundown has been fully heard on this counterclaim.  *See* Rule 50(a)(1).

IX

The court now turns to Sundown's renewed motion for judgment as a matter of law under Rule 50(b), which is addressed to its Hurricane Rita-based breach of contract counterclaim.

A

Sundown moved for judgment as a matter of law under Rule 50(a) after the close of evidence as to its Hurricane Rita breach of contract counterclaim.  The court denied the motion, and Sundown now renews it.

In response to Question No. 1, the jury found that Sundown did not prove each of the essential elements of its Hurricane Rita duty to indemnify breach of contract counterclaim.  Sundown argues that there is no legally sufficient evidence for a reasonable jury to make this finding.  The court instructed the jury that Sundown alleged that Hurricane Rita caused a separate "Pollution Incident" covered by the Primary Policy.  *See* Charge at 8.  The court also instructed the jury that, to establish its breach of contract counterclaim, Sundown was required to prove that a contract existed, Mid-Continent breached the contract, and Sundown suffered

damages as a result of the breach. *See id.* at 9.  In rejecting Sundown's counterclaim, the jury necessarily found that Mid-Continent did not breach the contract and/or that Sundown did not suffer damages as a result of Mid-Continent's breach.[45]

The court set forth many of the relevant background facts and the procedural history of this counterclaim in *Mid-Continent I*, 2009 WL 3074618, at *1-3, *18-20.  The court will therefore briefly recount the facts and procedural history pertinent to the present decision.  Sundown operates oil and gas production facilities near Port Sulphur, Plaquemines Parish, Louisiana.  PTO 20 ¶ 9. Sundown's facility on the west side of the Mississippi River is referred to as "West Potash," and its facility on the east side of the Mississippi River is referred to as "East Potash." *Id.* Hurricane Katrina struck the Louisiana coast on August 29, 2005 and caused a release of crude oil from Sundown's storage tanks. *Mid-Continent I*, 2009 WL 3074618, at *1; PTO 20 ¶ 10.  Hurricane Katrina caused damage to Sundown's East and West Potash facilities, and the release of oil from the East and West Potash facilities was a "Pollution Incident" as defined in the Primary Policy.  PTO 20-21 ¶¶ 10-11.  The Coast Guard mandated that Sundown clean up the affected land, canals, and marsh that surrounded Sundown's facility. *Mid-Continent I*, 2009 WL 3074618, at *1.  While Sundown

_____

[45]The existence of a contract was not in dispute.  Sundown and Mid-Continent stipulated to the existence of the Primary Policy and the Umbrella Policy in the PTO.  *See* PTO 20 ¶¶ 1 & 4.

was conducting Hurricane Katrina cleanup, Hurricane Rita made landfall on September 24, 2005 and caused crude oil to escape from a containment boom that Sundown had installed to corral the oil that had escaped due to Hurricane Katrina. *Id.*

Mid-Continent insured Sundown under the Primary Policy, which had limits of $1 million per occurrence and $2 million aggregate and included a duty to defend, and under the Umbrella Policy, which had an aggregate limit of $5 million. *Id.* at *2; PTO 20 ¶¶ 1-5; *see also* P. May 19, 2008 App. 13-35 (Primary Policy); P. May 19, 2008 App. 37-54 (Umbrella Policy). Sundown submitted a claim for Hurricane Katrina cleanup under the Primary Policy and the Umbrella Policy on September 12, 2005. PTO 21 ¶¶ 15-16. The court in *Mid-Continent I* held that Mid-Continent exhausted the applicable limits of the Primary Policy and had no further duty to defend Sundown when it tendered to Sundown on March 22, 2006 a payment for the $1 million limits of the Primary Policy. *Mid-Continent I*, 2009 WL 3074618, at *12. Sundown submitted a claim to Mid-Continent for cleanup costs due to Hurricane Rita on July 12, 2006. PTO 23 ¶ 43. Mid-Continent tendered the $5 million limits of the Umbrella Policy to Sundown on August 18, 2006. *Id.* at ¶ 46. The court held in *Mid-Continent II* that Sundown was legally obligated to pay $5,469,650.65 at that time, and that Mid-Continent's $5 million tender fulfilled its obligations under the Umbrella Policy. *Mid-Continent II*, slip op. at 25. Mid-Continent denied Sundown's

Hurricane Rita cleanup claim by letter dated July 19, 2007. PTO 24 ¶ 52.

The Primary Policy had a per occurrence limit of $1 million, and an aggregate limit of $2 million; in other words, if there were two occurrences, the Primary Policy provided $2 million in coverage. Although the Primary Policy excluded pollution coverage, an Oil & Gas Endorsement provided coverage for a "Pollution Incident." P. May 19, 2008 App. 18. The court held in *Mid-Continent I* that "a 'Pollution Incident' also clearly constitutes an 'occurrence.' . . . Under the unambiguous terms of the Primary Policy, property damage arising from a 'Pollution Incident' is subject to the policy's applicable limits of insurance, which are a per occurrence limit of $1 million and an aggregate limit of $2 million." *Mid-Continent I*, 2009 WL 3074618, at *6.

The court in *Mid-Continent I* addressed the preliminary question whether Hurricane Rita caused a second "Pollution Incident" covered by the Primary Policy. *Id.* at *18. The Oil & Gas Endorsement to the Primary Policy defines a "Pollution Incident" as:

> the sudden and accidental emission, discharge, release or escape of pollutants into or upon the land, atmosphere or any water course or body of water, provided that such emission, discharge, release or escape emanates from operations conducted on land and results in "Bodily Injury" or "Property Damage." The entirety of any such emission, discharge, release or escape shall be deemed to be one "Pollution Incident[."]

P. May 19, 2008 App. 19.

> It is undisputed that while Hurricane Rita
> caused an escape of crude oil previously
> contained within a boom erected by Sundown's
> cleanup contractor, Environmental Safety and
> Health Consulting Services, Inc. d/b/a ES & H
> Consulting and Training Group ("ES & H"),
> Hurricane Rita did not cause any new crude oil
> to escape from Sundown's facility. The court
> must therefore decide whether, under the Oil &
> Gas Endorsement to the Primary Policy,
> Hurricane Rita's damage constitutes a second
> "Pollution Incident" or whether it is merely a
> continuation of the entirety of the Hurricane
> Katrina "Pollution Incident."

*Mid-Continent I*, 2009 WL 3074618, at *18.

In its summary judgment briefing, Sundown argued, *inter alia*, that Hurricane Rita was a second "Pollution Incident" because it caused an "escape" of crude oil that had previously been contained within a boom. *Id.* Mid-Continent responded that the sudden and accidental escape of crude oil was caused by Hurricane Katrina, and that Hurricane Rita merely caused the escape of oil from a containment boom utilized because of the initial escape. *Id.* Mid-Continent argued that because the Primary Policy provided that "[t]he entirety of any . . . escape shall be deemed to be one 'Pollution Incident,'" the escape of oil from the containment boom is part of the entirety of the escape caused by Hurricane Katrina, and is subsumed within one "Pollution Incident" caused by Hurricane Katrina. *Id.* (quoting P. May 19, 2008 App. 19).

The court concluded that "it is reasonable to construe 'Pollution Incident' to include a sudden and accidental release of

previously spilled oil, provided the escape occurs at a different time and emanates from an operation conducted on land." *Id.* at *19. The court also held:

> [n]othing in the definition "Pollution Incident" makes the language reasonably susceptible only to Mid-Continent's interpretation, which would mean that pollutants can emanate only once from operations conducted on land. Because the relevant portions of the Oil & Gas Endorsement are susceptible to more than one reasonable meaning, the court adopts Sundown's construction. A sudden and accidental escape of a previously-escaped pollutant is covered as a separate "Pollution Incident," provided that such escape occurs at a different time, has a sudden and accidental cause, and emanates from an operation conducted on land.

*Id.* at *20. The court denied summary judgment for both parties on the question whether Sundown qualified for an additional $1 million in coverage under the Primary Policy due to Hurricane Rita. *Id.* Specifically, the court held that there was a genuine issue of material fact whether Hurricane Rita caused an escape of crude oil from "operations conducted on land" when it caused an escape of crude oil previously contained within the boom. *Id.*

B

In deciding Sundown's motion for judgment as a matter of law, the court begins by explaining the difficult burden that Sundown must satisfy. In a typical motion for judgment as a matter of law, the moving party asks the court to enter judgment on an issue for which the moving party *does not bear* the burden of proof at trial

(e.g., Mid-Continent's motion for judgment as a matter of law). "Usually judgment as a matter of law is sought under Federal Rule 50 against the party asserting a claim and amounts to a determination that the claimant has failed to discharge the burden of proof imposed by the law for establishing that claim." 9B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2535, at 526 (3d ed. 2008). The court should enter judgment as a matter of law where there was legally insufficient evidence to support the jury's finding against the moving party. This is the standard because the *nonmoving* party has the burden of proof and is therefore required to adduce evidence in support of its claim.

The present case, however, does not involve the typical motion for judgment as a matter of law. The party seeking this relief (Sundown) had the burden of proof at trial on its breach of contract counterclaim. "[C]ourts often caution that granting a judgment as a matter of law for the party bearing the burden of proof is reserved for extreme cases." *Id.* at 526-27; *accord Jefferson Amusement Co. v. Lincoln Nat'l Life Ins. Co.*, 409 F.2d 644, 651 (5th Cir. 1969) ("Ordinarily, directed verdicts are sought and given in those instances where the party requesting the motion does not have a burden of proof involved in the question submitted."). "[I]t is an exceptional case wherein the party on whom rests the burden of proof is entitled to a directed verdict."

*Jefferson Amusement Co.*, 409 F.2d at 651. "A more stringent standard is imposed on a movant having the burden of proof." *Id.* (citation omitted). Accordingly, in deciding Sundown's motion, the question is not whether there is legally insufficient evidence to support the jury's finding that Sundown failed to prove that Mid-Continent breached the Primary Policy. Instead, the question is whether the evidence, construed in the light most favorable to Mid-Continent, was so overwhelmingly in favor of Sundown that no reasonable jury could have arrived at a verdict other than that Sundown proved its breach of contract counterclaim.

When the party who bears the burden of proof on an issue at trial moves for judgment as a matter of law, the court should grant the motion only when "the evidence to support the granting of the motion [is] so one-sided as to be of over-whelming effect." *Grey v. First Nat'l Bank*, 393 F.2d 371, 379 (5th Cir. 1968). Judgment should be entered in favor of the moving party only where "on the entire record construed in the light most favorable to the nonmoving party," the evidence is "so overwhelmingly in favor of the moving party that no reasonable jury could have arrived at the disputed verdict." *Long v. Shultz Cattle Co.*, 881 F.2d 129, 132 (5th Cir. 1989); *see also* 9B Wright & Miller, *supra*, § 2535 at 527-28 ("To the extent that the party with the burden of proof has established the elements of its case by testimony that the jury is not at liberty to disbelieve . . . judgment as a matter of law in

that party's favor may be granted on that party's motion.").

Moreover, "[t]he standard for granting summary judgment mirrors the standard for a directed verdict under [Rule 50(a)]." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks and citation omitted); *accord Armstrong v. City of Dallas*, 997 F.2d 62, 66 (5th Cir. 1993) ("A motion for summary judgment poses essentially the same legal inquiry as a motion for judgment as a matter of law[.]"). And a party moving for summary judgment on claims for which it will bear the burden of proof at trial "'must establish beyond peradventure all of the essential elements of the claim[.]'" *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 749 F.Supp.2d 486, 494 (N.D. Tex. 2010) (Fitzwater, C.J.) (quoting *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.)). "Th[is] court has noted that the beyond peradventure standard is heavy." *Id.* (internal quotation marks and citation omitted).

Sundown was obligated at trial to prove by a preponderance of the evidence that a valid contract existed, that Mid-Continent breached the contract, and that Sundown suffered damages as a result of the breach. *See* Charge at 9. Accordingly, to succeed on its motion for judgment as a matter or law, Sundown must establish all three elements of its breach of contract claim beyond peradventure. Construing the entire record in the light most

favorable to Mid-Continent, the evidence must be so overwhelmingly in favor of Sundown that no reasonable jury could have arrived at a verdict other than that Sundown proved its Hurricane Rita breach of contract counterclaim.

C

The court considers first whether Sundown has met this heavy burden with respect to the requirement that it prove that Mid-Continent breached the contract.

Mid-Continent argues that a reasonable jury could have found that Mid-Continent did not breach the Primary Policy by finding that Sundown failed to present evidence of the amount of costs it incurred for Hurricane Rita cleanup; finding that, following an investigation, Mid-Continent could not determine any cleanup costs attributable to Hurricane Rita; finding that Sundown had no "clean-up costs," as defined in the Primary Policy; finding that the alleged release caused by Hurricane Rita was not "sudden" or was not "accidental," as required by the definition of "Pollution Incident"; finding that there was no "emission, discharge, release or escape of pollutants," as required by the definition of "Pollution Incident," due to Hurricane Rita; finding that there was no release "into or upon the land," as required by the definition of "Pollution Incident"; finding that there was no release "into . . . any course or body of water," as required by the definition of "Pollution Incident"; finding that there was no release "from

operations conducted on land," as required by the definition of "Pollution Incident"; finding that there was no release that resulted in "Property Damage"; finding that the entirety of any release was one "Pollution Incident"; and/or finding that Sundown presented no evidence of a government mandate, as required by the definition of "Pollution Incident." P. JMOL Resp. 2-3. These grounds fall into three general categories: first, there was insufficient evidence of the Hurricane Rita cleanup costs; second, the definition of "Pollution Incident" was not met as to Hurricane Rita; and, third, there was no "Property Damage" from Hurricane Rita.

D

1

The court holds that Sundown did not adduce evidence that was so one-sided as to be of overwhelming effect such that a reasonable jury could only have found that Mid-Continent breached the Primary Policy. For example, Sundown did not present overwhelming evidence from which a reasonable jury could only have found that Sundown incurred cleanup costs due to Hurricane Rita.

Mid-Continent contends that Sundown did not present evidence of the amount of costs incurred for Hurricane Rita cleanup; following an investigation, Mid-Continent could not find any cleanup costs attributable to Hurricane Rita; and Sundown had no "clean-up costs" as defined in the Primary Policy. These grounds

are substantially the same and argue that Sundown did not allege, and Mid-Continent did not find through its investigation, any cleanup costs incurred due to Hurricane Rita.

The Oil & Gas Endorsement provides that "'Property Damage' resulting from a 'Pollution Incident' includes mandated 'clean-up costs' caused by a 'Pollution Incident[.]'" *See* P. May 19, 2008 App. 18. "Property Damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property[,]" and "[l]oss of use of tangible property that is not physically injured." *Id.* at 33. "Clean-up costs" are "expenses for the removal or neutralization of contaminants, irritants or pollutants." *Id.* at 19.

Sundown maintains that, "[e]ven though Sundown was never able to pinpoint the upper limit of cleanup attributable to Hurricane Rita, it is uncontested that there were some cleanup costs caused by Hurricane Rita—and that these amounts were substantial." Ds. JMOL Br. 9. Sundown contends that bills sent by McGuire to Haltom on July 12, 2006 reflect standby charges, substantial site assessment charges, and response charges due to Hurricane Rita. Sundown points to bills submitted by ES&H Training and Consulting Group ("ES&H"), Sundown's cleanup contractor, for, *inter alia*, "Standby 9/24/05," "Site Assessment 9/26/05," "Response 9/27/05," "Response 9/28/05," "Delivery 9/28/05," and "Response 9/29/05." Ds. JMOL App. 21, 33.

Hurricane Rita made landfall on September 24, 2005. The majority of the bills in this exhibit are dated *before* Hurricane Rita made landfall, and the only mention of Hurricane Rita is in the headings of some bills marked "Standby——Hurricane Rita Evacuation." *See, e.g.,* Ds. JMOL App. 34. In an October 6, 2005 letter from ES&H to Sundown, ES&H noted that from September 26, 2005 to October 2, 2005, "our active remedial operations were impacted by the passage of Hurricane Rita which caused additional flooding on HWY 23 that limited access to the West Potash Site." *Id.* at 41. Sundown also points to an invoice dated September 21, 2005 that states, "[p]ersonnel worked to demobilize the site in preparation for Hurricane Rita[,]" *id.* at 77, and invoices dated September 23-25, 2005 that read, "[e]quipment and personnel demobilized due to Hurricane Rita[,]" *id.* at 81-86.

But Sundown points to no evidence that, construed in the light most favorable to Mid-Continent, would have *required* a reasonable jury to have found that Sundown incurred *cleanup costs* due to Hurricane Rita. Although Sundown cites bills it received for cleanup after Hurricane Rita, the bills indicate only that the *Hurricane Katrina* cleanup was put on hold and was more costly due to Hurricane Rita, as evidenced by the standby costs. Sundown points to no *cleanup costs* incurred due to Hurricane Rita. In other words, the bills Sundown points to list *cleanup* costs due to Hurricane Katrina and *standby* and *evacuation* costs due, at least in

- 130 -

part, to Hurricane Rita, but do not list *cleanup* costs due to Hurricane Rita. This evidence, again viewed favorably to Mid-Continent and considering Sundown's heavy burden, would not have *required* a reasonable jury to have found that these costs incurred after Hurricane Rita were cleanup costs due, in part or in whole, to Hurricane Rita. Hilton also testified that there were additional cleanup operations after Hurricane Rita and that he "just kn[e]w additional time was required to continue and clean up after Hurricane Rita." Tr. 5B:8. Sundown stated in a letter to Mid-Continent: "[w]e also know that while the clean up of the impact of Hurricane Katrina was in its early stages at the time Hurricane Rita made landfall, all costs incurred after September 24, 2006, are attributable to the clean up of the impact of both Hurricanes Katrina and Rita." P. JMOL Resp. App. 46.

Corley, formerly of Mid-Continent, testified that he did not find any evidence to support Sundown's claim for $1 million in coverage due to Hurricane Rita cleanup costs. *See* Tr. 8A:95. Hilton averred that Sundown made no attempt to segregate or separate any cleanup costs attributable to Hurricane Rita from cleanup costs attributable to Hurricane Katrina. Tr. 5B:21-22.[46]

---

[46]Although Hilton testified that Sundown did not attempt to separate "clean-up costs attributable to Rita as opposed to clean-up costs attributable to Hurricane Rita," Tr. 5B:21, the court assumes that Hilton misspoke and that he meant to say that Sundown did not attempt to separate costs associated with Hurricane Rita from costs associated with Hurricane *Katrina*.

In its submittal to Mid-Continent, Sundown stated, "[a]t this time, we have not been able to determine the amount of the clean up specifically allocable to Hurricane Rita." Tr. 9B:18; P. JMOL Resp. App. 46. Likewise, Sundown did not present evidence at trial of cleanup costs attributable to Hurricane Rita.

Sundown has failed to demonstrate that, construing the entire record in the light most favorable to Mid-Continent, the evidence was so overwhelmingly in favor of Sundown that no reasonable jury could have arrived at a verdict other than that Sundown proved its breach of contract counterclaim. Although Sundown repeatedly stated its belief that the cleanup costs incurred after Hurricane Rita were due at least in part to Hurricane Rita, a reasonable jury could have found otherwise.

2

Mid-Continent also maintains that the jury could reasonably have found that Hurricane Rita did not cause a release that caused property damage.

The Primary Policy provided coverage for "Bodily Injury" or "Property Damage" arising out of a "Pollution Incident." P. May 19, 2008 App. 18. "'Property Damage' resulting from a 'Pollution Incident' includes mandated 'clean-up costs' caused by a 'Pollution Incident.'" *Id.* "Property Damage" includes "[p]hysical injury to tangible property[.]" *Id.* at 33.

The court holds above that Sundown has failed to demonstrate

that, construing the entire record in the light most favorable to Mid-Continent, the evidence was so overwhelmingly in favor of Sundown that no reasonable jury could have arrived at a verdict other than that Sundown proved that it incurred *cleanup costs* from Hurricane Rita. For the same reasons, Sundown has not established that the evidence is so overwhelmingly one-sided such that a reasonable jury could only have found that Hurricane Rita caused "Property Damage." A reasonable jury could have found that Hurricane Rita did not cause "Property Damage" because it did not cause cleanup costs or physical injury to tangible property.[47]

E

Assuming *arguendo* that Sundown can meet its heavy burden regarding the breach of contract element, the court next addresses whether, construing the evidence in the light most favorable to Mid-Continent, the evidence was so overwhelmingly in favor of Sundown that a reasonable jury could only have found that Sundown suffered damages as a result of Mid-Continent's breach.

Sundown vigorously argues that Mid-Continent misled the jury by pressing at trial the theme that Sundown was not damaged because Mid-Continent paid Sundown $6 million and Sundown incurred only $5.7 million in total cleanup costs, whether for Hurricane Katrina alone or for both Hurricanes Katrina and Rita. Sundown contends

---

[47]Although Mid-Continent offers other arguments that support denying Sundown's motion, the court need not address them.

that the most likely explanation for the jury's adverse finding on the breach of contract counterclaim is Mid-Continent's argument that, regardless of the origin of or reason for the $6 million payment, Sundown was fully compensated for its total cleanup costs of $5.7 million. Sundown also maintains that the jury found for Mid-Continent because court did not allow Sundown's expert to explain Mid-Continent's improper manipulation of policy limits. Sundown posits that whether Mid-Continent was entitled to tender its Primary Policy and Umbrella Policy limits is irrelevant to Mid-Continent's obligation to pay for the Hurricane Rita claim. In short, Sundown reasons that Mid-Continent misled the jury to think that Mid-Continent had overpaid Sundown, and thus that Sundown was not injured.

Even if the court credits Sundown's argument, Sundown has not met its heavy burden. Construing the entire record in the light most favorable to Mid-Continent, the evidence must be so overwhelmingly in favor of Sundown that a reasonable jury could only have found that Sundown suffered damages caused by Mid-Continent's failure to pay for some of the cleanup costs under the Primary Policy as a second occurrence due to Hurricane Rita.

For the reasons discussed *supra* at § IX(D), the court holds that a reasonable jury could have found that Sundown was not

damaged by a breach of the Primary Policy.[48]  Construing the entire

---

[48]Sundown maintains that Mid-Continent was obligated at trial to distinguish between cleanup costs caused by Hurricane Katrina and by Hurricane Rita.  It objected to the court's refusal to instruct the jury as follows:

> Sundown need not allocate the damages caused purely by Hurricane Rita with mathematical precision.  Once an insured (here, Sundown) demonstrates that a loss is covered by the insurance policy, the obligation of determining the extent of the loss lies with the insurance company (here, Mid-Continent). Further, the insurance company (here Mid-Continent) bears the burden of allocating losses between two occurrences if both are covered.

Ds. (August 2, 2010) Proposed Jury Charge 6 (footnotes and citations omitted).  Sundown made a similar argument during the hearing on the post-judgment motions.  But the cases Sundown cites do not hold that an insurance company bears the burden of allocating losses between two covered occurrences; in fact, they do not appear to resolve that question.  Instead, these cases establish that the *insured* bears the burden at trial of proving which claims are covered.

Courts impose the same burdens in insurance cases and general breach of contract cases.  It is the plaintiff's burden, even a plaintiff who is also the insured, to establish the existence of a contract, a breach of the contract, and damages.  *See, e.g., Stroman v. Fid. & Cas. of N.Y.*, 792 S.W.2d 257, 261 (Tex. App. 1990, writ denied).  Sundown therefore had the burden at trial of proving that it suffered damages from Mid-Continent's failure to pay a Hurricane Rita claim separately.

Sundown's burden of proof on its breach of contract counterclaim is different and unrelated to Mid-Continent's general duty as the insurer to determine the amount of loss.  For example, if Sundown argued that Mid-Continent breached the contract by neglecting its duty to investigate a claim, Sundown would have to prove its breach of contract counterclaim in full, and would likely offer proof that Mid-Continent failed to investigate even though it had the duty to do so.  Sundown would also likely offer proof of the damage it suffered, i.e., what Mid-Continent would have found had it investigated.  If Mid-Continent offered no evidence regarding Sundown's breach of contract counterclaim, Sundown would still be obligated to prove the claim.  Sundown would therefore be

record in the light most favorable to Mid-Continent, Sundown has not shown that the evidence was so overwhelmingly in favor of Sundown that a reasonable jury could only have found that Sundown was damaged by Mid-Continent's failure to pay cleanup costs under the Primary Policy as a second occurrence due to Hurricane Rita.[49]

F

Accordingly, construing the entire record in the light most favorable to Mid-Continent, the court holds that Sundown has failed to show that the evidence was so overwhelmingly in favor of Sundown that no reasonable jury could have arrived at a verdict other than that Sundown proved its breach of contract counterclaim. The court therefore denies Sundown's motion for judgment as a matter of law.

X

Mid-Continent moves to alter or amend the judgment, contending the court should grant this relief to correct a clear error of law or prevent manifest injustice. Mid-Continent maintains that the court erred by awarding duplicative damages to Sundown.

_____

required to prove that Mid-Continent caused it damages. After Sundown established that it was damaged, a jury would determine the amount of damages.

[49]If Sundown had met this heavy burden, a new trial would be required to decide the amount of damages for breach of contract. In response to the court's questions during the hearing on the post-judgment motions, Sundown suggested that the court should award $1 million for Hurricane Rita costs. But even if the jury had found in favor of Sundown on this counterclaim, it could have allocated much less than $1 million to Hurricane Rita cleanup costs. This is not a question that the court can decide on the present record, without a new trial and a determination by a jury.

The jury awarded Sundown $1.75 million in additional damages based on its finding that Mid-Continent knowingly failed to promptly provide Sundown with a reasonable explanation, in relation to the facts or applicable law, for the Leopold offer, i.e., that it knowingly committed an unfair settlement practice. The jury awarded Sundown $4.7 million in punitive damages based on its finding that when Mid-Continent breached the duty of good faith and fair dealing, it acted fraudulently, maliciously, or with gross negligence. Mid-Continent argues that Sundown is not entitled to both awards because they are predicated on one finding of actual damages——the increased cost of the *Blanchard* settlement——and would amount to an impermissible double recovery.

Because the court has eliminated both recoveries by granting judgment as a matter of law in Mid-Continent's favor, Mid-Continent's motion to alter or amend the judgment is denied without prejudice as moot.

XI

Mid-Continent moves for an award of attorney's fees related to the prosecution of its declaratory judgment action against Sundown and to its defense of Sundown's counterclaims as they relate to Sundown's argument that it could place its claim "in abeyance."

A

In *Mid-Continent I* the court held that "there was no basis for Sundown to place its claim in abeyance[.]" *Mid-Continent I*, 2009

WL 3074618, at *12. Mid-Continent argues that although the Declaratory Judgment Act, 28 U.S.C. § 2202, does not plainly grant a successful litigant a right to recover attorney's fees, such fees are appropriate where the opponent conducted the action in bad faith, vexatiously, or with wantonness or oppression. Mid-Continent maintains that, under the court's inherent power, it can order Sundown to pay Mid-Continent's attorney's fees incurred due to Sundown's abeyance theory, which Mid-Continent says Sundown asserted in bad faith. Mid-Continent relies on the court's conclusions in *Mid-Continent I* that "there is no statutory or common law predicate for a right of abeyance" and that "the concept of abeyance directly conflicts with Mid-Continent's rights under the Primary Policy." *Mid-Continent I*, 2009 WL 3074618, at *9.

B

"Attorney's fees are appropriate under § 2202 in 'cases of bad faith, vexation, wantonness, or oppression relating to the filing or maintenance of the action.'" *Allstate Ins. Co. v. Mader*, 201 Fed. Appx. 261, 264 (5th Cir. 2006) (per curiam) (quoting *Mercantile Nat'l Bank v. Bradford Trust Co.*, 850 F.2d 215, 218 (5th Cir. 1988)). "Federal courts also have a limited, inherent power to impose sanctions against a vexatious litigant." *Estate of Merkel v. United States*, 2009 WL 2002902, at *4 (N.D. Tex. July 9, 2009) (Fitzwater, C.J.) (citing *Newby v. Enron Corp.*, 302 F.3d 295, 302 (5th Cir. 2002)). "The Supreme Court has held that 'a court

may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Id.* (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991)). But "[t]he imposition of sanctions using the court's inherent power should be reserved for situations in which the court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled.'" *Id.* (quoting *Chambers*, 501 U.S. at 46).

Mid-Continent has failed to demonstrate that Sundown has practiced a fraud upon this court or defiled the very temple of justice, or that it has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. Mid-Continent's demand for attorney's fees is based entirely on Sundown's pursuit of a theory that the court has held is unsupported under existing law (i.e., that an insured can place a claim in abeyance). Sundown did not act in bad faith simply by presenting a novel theory of law. "[S]anctioning a party for presenting an issue of first impression would not be permissible, as it would unduly chill advocacy." *Macklin v. City of New Orleans*, 300 F.3d 552, 554 (5th Cir. 2002) (citing *Estiverne v. Sak's Fifth Ave.*, 9 F.3d 1171, 1174 (5th Cir. 1993) (per curiam)). Moreover, the court should not "deter any litigant from advancing any claim or defense which is arguably supported by existing law, or any reasonably based suggestion for its extension, modification, or reversal . . . although they may be unsuccessful[.]" *Farguson v. MBank Hous., N.A.*, 808 F.2d 358, 359

(5th Cir. 1986).

The court therefore declines to award Mid-Continent attorney's fees based on Sundown's assertion of the abeyance theory, whether with respect to Mid-Continent's declaratory judgment action against Sundown or to its defense of Sundown's counterclaims as they relate to Sundown's argument that it could place its cleanup claim "in abeyance." Mid-Continent's motion for attorney's fees is denied.

\* \* \*

For the reasons explained, the court grants Mid-Continent's September 28, 2010 renewed motion for judgment as a matter of law, and it denies Sundown's September 28, 2010 renewed motion for judgment as a matter of law. The court conditionally denies Mid-Continent's September 28, 2010 alternative motion for a new trial on Sundown's breach of the duty of good faith and fair dealing counterclaim and conditionally grants the motion on all other grounds. The court denies Mid-Continent's September 14, 2010 motion for attorney's fees, and it denies Sundown's September 14, 2010 motion for attorney's fees.[50] Finally, the court denies without prejudice as moot Mid-Continent's September 28, 2010 motion

---

[50]Sundown's motion for attorney's fees is denied in light of the judgment being entered today in favor of Mid-Continent.

to alter or amend the judgment.  The court is today entering an amended judgment consistent with these rulings.

**SO ORDERED.**

June 14, 2011.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE